UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PAUL R. CROFT,<br>    *Plaintiff,*<br><br>v.<br><br>NATIONAL BEDDING COMPANY D/B/A<br>SERTA MATTRESS COMPANY,<br>    *Defendant.* | )<br>)<br>)<br>)<br>)  CIVIL ACTION NO. 04CV-11487-RWZ<br>)<br>)<br>)<br>) |

### AFFIDAVIT OF NANCY A. NEWARK IN SUPPORT OF PLAINTIFF'S OPPOSITON TO DEFENDANT'S MOTION FOR LEAVE TO FILE AMENDED ANSWER TO PLAINTIFF'S COMPLAINT

Nancy A. Newark, being duly sworn, depose and state as follows:

1) I am a member in good standing of the bar of the Commonwealth of Massachusetts and have been since 1997. I am also admitted to practice and have been in good standing since my admission before the United States District Court for the District of Massachusetts (admitted 1998) and the United States Court of Appeals for the First Circuit (admitted 1999).

2) I am an associate in the firm of Burns & Levinson LLP ("B&L") and have been since June 2001 and am an attorney of record for Plaintiff Paul R. Croft.

3) Attached hereto as Exhibit A is a true and accurate copy of <u>Espinosa v. Sisters of the Providence Health Care Sys.</u>, Civil Action 03-30259-MAP, 2005 U.S. Dist. LEXIS 4444, at *5 (D. Mass. 2005).

4) Attached hereto as Exhibit B are true and accurate copies of Deposition of Robert Sherman pp. 14, 15, 65, 66, 131 and 139.

5)   Attached hereto as Exhibit C is a true and accurate copy of <u>Luke Bros. v. Krusell</u>,

Civil Action No. 94-11701-MWL, 1996 U.S. Dist. LEXIS 1344 (D. Mass. 1996).

6)   Attached hereto as Exhibit D is a true and accurate copy of <u>States Res. Corp. v.</u>

<u>Capizzi</u>, Civil Action No. 04-10095-DPW, 2005 U.S. Dist. LEXIS 956, at *58 (D.

Mass. 2005).

*Nancy A. Newark*

Nancy A. Newark

Dated:  April 7, 2005



1 of 1 DOCUMENT

**WALESKA ESPINOSA and DAVID L. TERRON, Plaintiffs v. SISTERS OF PROVIDENCE HEALTH SYSTEM, AMANDA (a/k/a AMY) MITCHELL, LISA MADRU and KERRY WALSH, Defendants**

Civil Action No. 03-30259-MAP

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

*2005 U.S. Dist. LEXIS 4444*

March 18, 2005, Decided

**DISPOSITION:** Motion to file amended answers was allowed in part.

**LexisNexis(R) Headnotes**

**COUNSEL:** [*1] For David L. Terron, Plaintiff: Anne S. Diebold, Law Office of Michael O. Shea, Wilbraham, MA.

For Kerry Walsh, Defendant: John E. Garber, Weinberg & Garber, P.C., Northampton, MA.

For David L. Terron, Plaintiff: Michael O. Shea, Law Office of Michael O. Shea, Wilbraham, MA.

For Providence Hospital, Inc., Defendant: Guy P. Tully, Jackson Lewis LLP, Boston, MA.

**JUDGES:** KENNETH P. NEIMAN, U.S. Magistrate Judge.

**OPINIONBY:** KENNETH P. NEIMAN

**OPINION:**

MEMORANDUM AND ORDER WITH REGARD TO DEFENDANTS' MOTION TO FILE AMENDED ANSWERS (Document No. 58)

NEIMAN, U.S. M.J.

Presently before the court is a motion to amend each answer of the four defendants, Sisters of Providence Health System ("SPHS") and three of its employees, Amanda Mitchell ("Mitchell"), Lisa Madru ("Madru") and Kerry Walsh ("Walsh") (together "Defendants"). The amended answers, if permitted, would add a number of affirmative defenses, including defenses under *Mass. Gen. L. ch. 231, § 85K ("section 85K")*, which relates to charitable immunity caps on damages. Waleska Espinosa ("Espinosa") and David Terron ("Terron") (together "Plaintiffs") oppose the motion. For the reasons which follow, the [*2] court will allow the motion, but in part only.

I. BACKGROUND

This employment discrimination action was filed in October of 2003. Plaintiffs allege that Defendants subjected Espinosa to a hostile work environment which led to her constructive discharge and are, thus, liable for sexual harassment, retaliation, and discrimination based on gender, ethnicity, race, color, national origin and ancestry.

The complaint contains ten counts: Counts I and II allege violations of Title VII of the Civil Rights Act of 1964, *42 U.S.C. § 2000e et seq.* ("Title VII"); Counts III through IX allege violations of *Massachusetts' employment discrimination statute, Mass. Gen. L. ch. 151B ("chapter 151B")*; and, in Count X, Espinosa's husband, Terron, alleges that Defendants are liable for his loss of consortium. According to the existing schedule, counsel are to appear for a case management conference on April 4, 2005.

II. DISCUSSION

Defendants' motion is a bit cryptic. For starters, it does not adequately describe the amendments Defendants seek, leaving it to the court to compare the

proposed answers to those originally filed. In addition, the motion provides little [*3] explanation as to why Defendants seek amendments at this late date.

Having compared the existing answers to those now proposed, it appears that SPHS and Madru want to add two affirmative defenses each to the panoply of defenses previously asserted. In essence, SPHS and Madru seek to assert that Plaintiffs' claims are barred in whole or in part by *section 85K* which caps at $ 20,000 liability for "any cause of action based on tort" against charities. For their part, Mitchell and Walsh not only want to add affirmative defenses grounded in that statute, but another nine affirmative defenses as well. These nine additional defenses reflect defenses already raised by SPHS and Madru in their original answers to Plaintiffs' first amended complaint.

As indicated, Defendants provide little by way of explanation as to why they waited to seek these amendments. SPHS and Madru's original answers were filed, respectively, on March 18 and May 11, 2004. Mitchell's answer was filed on June 14, 2004, and Walsh's on July 16, 2004. At best, Defendants explain that, when they filed their original answers, Mitchell and Walsh were not represented by their present counsel, who is also counsel for SPHS and [*4] Madru. This explanation, however, only justifies the motion to amend insofar as it seeks to make consistent Mitchell and Walsh's affirmative defenses with those originally asserted by SPHS and Madru. In effect, Defendants argue that Plaintiffs were well aware of these particular defenses and their addition to Mitchell and Walsh's answers would not unduly prejudice Plaintiffs. The court agrees and, accordingly, will allow Defendants' motion insofar as it seeks to add to Mitchell and Walsh's answers the nine additional affirmative defenses which had been asserted previously by SPHS and Madru.

However, Defendants' attempt to add to their answers the affirmative defenses grounded in *section 85K* is quite another matter. For one thing, it is a bit disingenuous for Defendants to argue, broadly, that "the additional affirmative defenses asserted on behalf of . . . Mitchell and Walsh have already been asserted on behalf of . . . SPHS and Madru." This may be true of the nine other defenses, but it is certainly not true of the charitable cap defenses. In fact, SPHS and Madru also want to add these charitable cap defenses for the first time through the present motion.

*Rule 15(a) of the Federal Rules of Civil Procedure* [*5] provides that leave to amend "shall be freely given when justice so requires." And, as the United States Supreme Court has stated, the liberal amendment policy of *Rule 15(a)* is a mandate to be heeded. *Foman v. Davis, 371 U.S. 178, 182, 9 L. Ed. 2d 222, 83 S. Ct. 227 (1962).*

Even so, an amendment need not be granted in the face of "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." *Id. at 182.* Here, in the court's estimation, Defendants' motion to add these charitable immunity defenses comes too late under *Rule 15(a)* and would unduly prejudice Plaintiffs at this point in time.

First, however, the court needs to address Plaintiffs' argument that the proposed *section 85K* amendments would be futile. The court agrees, at least with respect to Plaintiffs' claims under *chapter 151B* (Counts III through IX). The Supreme Judicial Court recently made crystal clear that *section 85K* "does not apply to damages awarded pursuant to a successful claim of retaliation under G.L. c. 151B." *Ayash v. Dana-Farber Cancer Inst, 2005 Mass. LEXIS 14 (Mass. 2005).* [*6] In so holding, the SJC cited with approval the First Circuit's more general holding in *McMillan v. Massachusetts Soc'y for the Prevention of Cruelty to Animals, 140 F.3d 288, 307 (1st Cir. 1998),* that *section 85K* does not limit damages awarded under *chapter 151B.* "The First Circuit concluded," the SJC explained, "that *G.L. c. 151B* . . . created rights that did not exist under the common law and, thus, claims under *G.L. c. 151B* were not to be considered 'torts' for purposes of § *85K*." *Ayash, 2005 Mass. LEXIS 14, at 45.*

It is an open question, however, whether Plaintiffs' Title VII claims should also be considered causes of action "based on tort" and, thus, subject to *section 85K*'s damage cap. Neither *Ayash* nor *McMillan* address Title VII, the parties have not briefed the issue, and the court's own research has uncovered no reported case discussing *section 85K*'s applicability to Title VII. n1 Nor have the parties addressed whether *section 85K* might apply to Terron's loss of consortium claim, although Defendants seem most intent on having their *section 85K* defense apply to this claim. Even though the claim is arguably derivative of Espinosa's employment [*7] discrimination claims, this court would likely treat the loss of consortium claim as a "tort" falling within *section 85K*'s scope. *See Barranco v. Milford Housing Auth., 408 Mass. 502, 562 N.E.2d 74, 74 (Mass. 1990)* (describing loss of consortium claims as "necessarily . . . grounded in tort"). But these issues, interesting as they may be, need not be decided for present purposes, because Defendants' attempt to add the *section 85K* defenses, in the court's view, is too late and unduly prejudicial under *Rule 15(a).*

n1 Title VII and *Chapter 151B* are "generally aligned." *Fite v. Digital Equip. Corp., 232 F.3d*

*3, 7 (1st Cir. 2000)*. Moreover, Title VII has historically been viewed as contract-based as opposed to tort-based. *See United States v. Burke, 504 U.S. 229, 119 L. Ed. 2d 34, 112 S. Ct. 1867 (1992)*. See also Paul T. O'Neill, *Charitable Immunity: The Time to End Laissez-Faire Health Care in Massachusetts Has Come, 82 Mass. L. Rev. 225, 231 (Fall 1997)* (because *section 85K* applies "only to tort-based claims," one way to avoid the statute "is by characterizing a claim as contract-based"). According to the Supreme Court, however, the 1991 amendments to Title VII "signalled a marked change in [Congress'] conception of the injury redressable by Title VII," *Burke, 504 U.S. at 241 n.12*, such that federal courts are now willing to view Title VII actions as akin to "common law tort claims," *Abrams v. Lightolier, Inc., 50 F.3d 1204, 1220 (3rd Cir. 1995)*. See also *Drase v. United States, 866 F. Supp. 1077, 1079 n.1 (N.D. Ill. 1994)*.

[*8]

In so ruling, the court relies as well on *Rule 8(c)*, which provides that "any matter constituting an avoidance or affirmative defense" is generally deemed waived unless raised in an answer. n2 The rule "is designed to provide plaintiffs with adequate notice of a defendant's intention to litigate an affirmative defense, thereby affording an opportunity to develop any evidence and offer responsive arguments to the defense." *Davignon v. Clemmey, 322 F.3d 1, 15 (1st Cir. 2003)*. To be sure, there are certain exceptions to waiver when "(i) the defendant asserts [the defense] without undue delay and the plaintiff is not unfairly prejudiced by any delay, or (ii) the circumstances necessary to establish entitlement to the affirmative defense did not obtain at the time the answer was filed." *Id.* (citations omitted). Those exceptions, in the court's opinion, do not apply here.

n2 The court assumes, as evidently have the parties, that *section 85K* is a "defense" which falls within *Rule 8(c)*'s residuary clause insofar as it "shares the common characteristic of a bar to the right of recovery even if the general complaint were more or less admitted to." *Jakobsen v. Massachusetts Port Authority, 520 F.2d 810, 813 (1st Cir. 1975)*. But see *English v. New England Med. Ctr., Inc., 405 Mass. 423, 541 N.E.2d 329, 330 (Mass. 1989)* (addressing *section 85K* via post-trial motion without indicating if it was first raised as an affirmative defense).

[*9]

For one thing, there is little question, given all the facts, that significant time has passed since Defendants' counsel filed the first answer to Plaintiffs' complaint on behalf of SPHS. *See Quaker State Oil Refining Corp. v. Garrity Oil Co., 884 F.2d 1510, 1517 (1st Cir. 1989)* ("A party's belated attempt to revise its pleadings requires that a court examine the totality of the circumstances and exercise sound discretion in light of the pertinent balance of equitable considerations."). Although *Rule 15(a)* does not prescribe a particular time limit for a motion to amend, it is well established that such a motion "should be made as soon as the necessity for altering the pleading becomes apparent." 6A Charles Alan Wright, et al., *Federal Practice & Procedure* § 1488 (2003). Moreover, where "considerable time has elapsed between the filing of the complaint and the motion to amend," the movant has the burden of showing some valid reason for his neglect and delay." *Acosta-Mestre v. Hilton Int'l of Puerto Rico, Inc., 156 F.3d 49, 52 (1st Cir. 1998)*. See also *Rodriguez v. Doral Mortgage Corp., 57 F.3d 1168, 1178 n.1 (1st Cir. 1995)* (Rule 15(a) [*10] "frowns upon undue delay in the amendment of pleadings, particularly if no legitimate justification is forthcoming.") (citations omitted).

Defendants, however, barely offer any explanation for the delay. Aside from some conclusory allegations, Defendants assert only that "the defense or limitation of damages based on the charitable immunity cap . . . has been recognized as an important defense or limitation on damages." If true, the importance of the defense was well known to Defendants, particular SPHS and Madru, when their original answers were filed.

The fact that non-expert discovery is still open, as Defendants also argue, is of little moment. The only reason such discovery is still available was to accommodate the parties' request to mediate the matter. At first, non-expert discovery was scheduled to end on December 30, 2004. In late November, that date was extended to January 29, 2005, the parties having explained to the court that counsel for SPHS and Madru had undertaken the defense of Mitchell and Walsh as well. On January 24, 2005, the court again extended the date to complete non-expert discovery, this time to March 30, 2005, after the parties indicated that they [*11] wished to mediate the matter. Defendants filed their instant motion to amend nearly one month later.

Finally, the fact that the parties may have delayed certain depositions to accommodate mediation actually supports Plaintiffs' argument that they would be prejudiced by a late amendment. Although a trial is not imminent, there is little doubt that the proposed amendment would require Plaintiffs to undertake further discovery with respect to a defense the existence of which was not even hinted at in prior proceedings.

*Compare Boston Hides & Furs, Ltd. v. Sumitomo Bank, Ltd., 870 F. Supp. 1153, 1162 n.6 (D. Mass. 1994)* ("If the plaintiff receives notice of an affirmative defense other than through the pleadings, the defendants' failure to comply with *Fed. R. Civ. P. 8(c)* does not cause the plaintiff any prejudice."). Even a cursory reading of *section 85K* raises the specter of factual questions, for example, whether the alleged torts by Defendants were "committed in the course of a charitable purposes" or were "primarily commercial in character." In the end, therefore, the court has little choice but to deny Defendants' motion to [*12]  the extent it seeks the addition of the charity cap affirmative defenses.

   III. CONCLUSION

For the reasons stated, the court ALLOWS Defendants' motion insofar as it seeks to add the nine affirmative defenses to Mitchell and Walsh's answers, i.e., those defenses already asserted by SPHS and Madru, but otherwise DENIES the motion. Defendants shall forthwith file amended answers in accord herewith.

   IT IS SO ORDERED.

DATED: March 18, 2005

   KENNETH P. NEIMAN

   U.S. Magistrate Judge

Volume I
Pages 1 to 144
Exhibits (See Index)
UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
CIVIL ACTION NO. 04CV-11487-RWZ

PAUL R. CROFT,                                    )
  Plaintiff,                           )
                                                  )
  vs                                    )
                                                  )
NATIONAL BEDDING COMPANY d/b/a                    )
SERTA MATTRESS COMPANY,                           )
  Defendant.                            )

    **DEPOSITION OF ROBERT SHERMAN**, taken

pursuant to Notice under the Massachusetts Rules of

Civil Procedure on behalf of the Plaintiff, before

Linda M. Thomas, RMR, a Notary Public and Registered

Merit Reporter, in and for the Commonwealth of

Massachusetts at the offices of BURNS & LEVINSON LLP,

125 Summer Street, Boston, Massachusetts on January

14, 2005, commencing at 10:00 a.m.

LINDA M. THOMAS COURT REPORTING
Certified Shorthand Reporter No. 129293
Registered Merit Reporter
235 Winter Street
Walpole, Massachusetts    02081
(508) 668-5821
E-mail:  lthomascourtrep@comcast.net

1    me.

2         Q.   Well, are you aware of Paul Croft making any

3    claim that they did it for Jeremiah; therefore, they

4    should do it for him in this lawsuit?  Are you aware

5    of any such claim?

6         A.   Yes.

7         Q.   What is your understanding of the nature of

8    that claim?

9         A.   Referring to the 2/5 memo talking about the

10   bonus program and then producing a document that

11   showed that I paid Jeremiah, supposedly, based on that

12   formula a year later, I think definitely came into

13   play in this case.

14        Q.   Well, there would be nothing to prevent

15   Jeremiah from sharing his information about how his

16   bonus was calculated with anybody, would there?

17                  MR. KLEIN:  Objection.

18                  THE WITNESS:  No.  I don't believe that

19   he should be showing and sharing our P & L statements.

20   BY MS. STUDEN:

21        Q.   Do you have a company policy with regard to

22   how documents are handled?

23        A.   No.

24        Q.   Have you ever made a demand on a former

1    employee for the return of documents?

2        A.    No.

3        Q.    Have you ever sued an employee for the

4    failure to return company documents?

5        A.    No.

6        Q.    To the best of your recollection, did you

7    ever ask Paul Croft to return documents after he left?

8        A.    No.

9        Q.    Did you ever ask Jeremiah Reardon to return

10   documents?

11       A.    No.

12       Q.    Have you ever instructed anybody in your

13   employ not to take company documents home?

14       A.    No.

15       Q.    Are you aware that your employees do, in

16   fact, take company documents home?

17       A.    No.

18       Q.    Would it surprise you that your employees

19   take company documents home?

20       A.    No.

21       Q.    Now, how would Paul Croft having copies of

22   P & L statements after he left help him in his

23   lawsuit?

24                 MR. KLEIN:    Objection.

1      Q.    How many things did you exchange back and

2  forth?

3      A.    Don't know.

4      Q.    Well, let me show you what we marked as

5  Exhibit 17, and it is a document that reads at the

6  top, "Contract length through December 31st, 2004,"

7  and it has a fax date on it of February 5th, '01.  You

8  recall that document I am sure?

9      A.    From yesterday.

10     Q.    When was the first time you saw that

11  document?

12     A.    A month ago.

13     Q.    A month ago.  Now, that document originated

14  from your office, did it not?

15     A.    Are you talking about me, specifically?

16     Q.    Well, I'm talking about it coming from --

17     A.    It came from Serta.

18     Q.    Was there anybody else from Serta

19  negotiating with Paul Croft, or Jeremiah Reardon about

20  the terms of their employment in the latter part of

21  January, early part of February?

22     A.    No.

23     Q.    You were the only one, correct?

24     A.    Yes.

LINDA M. THOMAS COURT REPORTING

1       Q.   You have no idea who sent this to Paul

2  Croft?

3       A.   No.

4       Q.   And you say you never saw it before?

5       A.   I don't recall seeing it.

6       Q.   You don't recall seeing it.  So, the first

7  time you say you saw that was when it was produced in

8  connection with this litigation?

9            MR. KLEIN:  First time he recalls

10  seeing it.

11  BY MS. STUDEN:

12       Q.   Yes, the first time you recall seeing it.

13       A.   Yes.

14       Q.   Do you know who typed it?

15       A.   No.

16       Q.   Can you think of any other person who would

17  have sent it, other than yourself?

18       A.   No.

19       Q.   When you saw this document, what was your

20  reaction?

21       A.   My reaction was there was probably numerous

22  documents between us, and they picked out the one that

23  they thought would be best for them.

24       Q.   Now, did you go looking for the other

1      Q.    This is a note to Julie in Human Resources?

2      A.    Yes.

3      Q.    This says "Notify Jeremiah that effective

4    March 1 we would start the two-year clock for

5    severance." Do I gather from this memo that you had

6    already told him that he was no longer going to be

7    working for the company?

8      A.    Correct.

9      Q.    And, the two-year clock for severance is the

10    obligation that you had to Jeremiah under the contract

11    marked Exhibit 3, correct?

12      A.    Correct.

13      Q.    And, you believed that Jeremiah was entitled

14    to receive that contractual benefit, correct?

15      A.    Correct.

16      Q.    And, you also agreed that Paul Croft was

17    entitled to receive that contractual benefit?

18      A.    Correct.

19              MS. STUDEN:    Mark as the next Exhibit

20    a document dated December 19th, 2000, to Burt Kaplan

21    and Richard Yulman from Bob Sherman.

22

23              (Deposition Exhibit No. 40, the
               above-referred to Memo from Bob
24              Sherman to Burt Kaplan & Richard
               Yulman 12/19/00, was marked for

LINDA M. THOMAS COURT REPORTING

**143**

1    before, and he said "No." And you are referring to

2    the response to a request that he hasn't reviewed,

3    yet.

4             MS. STUDEN: He said "Yes."

5             MR. KLEIN: He understood that you

6    meant legal request. He is not a lawyer.

7             MS. STUDEN: Well, you were asking by

8    somebody -- strike that. I am going to take a short

9    break. I shall return.

10            **(Recess; 2:21 to 2:35 p.m.)**

11            MS. STUDEN: I actually have no further

12   questions. Do you wish to ask him anything?

13            MR. KLEIN: No.

14

15            (The deposition was concluded at 2:36 p.m.)

16

17

18

19

20

21

22

23

24

---

**142**

1    COMMONWEALTH OF MASSACHUSETTS
     COUNTY OF NORFOLK

2        I, LINDA M. THOMAS, Certified Shorthand Reporter

3    and Notary Public duly and qualified in and for the

4    COMMONWEALTH OF MASSACHUSETTS do hereby certify there

5    came before me the deponent herein, namely **ROBERT**

6    **SHERMAN**, who was by me duly sworn to testify to the

7    truth and nothing but the truth concerning the matters

8    in this cause.

9        I further certify that the foregoing transcript

10   is a true and correct transcript of my original

11   stenographic notes.

12       I further certify that I am neither attorney or

13   counsel for, nor related to or employed by any of the

14   parties to the action in which this deposition is

15   taken; and furthermore, that I am not a relative or

16   employee of any attorney or counsel employed by the

17   parties hereto or financially interested in the

18   action.

19       IN WITNESS WHEREOF, I have hereunto set my hand

20   and affixed my Notarial Seal this 27th day of January,

21   2005.

22       _____

         LINDA M. THOMAS, RPR, RMR

23       CSR No. 129293

         NOTARY PUBLIC

24       My Commission expires July 30, 2010.

---

**143**

1

2    PLEASE NOTE:

3        THE FOREGOING CERTIFICATION OF THIS

4    TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION OF THE
     SAME BY ANY MEANS UNLESS UNDER THE DIRECTION OF THE
     CERTIFYING REPORTER.

5             C-E-R-T-I-F-I-C-A-T-E

6

             I, ROBERT SHERMAN, do certify that

7    I have read the foregoing deposition and that, to the
     best of my knowledge, said deposition is true and

8    accurate.

9

10   ROBERT SHERMAN

11

12

13

14   Subscribed and sworn before me this 25 day of

15   Feb , 2005.

16

17   DATE 2/25/05

18            NOTARY PUBLIC

19

20

21   WITNESS SIGNATURE

22

23   My Commission expires: 9-5-2005

24

"OFFICIAL SEAL"
Teresa T. Ferrer
Notary Public, State of Illinois
My Commission Expires 9-5-2005

---

**144**

1             ERRATA SHEET

2

3

4        In accordance with the rules of procedure

5    governing depositions, you are entitled to read and

6    correct your deposition.

7             Accordingly, please carefully read your

8    deposition and, on this errata sheet, make any changes

9    or corrections in form or substance to your deposition

10   that you feel should be made. PLEASE DO NOT MARK THE

11   TRANSCRIPT.

12            After completing this procedure, sign at the

13   conclusion of such changes/corrections (if any) and

14   return it in accordance with your instructions.

15

16   PAGE LINE        CHANGE

17

18

19

20

21

22   SIGNATURE: _____ DATE: _____

23

24



RECYCLED

2 of 2 DOCUMENTS

**LUKE BROTHERS, INC. et al., Plaintiffs, v. STUART P. KRUSELL, et al., Defendants, and MASSACHUSETTS WHOLESALERS OF MALT BEVERAGES, INC., Intervenor-Defendant.**

**C.A. No. 94-11701-MLW**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS**

*1996 U.S. Dist. LEXIS 1344*

**January 30, 1996, Decided**

**LexisNexis(R) Headnotes**

**COUNSEL:** [*1] For SEA SHORE CORPORATION dba Canterbury Liquors & Pantry, Plaintiff: Alan L. Kovacs, [COR LD NTC], Gerald J. Caruso, [COR LD NTC], Ferriter, Scobbo, Sikora, Caruso & Rodophele, Boston, MA.

For PAMELA M. NOURSE, Individually and in her Official Capacities as a member of the Alcoholic Beverages Control Commission, MASSACHUSETTS ALCOHOLIC BEVERAGES CONTROL COMMISSION, Defendants: Jane L. Willoughby, [COR LD NTC], Attorney General's Office, Boston, MA.

For MASSACHUSETTS WHOLESALERS OF MALT BEVERAGES, Intervenor-Defendant: Eileen M. Fava, [COR LD NTC], LeBoeuf, Lamb, Greene & MacRae, Boston, MA.

**JUDGES:** Mark L. Wolf, UNITED STATES DISTRICT JUDGE

**OPINIONBY:** Mark L. Wolf

**OPINION:**

MEMORANDUM AND ORDER

WOLF, D.J.

January 30, 1996

Intervenor-defendant Massachusetts Wholesalers of Malt Beverages, Inc. ("Wholesalers") has filed a motion for reconsideration and reversal of Magistrate Judge Karol's June 23, 1995 order denying Wholesalers' motion to vacate the notices of dismissal of four plaintiffs and has filed a motion for reconsideration and reversal of Magistrate Judge Karol's June 23, 1995 order denying Wholesalers' motion to amend its answer to add a counterclaim. For the [*2] reasons stated below, Wholesalers' motions for reconsideration and reversal are DENIED.

I. Wholesaler's Motion to Vacate Plaintiffs' Notices of Dismissal.

On June 5, 1995, plaintiffs Luke Brothers, Inc., Cape Cod Package Store, Inc., Andy's Market, Inc., and Yankee Spirits, Inc., filed notices of dismissal pursuant to *Fed. R. Civ. P. 41(a)(1)*. As of that date, none of the original defendants had filed an answer to the plaintiffs' complaint. However, Wholesalers, which had intervened in this action, had filed an answer to the plaintiffs' complaint on September 20, 1994. n1 As a result of Wholesalers' previously filed answer, plaintiffs were not entitled to automatic dismissal pursuant to Rule 41(a)(1). n2 With this consideration apparently in mind, the Magistrate Judge properly treated the notices of dismissal as motions to dismiss (presumably under *Fed. R. Civ. P. 41(a)(2)*) and allowed them. See Margin Order, Wholesalers' Motion to Vacate Notices of Dismissal.

n1 Wholesalers' answer did not assert any counterclaims against the plaintiffs who are seeking dismissal.

n2 Rule 41(a)(1) allows a plaintiff to dismiss an action "at any time before service by the adverse party of an answer or of a motion for summary judgment, whichever first occurs..." Plaintiffs' argument that Wholesalers, as an intervenor, is not an "adverse party" is not persuasive. It is well-established that "unless conditions have been imposed, the intervenor is treated as if he were an original party and has equal standing with the original parties." 7C Wright & Miller, Federal Practice and Procedure § 1920, p. 488. See also *Alvarado v. J.C. Penney Co., Inc., 997 F.2d 803, 805 (10th Cir. 1993); Schneider v Dumbarton Developers, Inc., 247 U.S. App. D.C. 217, 767 F.2d 1007, 1017 (D.C.Cir. 1985).* This principle applies to the present case and makes Wholesalers an "adverse party" under Rule 41(a)(1).

[*3]

*Fed. R. Civ. P. 41(a)(2)* provides that "an action shall not be dismissed at the plaintiff's instance save upon order of the court and upon such terms and conditions as the court deems proper." Dismissal is generally proper "unless the defendant would suffer some plain legal prejudice other than the mere prospect of a second lawsuit." *Cone v. West Virginia Pulp & Paper Co., 330 U.S. 212, 217, 91 L. Ed. 849, 67 S. Ct. 752 (1947).* See also 9 Wright & Miller, Federal Practice and Procedure § 2364, p. 280.

In the present case, Wholesalers has failed to demonstrate the type of manifest prejudice that would bar dismissal of plaintiffs from this suit. To date, no dispositive motions have been filed in this case and, at the time plaintiffs' notices of dismissal were filed, Wholesalers had not asserted any counterclaims against the plaintiffs. Wholesalers argues, however, that it will be prejudiced by plaintiffs' dismissal because it will be unable to obtain discovery from the four dismissed plaintiffs which is necessary to defend itself against the claims of the remaining plaintiff. This argument is not persuasive.

As an initial matter, it is not evident why Wholesalers will [*4] need extensive discovery from the four plaintiffs who are seeking dismissal. Plaintiffs have been challenging the constitutionality of a Massachusetts statute which they claim violates the Sherman Antitrust Act, *15 U.S.C. § 1,* and is therefore void under the Supremacy Clause of the Constitution. Wholesalers has not presented an adequate explanation as to why

discovery from the four plaintiffs who are seeking dismissal is material to the resolution of this legal issue, particularly when one plaintiff remains in the suit. In addition, Wholesalers has consistently argued, inter alia, that plaintiffs have no standing to bring this suit. Any discovery on this question could evidently be provided by the remaining plaintiff, Sea Shore Corporation d/b/a Canterbury Liquors & Pantry.

Furthermore, even if Wholesalers has a substantial need for discovery from the four plaintiffs seeking dismissal, *Fed. R. Civ. P. 45(a)(1)(C)* provides a mechanism for obtaining such discovery from non-parties. Through the issuance of a subpoena, Wholesalers can "command each [non-party]...to attend and give testimony or to produce and permit inspection and copying of designated books, documents or tangible [*5] things in the possession, custody or control of that person..." The 1991 amendments to Rule 45 make it clear that "[a] subpoena may be issued to compel a nonparty to produce evidence independent of a deposition." 9A Wright & Miller, Federal Practice and Procedure § 2452, p. 21. Therefore, Rule 45 adequately addresses Wholesalers' purported need for discovery from the plaintiffs who seek dismissal.

II. Wholesalers' Motion to Amend its Answer to Add an Abuse of Process Counterclaim.

On June 6, 1995, Wholesalers filed a motion to amend its answer to add a counterclaim alleging abuse of process against all plaintiffs. Although *Fed. R. Civ. P. 15(a)* provides that leave to amend "shall be freely given when justice so requires," a court should not grant leave to amend where the proposed amendment "would be futile or would serve no legitimate purpose." *Correa-Martinez v. Arrillaga-Belendez, 903 F.2d 49, 59 (1st Cir. 1990).* Whether a claim would survive a motion to dismiss is a frequent touchstone used by courts to determine futility. See 6 Wright & Miller, Federal Practice & Procedure § 1487, p. 643.

In the present case, Wholesalers' abuse of process counterclaim [*6] could not survive a motion to dismiss. In their counterclaim, Wholesalers allege that "plaintiffs used their Complaint to accomplish an ulterior, illegitimate purpose"; namely, to seek "clemency from the ABCC from pending investigations" and "to obtain changes in the price posting regulations rather than invalidating them..." Wholesalers' Motion to Amend Answer.

For an abuse of process claim "to avoid dismissal under Rule 12(b)(6), a plaintiff must allege facts which are sufficient to support the propositions that (1) 'process' was used; (2) for an ulterior or illegitimate purpose; (3) resulting in damage." *Jones v. Brockton Public Markets,*

*Inc.*, 369 Mass. 387, 388, 340 N.E.2d 484 (1975). A recent decision by the Appeals Court of Massachusetts explains that "the word 'process' in the context of abuse of process means causing papers to issue by a court 'to bring a party or property within its jurisdiction.'" *Silvia v. Building Inspector of West Bridgewater, 35 Mass. App. Ct. 451, 454 n.4, 62. N.E.2d 686 (1993)* (quoting *Jones, 369 Mass. at 388* (emphasis added)). In the present case, the plaintiffs did not "cause" process to issue against Wholesalers. Wholesalers entered [*7] the litigation voluntarily by filing a motion to intervene. In *Cuddy v. Sweeney, 7 Mass. App. Ct. 880, 881, 386 N.E.2d 805 (1979)* the Massachusetts Appeals Court confronted a similar situation. In that case, plaintiff asserted abuse of process claims against several defendants on the basis of two lawsuits instituted by the defendants in 1967 and 1970. With regard to the first lawsuit, the court rejected plaintiff's abuse of process claim because plaintiff was never a party to that suit. "She, therefore, could not show under any set of facts that process issued against her..." *Id.* The court went on to say that "the same conclusions hold true for the 1970 lawsuit, since the record indicates that the present defendants did not institute that suit against the plaintiff; her participation in the action occurred by way of her own voluntary intervention." *Id* (emphasis added).

The foregoing analysis is equally applicable here. Wholesalers may argue that it felt compelled to intervene in order to protect its own interests. There is, however, no precedent in Massachusetts, or, evidently, elsewhere, for predicating an abuse of process claim on such circumstances. "'Abuse of process [*8] cases, like actions for malicious prosecution, are not to be favored and ought not to be encouraged.'" *Cohen v. Hurley, 20 Mass. App. Ct. 439, 443, 480 N.E.2d 658 (1985)* (quoting *Wingersky v. E.E. Gray Co., 254 Mass. 198, 201, 150 N.E. 164 (1926)).* Thus, this court would grant a motion to dismiss Wholesaler's counterclaim even if the departing plaintiff's remained in this case.

## III. ORDER

In view of the foregoing, it is hereby ORDERED that:

1. Wholesalers' motion for reconsideration and reversal of the Magistrate Judge's order allowing four of the plaintiffs to dismiss their claims (#59) is DENIED. Plaintiffs claims are dismissed without prejudice.

2. Wholesalers' motion for reconsideration and reversal of the Magistrate Judge's order denying Wholesalers motion for leave to amend its answer to add an abuse of process counterclaim (#57) is DENIED.

Mark L. Wolf

UNITED STATES DISTRICT JUDGE

D



1 of 2 DOCUMENTS

**STATES RESOURCES CORP., Plaintiff, v. MICHAEL CAPIZZI et al., Defendants.**

**CIVIL ACTION NO. 04-10095-DPW**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS**

*2005 U.S. Dist. LEXIS 956*

**January 20, 2005, Decided**

**PRIOR HISTORY:** *Capizzi v. States Res. Corp., 2005 U.S. Dist. LEXIS 738 (D. Mass., Jan. 20, 2005)*

**DISPOSITION:** Summary judgment motions granted, in favor of State Resources Corp. and against The Architechetural Team, Inc. and Michael and Catherine Capizzi; in favor of Kevin Duffy and against the Capizzis; and in favor of Garrett, Inc.

**LexisNexis(R) Headnotes**

**COUNSEL:** [*1] For State Resources Corp, Plaintiff: John A. Doonan, Doonan, Graves, Longoria, LLC, Beverly, MA; Reneau J. Longoria, Doonan, Graves & Longoria, LLC, Beverly, MA.

For Michael Capizzi, Defendant: Pro se, Concord, MA.

For Catherine R. Capizzi, Defendant: Pro se, Concord, MA.

For The Architechetural Team, Inc., Defendant: Jordan lewis Ring, Ring Law Firm, Boston, MA.

For Garrett, Inc., Defendant: Stephanie M. Williams, Law Offices of Carmen Frattaroli & Associates, Salem, MA.

For John Connolly, Jr., Defendant: Pro se, Law Offices of John Connolly, Jr., Wakefield, MA; Kevin P. Geaney, Law Office of John Connolly Jr., Wakefield, MA.

For Massachusetts Department of Revenue, Defendant.

For James Grumbach, Defendant.

For Kevin Duffy, Third Party Defendant: Joseph M. Connors, Jr., Law Office of Joseph M. Connors, Jr. Esq., Waltham, MA.

For Catherine R. Capizzi, Cross Defendant: Pro se, Lincoln, MA.

For The Architechetural Team, Inc., Counter Claimant: Jordan lewis Ring, Ring Law Firm, Boston, MA.

For State Resources Corp, Counter Defendant: Reneau J. Longoria, Doonan, Graves & Longoria, LLC, Beverly, MA.

For John Connolly, Jr., Cross [*2] Claimant.

For Catherine R. Capizzi, Cross Defendant: Pro se, Lincoln, MA.

For Michael Capizzi, Cross Defendant, Pro se, Lincoln, MA.

For Garrett, Inc., Counter Claimant: Carmen A. Frattaroli, Carmen A. Frattaroli & Associates, Salem, MA; Stephanie M. Williams, Law Offices of Carmen Frattaroli & Associates, Salem, MA.

For Michael Capizzi, Counter Defendant: Pro se, Lincoln, MA.

For Catherine R. Capizzi, Cross Claimant: Pro se, Lincoln, MA.

For Michael Capizzi, Cross Claimant: Pro se, Lincoln, MA.

**JUDGES:** DOUGLAS P. WOODLOCK, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** DOUGLAS P. WOODLOCK

**OPINION:**

### MEMORANDUM AND ORDER

This interpleader action is the fourth lawsuit to come before me regarding residential property located at 236 Lincoln Road, Lincoln, MA (the "Property"). Plaintiff States Resources Corporation ("SRC") commenced the instant case seeking a judicial determination regarding the proper apportionment of proceeds from the foreclosure sale it conducted of the Property on September 26, 2003. Defendants Michael Capizzi and Catherine Capizzi (collectively, the "Capizzis") -- the former owners and long-term residents of the Property who have filed no fewer than eight [*3] lawsuits in this court, various state courts, and the Bankruptcy Court to challenge the foreclosure by SRC and their subsequent eviction from the Property -- use the occasion to mount another challenge. They are now joined in this battle to contest the foreclosure auction by one of their creditors, The Architectural Team, Inc. ("TAT"). For the reasons set forth below, however, their renewed efforts do not meet with success.

### I. OVERVIEW

#### A. Factual Background

##### 1. The Loan and the Mortgage

In October 1988, Michael Capizzi obtained a loan in the form of a $ 750,000.00 adjustable-rate note (the "Note") from Winchendon Savings Bank ("WSB") for use in development of the Property, specifically, building a home on the site that the Capizzis thereafter occupied as their principal residence. Mr. Capizzi secured this loan by granting WSB a $ 750,000.00 mortgage (the "Mortgage") on the Property. On August 14, 1992, WSB was declared insolvent or in such condition that it was unsafe for it to continue doing business. The Federal Deposit Insurance Corporation ("FDIC") was appointed as receiver for WSB, and all WSB mortgages and security documents, including the Mortgage, were [*4] transferred to the FDIC. The FDIC assigned the Mortgage to First Essex Bank, FSB on January 18, 1995, which then assigned it back to the FDIC on June 28, 1995. SRC obtained the Mortgage from the FDIC on September 30, 1998.

Alleging that Mr. Capizzi was in default on the Note, SRC initiated foreclosure proceedings against the Property in January 1999. Prior to the scheduled foreclosure auction, the Capizzis made a payment to SRC and the auction was cancelled. This pattern -- foreclosure proceedings commenced by SRC, foreclosure auction scheduled, payment made by Capizzis, and auction cancelled -- was repeated at least four more times over the following year-and-a-half. In June 2001, the Capizzis commenced a civil lawsuit against SRC in the Middlesex Superior Court seeking a declaratory judgment and monetary damages for breach of contract and violation of *Mass. Gen. Laws ch. 93A*. SRC removed the case to federal court, where it was assigned to me under docket number C.A. No. 01-11298-DPW. On August 20, 2002, I dismissed the lawsuit due to the failure by the Capizzis both to meet their discovery responsibilities and to prosecute their claims. The Capizzis moved for reconsideration and, [*5] following a hearing, I denied their motion. On September 30, 2002, I issued an amended order of dismissal making clear that the action was dismissed in its entirety without prejudice.

In September 2002, SRC once again commenced foreclosure proceedings against the Capizzis and scheduled a foreclosure auction for December 16, 2002. On December 2, 2002, the Capizzis brought a second civil action against SRC, this time filing directly in federal court, reiterating the allegations and prayers for relief made in their first suit, and also seeking a preliminary injunction enjoining SRC from proceeding with the December 16, 2002 foreclosure auction. This second federal court case, C.A. No. 02-12319-DPW, was also assigned to my docket. Following a December 13, 2002 hearing, I entered a stipulated order cancelling the December 16, 2002 foreclosure auction and enjoining SRC from rescheduling or advertising the foreclosure until further order of the court. Pursuant to my order, the Capizzis were obligated to pay SRC a sum of $ 6,177.76 on or before December 19, 2002 and by the nineteenth of the month each month thereafter; to post $ 219,771.95 in an escrow account on or before February 3, 2003; [*6] to provide proof to counsel for SRC that the real estate taxes on the Property were current and up to date as of December 31, 2002; and to provide proof to counsel for SRC that the Property was adequately insured with SRC listed as the mortgagee. The order specified that failure by the Capizzis to meet any one of these four obligations constituted grounds for SRC to apply to the court for a further order vacating the preliminary injunction.

On February 28, 2003, Michael Capizzi filed a voluntary petition for bankruptcy under Chapter 13 of the United States Bankruptcy Code (the "Code") in the United States Bankruptcy Court for the District of Massachusetts ("Bankruptcy Court"). SRC moved to dismiss the bankruptcy case on the grounds that, at the time of filing, Michael Capizzi was not an eligible Chapter 13 debtor because his secured debts exceeded

the amounts permissible for invocation of Chapter 13. On March 5, 2003, the Bankruptcy Court granted SRC relief from the automatic stay to permit the pending lawsuit in this court, C.A. No. 02-12319-DPW, to proceed to judgment. Michael Capizzi later filed a motion to voluntarily dismiss his Chapter 13 petition, which was granted by the Bankruptcy [*7] Court on May 1, 2003. Meanwhile, notice of default had entered against the Capizzis on April 9, 2003, in C.A. No. 02-12319-DPW.

On May 20, 2003, Catherine Capizzi filed a voluntary petition for bankruptcy under Chapter 11 of the Code. In response, SRC filed various motions in Bankruptcy Court, including motions to dismiss the petition and for relief from the automatic stay in order for the pending federal court case to proceed to judgment. On May 28, 2003, the Bankruptcy Court -- for reasons including its determination that Catherine Capizzi did not have an interest in the Property within the meaning of Chapter 11 of the Code -- granted SRC relief from the automatic stay.

On June 9, 2003, I granted SRC's motion for default judgment against the Capizzis in C.A. No. 02-12319-DPW due to the Capizzis' failure to plead or otherwise defend against the counterclaims SRC had asserted against them, and allowed SRC's motion to dismiss the Capizzis' complaint with prejudice. Upon application by SRC, which was supported by the requisite affidavits, I entered judgment for SRC against the Capizzis the same day in the amount of $ 875,203.38. n1

n1 The Capizzis did not appeal the judgment but did, almost a year to the day later on June 8, 2004, file a motion for relief from judgment under *Fed. R. Civ. P. 60(b)*. Based on my finding that the Capizzis have failed to establish the "exceptional circumstances" warranting relief under the rule, I deny their motion via separate Memorandum and Order issued this day.

[*8]

2. The Auction Proceedings

SRC, through counsel, had already hired Garrett, Inc. and its president, Garrett Healy (collectively, "Garrett"), to conduct the foreclosure auction of the Property. SRC and Garrett had agreed that if the Property was purchased at auction by a third party for an amount greater than the balance due on the Note, Garrett would be paid a commission of 3.5% of the sale price and be reimbursed for its expenses. n2

n2 SRC agrees that the 3.5% commission fee is reasonable but has consistently maintained that payment of the commission required prior court approval; Garrett contended that court approval was not necessary in order for it to receive the commission.

Following the dismissal with prejudice of C.A. No. 02-12319-DPW in which SRC had been enjoined from taking further action to foreclose upon the Property, SRC scheduled a foreclosure auction for July 24, 2004. Garrett conducted an auction at the Property on that date and Linda Micu ("Micu"), with an offer of $ 2,000,000.00, was [*9] the highest bidder. Micu, who -- it was later revealed -- had been acting as a straw person for the Capizzis, was unable to complete the sale and forfeited the $ 5,000.00 qualifying deposit, drawn on an account in the name of Catherine Capizzi, she had paid to Garrett at the auction . . .

SRC scheduled a second foreclosure auction for September 26, 2003. Pursuant to statutory requirements, SRC published a Notice of Mortgagee's Sale of Real Estate ("Legal Notice") in The Concord Journal on September 4, 11, and 18, 2003. The Legal Notice provided a legal description of the Property, including its square footage. Garrett, at the direction of SRC and as it had done in advance of the previously scheduled auctions, publicized the auction through various other mechanisms. The marketing efforts undertaken by Garrett included the use of telemarketing and mailings, providing information about the auction on its website, and publishing so-called "display advertisements" in The Boston Globe on September 14 and 21, 2003. The display advertisements contained incorrect information about the acreage of the Property and also the number of bedrooms, bathrooms, and fireplaces it contained. [*10]

In early August 2003, Garrett received a letter dated August 4, 2003 from Leonard Florence ("Florence") -- a third party he had spoken with recently regarding the Property -- indicating that Florence "would like to make an offer of $ 2,000,000 for the purchase of the property at foreclosure at 236 Lincoln Road in Lincoln, MA." Enclosed with the letter was a check in the amount of $ 50,000.00 to serve as a deposit. Garrett notified John Doonan, counsel for SRC, of the offer and deposit. Attorney Doonan informed Garrett that he needed to investigate whether SRC could accept the offer and would get back to Garrett with a response. Neither SRC nor Garrett informed the Capizzis or TAT of Florence's offer.

Attorney Doonan thereafter informed Garrett that under his interpretation of state law, SRC could not accept Florence's proposal because it was made outside

of the foreclosure auction process. After receiving this information from SRC, Garrett notified Florence that his offer had been refused and that a second auction would take place on September 26, 2003. Garrett asked Florence whether he wanted Garrett to place a $ 2,000,000.00 bid on the Property at the auction with the $ 50,000.00 [*11] deposit. Florence responded in the negative, informing Garrett that he was occupied with a large project in Chicago and did not have time to pursue the Property. Garrett thereafter returned the $ 50,000.00 deposit to Florence.

On the afternoon of September 25, 2003 -- the day before the scheduled foreclosure auction at the Property -- Michael Capizzi filed his second voluntary petition for bankruptcy, this time under Chapter 11 of the Code. The next day, both SRC and TAT n3 filed emergency motions for, respectively, relief from the automatic stay and to dismiss the bankruptcy case with prejudice. Finding that Mr. Capizzi was barred from filing another bankruptcy petition until 180 days after his voluntary dismissal of his prior Chapter 13 bankruptcy case (i.e., until November 1, 2003), the Bankruptcy Court granted both motions.

n3 A brief digression is in order to explain the presence of The Architectural Team, Inc. ("TAT") in this action. After filing suit against the Capizzis in Suffolk Superior Court in 1989 regarding a dispute over unpaid fees, TAT obtained and duly recorded a $ 600,000.00 attachment on the Property in 1994. The lawsuit went to trial and in 1999 the Superior Court entered judgment in favor of TAT in the amount of $ 200,254.00, with interest accruing from the August 7, 1989 filing date. See The Architectural Team, Inc. v. Capizzi, No. 89-4479-D, slip op. at 3-4 (Mass. Super. February 26, 1999). The Capizzis appealed the decision, which was affirmed by the Massachusetts Appeals Court on February 12, 2003. See The Architectural Team, Inc. v. Capizzi, 57 Mass. App. Ct. 1108, 782 N.E.2d 1136 (Mass. App. Ct. 2003). On September 24, 2003, TAT obtained a $ 541,152.81 execution on its judgment from the Superior Court and recorded the execution with the Middlesex County Registry of Deeds the same day.

[*12]

As planned Garrett conducted the foreclosure auction at the Property on September 26, 2003. The Legal Notice was read aloud and the high bid, $ 1,200,000.00, was made by Kevin Duffy ("Duffy").

Duffy and Garrett, as agent for SRC, executed a "Memorandum of Terms and Conditions For the Purchase at Mortgagee's Foreclosure Sale" ("Memorandum") and Garrett accepted a $ 50,000.00 deposit from Duffy. The Memorandum indicated, in the paragraph immediately above the parties' signatures, that TAT had a $ 600,000.00 real estate lien on the Property. As it had in July, TAT attended the auction but did not bid on the Property.

According to SRC, $ 932,630.87 was outstanding on the Note at the time of the foreclosure auction. The proceeds of the foreclosure auction exceeded this amount and in November 2003 counsel for SRC and TAT engaged in negotiations regarding disbursing surplus auction funds to TAT in partial satisfaction of the execution it held against the Capizzis. On November 11, 2003, SRC sent TAT a check in the amount of $ 210,096.33. After sending the check, SRC sent TAT an indemnification agreement (the "Indemnification Agreement") pursuant to which TAT would indemnify and hold harmless [*13] SRC "from any and all actions, proceedings, claims, demands, costs, damages and expenses . . . in connection with or arising out of the payment." SRC alleges that the parties had discussed and come to terms on the Indemnification Agreement -- i.e., that in consideration for SRC making the payment to TAT, TAT would indemnify SRC -- prior to its sending TAT the check. But TAT never executed the Indemnification Agreement.

3. The Eviction

After completing the sale, Duffy commenced a summary process action against the Capizzis in the Concord District Court in order to recover possession of the Property. Following trial, the District Court entered judgment for possession and monetary damages in favor of Duffy. The Capizzis appealed the decision but failed to post the bond necessary to perfect their appeal. Duffy obtained execution from the court and notified the Capizzis on his intent to levy upon it and evict them from the Property on March 17, 2004.

Repeating a now familiar pattern, on March 16, 2004, the Capizzis filed a civil action against Duffy and SRC in this court, C.A. No. 04-10533-DPW, raising allegations similar to those in the present action and seeking a temporary restraining [*14] order enjoining Duffy from levying on the execution. I denied the request for injunctive relief on March 16, 2004 and the Capizzis thereafter voluntarily dismissed the lawsuit. On March 17, 2004, the Capizzis filed another civil action against Duffy and SRC, C.A. No. MICV 2004-01041, this time in the Middlesex Superior Court, making the same claims it raises in the present action save for the wrongful eviction claim, which was then restyled as a

request for injunctive relief prohibiting Duffy from levying on the execution. Following a hearing on an ex parte motion by the Capizzis to record a memorandum of lis pendens, the court denied the motion and dismissed the case on April 22, 2004, finding that the Capizzis' interest in the Property had been extinguished by the foreclosure sale and that their claims were barred by res judicata. n4 In the meantime, Duffy had levied upon the execution and evicted the Capizzis from the Property over the course of March 17 and 18, 2004.

> n4  The appeal by the Capizzis of this decision is still pending in the Massachusetts Appeals Court.

[*15]

**B. Procedural History**

SRC commenced this action on January 15, 2004 interpleading the Capizzis, TAT, Garrett, John Connolly, Jr. ("Connolly"), the Massachusetts Department of Revenue ("DOR"), and James Grumbach.

The Capizzis have counterclaimed against SRC and Duffy, seeking declaratory judgment and an accounting, for unlawful and fraudulent foreclosure, breach of contract, violation of Mass. Gen. Laws ch. 93A, and wrongful eviction.

TAT has raised counterclaims against SRC seeking an accounting and alleging unjust enrichment and various other defects in the foreclosure, as well as a "cross-claim" against Catherine Capizzi, alleging breach of contract and seeking to reach and apply the rights of Michael Capizzi in order to satisfy its judgment against him.

Garrett has filed counterclaims against SRC for breach of contract, violation of Mass. Gen. Laws ch. 93A, unjust enrichment, quantum meruit, and promissory estoppel.

Attorney Connolly, who formerly served as counsel to the Capizzis, previously obtained an attachment on the Property against Mr. Capizzi in the amount of $ 65,712.14 in his Middlesex Superior Court lawsuit, C.A. No. MICV 2003-00667, against the Capizzis [*16] to collect unpaid legal fees. The Capizzis defaulted in the lawsuit and Connolly has moved for an assessment of damages. In the present action, Connolly has cross-claimed against the Capizzis, seeking a monetary judgment in his favor "in an amount to be determined by the Court."

Two named interpleader defendants have effectively disclaimed an interest in the interpled fund. DOR --

which, according to SRC, has a $ 9,612.17 tax lien on the Property -- has filed no appearance in the case. Mr. Grumbach, who obtained a $ 25,000.00 attachment against Mr. Capizzi in 1998, notified the court by letter dated May 12, 2004 that he neither claimed an interest in the Property nor planned to participate in the court proceedings.

Garrett filed a motion for summary judgment on May 27, 2004. At a June 3, 2004 scheduling conference, this motion was denied without prejudice to renew it after the close of discovery, which concluded on September 7, 2004 pursuant to court order. Both an "Emergency Motion for Permission to Record Memorandum of Lis Pendens" filed by the Capizzis and a motion for a protective order filed by SRC were denied on November 16, 2004 following hearing.

Currently before me [*17] are the following three summary judgment motions: (1) a motion by SRC for partial summary judgment dismissing all counterclaims brought by TAT and the Capizzis; (2) a motion by Duffy for summary judgment in his favor on the third-party complaint filed against him by the Capizzis; and (3) a motion by Garrett for summary judgment directing SRC to pay it $ 48,459.29, the amount it claims to be owed for its auction-related expenses and commission. Also pending are the second motion by TAT to amend its answer, affirmative defenses, counterclaims, and cross-claims; two motions by the Capizzis seeking permission to file amended counterclaims; and a motion by SRC to strike portions of an affidavit filed by TAT with its opposition to the motions for summary judgment by SRC and Garrett.

**II. DISCUSSION**

**A. Standard of Review**

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56 (c)*. A fact is "material" if it has the "potential [*18] to affect the outcome of the suit under the applicable law," *Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000)*, and a " genuine' issue is one supported by such evidence that a reasonable jury, drawing favorable inferences,' could resolve it in favor of the nonmoving party." *Triangle Trading Co., Inc. v. Robroy Indus., Inc., 200 F.3d 1, 2 (1st Cir. 1999)* (quoting *Smith v. F.W. Morse & Co., Inc., 76 F.3d 413, 428 (1st Cir. 1996))*. When deciding upon a motion for summary judgment, all facts are to be viewed, and all inferences drawn, in the

light most favorable to the nonmoving party. *Leahy v. Raytheon Co., 315 F.3d 11, 17 (1st Cir. 2002)*.

A party seeking summary judgment must make a preliminary showing that no genuine issue of material fact exists. *Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995)*, cert. denied, *515 U.S. 1103, 132 L. Ed. 2d 255, 115 S. Ct. 2247 (1995)*. Once the movant has made such a showing, the nonmovant must point to "specific facts demonstrating that there is, indeed, a trialworthy issue." Id. A genuine dispute of material fact cannot be [*19] established through "conclusory allegations, improbable inferences, and unsupported speculation" alone. *Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)*. The nonmovant "may not rest upon the mere allegations or denials of the [moving] party's pleading," and instead "must set forth specific facts showing that there is a genuine issue for trial." *Fed. R. Civ. P. 56 (e)*. Additionally, if the nonmovant fails to make "a showing sufficient to establish the existence of an element essential to [its] case, and on which [it] will bear the burden of proof at trial," *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)*, summary judgment must enter against it. With respect to the nonmovant's burden of proof in establishing the essential elements of its case, the resolution of a motion for summary judgment "implicates the substantive evidentiary standard of proof that would apply at a trial on the merits." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)* .

**B. SRC's Motion for Summary Judgment**

In considering the counterclaims asserted by the Capizzis and that upon which SRC seeks summary judgment, [*20] a bifurcated framework that distinguishes between claims that relate to whether it was lawful for SRC to foreclose on the Property and those concerning whether SRC conducted the foreclosure, including the auction, lawfully, may be helpful. For the reasons set forth below, the former category of claims, asserted only by the Capizzis, are barred by res judicata and the latter fail on the merits.

1. Propriety of Foreclosing on the Property

The Capizzis continue to maintain, vehemently, that they never were in default to SRC on the Note and that SRC breached the terms of the underlying loan documents, unlawfully and fraudulently foreclosed on the Property, and engaged in unfair and deceptive trade practices in violation of Mass. Gen. Laws ch. 93A ("ch. 93A"). In the present action, these allegations undergird counts one through four -- declaratory judgment and accounting, breach of contract, unlawful and fraudulent foreclosure, and violation of ch. 93A, respectively -- of

the Capizzis' counterclaims. n5 That the Capizzis are tireless in continuing to pursue these claims does not serve to imbue them with any vitality. By dint of their own conduct -- i.e., defaulting in C. [*21] A. No. 02-12319-DPW -- the Capizzis have already tolled the death knell for the claims regarding whether SRC was entitled to foreclose on the Property.

> n5 Counts three and four also include allegations regarding both how SRC conducted the foreclosure and the sale of the Property to Duffy at the foreclosure auction.

Before addressing the particular claims at issue, several basic principles must be set forth. First, pursuant to the doctrine of res judicata, n6 the Capizzis are barred from bringing any claims in this action for which: "(1) there is a final judgment on the merits in an earlier action; (2) sufficient identity exists between the parties in the earlier and later suits [;] and (3) sufficient identity exists between the causes of action in the two suits." *U.S. v. Cunan, 156 F.3d 110, 114 (1st Cir. 1998)* (internal quotations omitted). Second, a judgment by default pursuant to *Fed. R. Civ. P. 55(b)* "is a 'final disposition of the case and an appealable order' that has the same effect [*22] as a judgment rendered after a trial on the merits." *U.S. v. $ 23,000 in U.S. Currency, 356 F.3d 157, 163 (1st Cir. 2004)* (quoting 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure: Civil 3d, § 2684 (1998)); see also *Morris v. Jones, 329 U.S. 545, 550-51, 91 L. Ed. 488, 67 S. Ct. 451 (1947)* ("A judgment of a court having jurisdiction of the parties and of the subject matter operates as res judicata, in the absence of fraud or collusion, even if obtained upon a default.") (quoting *Riehle v. Margolies, 279 U.S. 218, 225, 73 L. Ed. 669, 49 S. Ct. 310 (1929)*); *SMA Life Assur. Co. v. Sanchez-Pica, 960 F.2d 274, 275 (1st Cir. 1992)*, cert. denied *506 U.S. 872, 121 L. Ed. 2d 147, 113 S. Ct. 207 (1992)* (endorsing the proposition that a default judgment "constituted a final judgment with res judicata effect").

> N6 Because the judgment in the first action was issued by a federal court, federal res judicata principles are employed in this analysis of a subsequent diversity action. See *Porn v. Nat'l Grange Mut. Ins. Co., 93 F.3d 31, 33-34 (1st Cir. 1996)* (holding that "the preclusive effect of [the judgment by the federal court in the first action] in the instant diversity action is governed by federal res judicata principles").

[*23]

A final observation is necessitated by what could be read as a mischaracterization on the part of SRC regarding the claim preclusive effect of a dismissal pursuant to *Fed. R. Civ. P. 41(b)*. The Supreme Court has held that a dismissal pursuant to that rule n7 -- which provides, in pertinent part, that a dismissal with prejudice pursuant to the rule "operates as an adjudication upon the merits" -- is not necessarily entitled to claim preclusive effects, at least in other courts. *Semtek Int'l Inc. v. Lockheed Martin Corp., 531 U.S. 497, 503-06, 149 L. Ed. 2d 32, 121 S. Ct. 1021 (2001)* ("In short, it is no longer true that a judgment 'on the merits' is necessarily a judgment entitled to claim-preclusive effect; and there are a number of reasons for believing that the phrase 'adjudication upon the merits' does not bear that meaning in *Rule 41(b)*."). For present purposes, the holding by the Supreme Court of particular pertinence is that such a dismissal does operate to bar the refiling of the same claim in the court that entered the dismissal. *Id. at 506* ("We think, then, that the effect of the 'adjudication upon the merits' default provision of *Rule 41(b)* . . is simply that, unlike a dismissal [*24] 'without prejudice,' the dismissal in the present case barred refiling of the same claim in the [same court].") .

n7 The full text of *Fed. R. Civ. P. 41(b)* reads as follows:

> For failure of the plaintiff to prosecute or comply with these rules or any order of court, a defendant may move for dismissal of an action or of any claim against the defendant. Unless the court in its order for dismissal otherwise specifies, a dismissal under this subdivision and any dismissal not provided for in this rule, other than a dismissal for lack of jurisdiction, for improper venue, or for failure to join a party under Rule 19, operates as an adjudication upon the merits.

The first two counterclaims made by the Capizzis against SRC in this case track precisely claims they previously made against this same opponent in two prior lawsuits, C.A. No. 01-11298-DPW and C.A. No. 02-12319-DPW. As noted above, the former of these lawsuits was dismissed without prejudice because the Capizzis failed to comply with their discovery [*25] obligations and to prosecute their suit. The latter case, however, was dismissed with prejudice, pursuant to *Rule 41 (b)*, due to the failure by the Capizzis to plead or

otherwise defend against the counterclaims made by SRC and default judgment was entered in favor of SRC in the amount of $ 875,203.38 pursuant to *Rule 55(b)*. Under these circumstances, the doctrine of res "judicata plainly bars the Capizzis from reasserting these claims in this court. They have had not one, but two prior opportunities to litigate these claims here. Their failure to see either action through to its conclusion does not entitle them to a third bite at the apple. Accordingly, I will enter summary judgment against the Capizzis on counts one and two of their counterclaims against SRC.

The attempt by SRC to characterize the other counterclaims made against it by the Capizzis -- i.e., unlawful and fraudulent foreclosure and violation of ch. 93A -- as within the scope of res judicata is not sufficient. Although these claims do rely, in part, on the same factual predicate as the barred claims -- namely that SRC was not entitled to foreclose upon the Property -- they also rest upon allegations [*26] related to the conduct of the foreclosure sale, including the advertising of and the price obtained at the auction. Accordingly, there is lacking "sufficient identity [] between the causes of action in the two suits," *Cunan, 156 F.3d at 114*, for the claims to be precluded by res judicata. Cf. *Jarosz v. Palmer, 436 Mass. 526, 536, 766 N.E.2d 482 (2002)* (noting that "this court and the Appeals Court have previously held that a dismissal with prejudice constitutes a valid and final judgment for the purposes of claim preclusion," but holding further that "we conclude that this principle does not apply with equal force to issue preclusion"). For the reasons set forth below, however, they fail on the merits.

2. Legality of Subsequent Foreclosure Proceedings

When considering the remaining counterclaims asserted by the Capizzis, as well as those made by TAT, regarding the manner in which SRC conducted the foreclosure sale of the Property, it is essential to bear in mind the standard to which the foreclosing mortgagee, SRC in this instance, is held under Massachusetts law. "In executing the power of sale, the [mortgagee], in addition to a literal compliance with [*27] the terms of the power, [is] bound to exercise good faith and to put forth reasonable diligence to protect the interests of the mortgagor." *Atlas Mortgage Co. v. Tebaldi, 304 Mass. 554, 555, 24 N.E.2d 554 (1939)*; see *Williams v. Resolution GGF Oy, 417 Mass. 377, 382-83, 630 N.E.2d 581 (1994)*. Consequently, SRC was obligated to do more than simply satisfy the strictures of *Mass. Gen. Law ch. 183, § 21* n8 and *ch. 244, § 14*, n9 which, respectively, define the "statutory power of sale" in mortgages and govern foreclosing thereunder. The Supreme Judicial Court has stated in no uncertain terms that "failure in these particulars [good faith and

reasonable delgence] will invalidate the sale even though there be literal compliance with the terms of the power."

n8 *Mass. Gen. Laws ch. 183, § 21* provides that:

The following "power" shall be known as the "Statutory Power of Sale", and may be incorporated in any mortgage by reference:

(POWER.)

But upon any default in the performance or observance of the foregoing or other condition, the mortgagee or his executors, administrators, successors or assigns may sell the mortgaged premises or such portion thereof as may remain subject to the mortgage in case of any partial release thereof, either as a whole or in parcels, together with all improvements that may be thereon, by public auction on or near the premises then subject to the mortgage, or, if more than one parcel is then subject thereto, on or near one of said parcels, or at such place as may be designated for that purpose in the mortgage, first complying with the terms of the mortgage and with the statutes relating to the foreclosure of mortgages by the exercise of a power of sale, and may convey the same by proper deed or deeds to the purchaser or purchasers absolutely and in fee simple; and such sale shall forever bar the mortgagor and all persons claiming under him from all right and interest in the mortgaged premises, whether at law or in equity.

[*28]

n9 *Mass. Gen. Laws ch. 244, § 14* provides, in pertinent part, that:

The mortgagee or person having his estate in the land mortgaged, or a person authorized by the power of sale, or the attorney duly authorized by a writing under seal, or the legal guardian or conservator of such mortgagee or person acting in the name of such mortgagee or person, may, upon breach of condition and without action, do all the acts authorized or required by the power; but no sale under such power shall be effectual to foreclose a mortgage, unless, previous to such sale, notice thereof has been published once in each of three successive weeks, the first publication to be not less than twenty-one days before the day of sale, in a newspaper, if any, published in the town where the land lies or in a newspaper with general circulation in the town where the land lies and notice thereof has been sent by registered mail to the owner or owners of record of the equity of redemption as of thirty days prior to the date of sale . . . . If no newspaper is published in such town, or if there is no newspaper with general circulation in the town where the land lies, notice may be published in a newspaper published in the county where the land lies, and this provision shall be implied in every power of sale mortgage in which it is not expressly set forth.

A notice of sale in the above form, published in accordance with the power in the mortgage and with this chapter, together with such other or further notice, if any, as is required by the mortgage, shall be a sufficient notice of the sale; and the premises shall be deemed to have been sold, and the deed thereunder shall convey the premises, subject to and with the benefit of all restrictions, easements, improvements, outstanding tax titles, municipal or other public taxes, assessments,

2005 U.S. Dist. LEXIS 956, *

*Bank v. Bowser, 324 Mass. 489, 493, 87 N.E.2d 113 (1949)*. But, having elected to do so, it was required to undertake these additional, optional efforts in good faith and with reasonable diligence.

Garrett maintains -- and [*33] SRC does not dispute -- that SRC provided Garrett with the information, some of which is now known to have been inaccurate, about the Property published in the display advertisements. SRC asserts that it obtained the information, including the inaccurate components, from Town of Lincoln records, upon which it reasonably relied. No allegation has been made that SRC was alerted to the inaccuracies in the display advertising prior to the auction and thereafter refused to remedy them. It is not sufficient for the Capizzis and TAT simply to point to the fact that the display advertising contained errors. Rather, they must make a showing of admissible evidence that would permit a reasonable factfinder to conclude that SRC had affirmatively acted in bad faith or without reasonable diligence in placing this advertising. See *F.D.I.C. v. Elder Care Services, Inc., 82 F.3d 524, 527 (1st Cir. 1996); Hull v. Attleboro Sav. Bank, 25 Mass. App. Ct. 960, 519 N.E.2d 775, 777-78 (Mass. App. Ct. Feb. 23, 1988).* If anything, the reasonable inference to be drawn from SRC's arranging for additional display advertising was that it was attempting to stir up interest among potential buyers [*34] of the Property and thereby generate competitive bidding at the auction.

### d. The First Auction

TAT contends that the July 24, 2003 auction "was on its face at least questionable and infecting [sic] all future sales by thereafter branding the locus in quo as having a failed sale and in effect reducing and chilling the future bidding purchase price, all to the damage of TAT." As a factual predicate for its counterclaim, TAT points to the winning bid by Linda Micu ("Micu") at this auction having been secured by a $ 5,000.00 deposit funded by Catherine Capizzi. TAT alleges that Micu delivered the deposit check to SRC prior to the bidding at the auction, that SRC "knew or ought to have known that Catherine Capizzi could not have been a qualified bidder as her bankruptcy filings evidenced her financial condition," and that the failure by SRC to "reveal the name of Catherine Capizzi on the qualifying check until this litigation indicates the consciousness of guilt or admission of wrongdoing of [SRC], all to the damage of TAT." This bluster does not make a claim.

As it did with the September 26, 2003 auction, SRC conducted the July 24, 2003 auction in compliance with statutory [*35] requirements. In response to TAT's allegations regarding Micu and her source of funding, SRC answers that neither it nor auctioneer Garrett, who was acting as its agent, knew at the time of the July 24,

2003 auction that Micu was functioning as a straw person for the Capizzis. TAT has neither proposed a legal basis upon which SRC could have refused Micu the opportunity to bid at the auction, nor suggested why, as a matter of law, the unsuccessful first auction should serve to invalidate the subsequent sale. This counterclaim lacks the factual or legal basis to survive summary judgment.

### e. Pre-Auction Offer

The most serious allegation made by TAT is that SRC improperly handled a pre-auction offer from Leonard Florence to purchase the Property for $ 2,000,000.00. The details of this offer and how it was handled are set forth in Section I.A. supra. The heart of TAT's argument is that SRC breached its duty both by not acting on the offer and by not communicating it to TAT and the Capizzis. SRC counters that had it "acted on the communications its agents had with Florence, made privately outside the public auction forum, [it] would have breached Massachusetts law and its fiduciary [*36] duty to the Capizzis, TAT and all junior lienholders to act in good faith and with reasonable diligence . . . [and] would also have breached its contract with the Capizzis under the mortgage." For purposes of this analysis, the determinative question is not whether SRC erroneously interpreted its obligations and privileges under Massachusetts foreclosure law and/or the Note, but rather whether, through its handling of the Florence "offer," SRC failed to demonstrate good faith and exercise reasonable diligence, a query answered in the negative for the following reasons.

As an initial matter, I note my agreement with SRC regarding its statement that neither it nor Garrett, the auctioneer to whom the Florence offer was made, "could contract to sell the property or were the holders of the equity of redemption." The only manner in which SRC could sell the Property out from under the Capizzis was by exercise of the statutory power of sale pursuant to *Mass. Gen. Laws ch. 183, § 21,* in compliance with the terms and conditions for such a sale set forth in *Mass. Gen. Laws ch. 244, § 14.* Based on its understanding of these limited methods by which it could sell the Property, SRC was compelled [*37] to reject the extra-auction offer by Florence. I find, therefore, that SRC acted with good faith and exercised reasonable diligence in refusing to sell the Property outside of the statutorily-prescribed auction process.

Between the date of the Florence "offer" and the time of the second auction, neither the Capizzis nor TAT were notified of this potential purchaser. Florence was informed of the auction by Garrett, SRC's agent, and was offered the opportunity to bid on the Property at auction, but, for unrelated reasons, had already decided not to pursue the Property further. TAT and the Capizzis need

not establish that, had they been put in contact with Florence, they would have been able to consummate the sale of the Property to him prior to the auction and for a higher price than that actually obtained by SRC. Rather, they must show that the failure by SRC to give them notice of Florence's interest and existence demonstrated bad faith and a lack of reasonable diligence.

This is not a situation in which the foreclosing bank itself became the purchaser at auction, a scenario under which one could assume the mortgagee having an interest in driving down the sale price and, accordingly, [*38] one in which it would be placed under a heightened duty to act with good faith and reasonable diligence. See *Union Mkt. Nat'l Bank of Watertown v. Derderian. 318 Mass. 578, 581-82, 62 N.E.2d 661 (1945)* (holding that "when a party who is intrusted with a power to sell attempts also to become the purchaser, he will be held to the strictest good faith and the utmost diligence") (internal citations and quotations omitted). Nor is it the case that the mortgagee blithely ignored the presentation of potential buyers by the mortgagor or junior lienholders. See *Danielczuk v. Ferioli, 7 Mass. App. Ct. 914, 388 N.E.2d 724 (Mass. App. Ct. May 4, 1979)* (finding that the disputed reasons for the mortgagee's failure to meet with "alleged representative of junior lienor who was prepared to bid an amount in excess of the sum realized -- at the foreclosure sale" were "material to the question of the good faith and reasonable diligence of the mortgagee in the conduct of the foreclosure sale," therefore precluding summary judgment). Here by contrast, after being approached by a third party who expressed interest in purchasing outside of the foreclosure process, the mortgagee determined that it was only [*39] authorized to sell the subject property at foreclosure auction. The potential buyer was notified of the foreclosure auction by the auctioneer, the agent of the mortgagee, and given the opportunity to bid at auction. But the potential buyer was no longer interested. In these circumstances, where steps were taken both to comply with the statutory mandates and to provide a potential purchaser with every opportunity to see his interest through to fruition via the foreclosure auction, there can be no finding of bad faith or lack of reasonable diligence by SRC or its agent Garrett. Had these parties failed to notify Leonard of the auction, the outcome might be otherwise. See *Sandler, 292 Mass. at 497, 198 N.E. 749 (1935)* (finding failure by foreclosing mortgagee to give notice of foreclosure sale to party who had a pre-mortgage attachment on the subject property and had "stated her intention to protect her interest by purchase" to be "evidence that good faith was not used to obtain the best reasonable possible price"); cf. *In re LaPointe, 253 B.R. 496, 500 (1st Cir. BAP 2000)* (upholding finding by Bankruptcy Court of lack of reasonable diligence on part of foreclosing [*40]

bank for reasons including the failure by the bank "to provide notice of the foreclosure sale to a party with whom it had previously negotiated and knew to be interested in purchasing the property").

f. Adequacy of Price

Both the Capizzis and TAT claim that SRC sold the Property at the foreclosure auction for an inadequate price. TAT grounds its allegation on the discrepancy between the $ 1,200,000.00 price obtained at auction and the $ 2,000,000.00 third-party offer discussed supra. The Capizzis base their contention that the auction price was less than 30% of the "then fair market value" of the Property on an assertion, made only in their proposed amended answer and counterclaims, that a real estate agent had recommended marketing the Property, if subdivided to include a two-acre "buildable lot," for between $ 3,700,000.00 and $ 4,100,000.00. Neither theory of insufficiency is availing.

Under Massachusetts law, to prevail on an inadequate sale price theory, the Capizzis and TAT must demonstrate that the $ 1,200,000.00 price obtained for the Property at auction was "so gross as to indicate bad faith, or a want of reasonable judgment and discretion in the mortgagee." *Seppala & Aho Constr. Co., Inc. v. Petersen, 373 Mass. 316, 327-28, 367 N.E.2d 613 (1977)* [*41] (quoting *Clark v. Simmons 150 Mass. 357, 361, 23 N.E. 108 (1890)*). The Supreme Judicial Court explained in *Seppala* that:

> 'Mere inadequacy of price is no reason for setting aside a sale. . . It is a notorious fact that, when land is sold, by auction, under a power contained in a mortgage, it seldom, if ever, brings a price which reaches its real value. If this is a hardship upon a mortgagor or those claiming under him, it is owing to the contract which he has made, and which the mortgagee has a right to have carried out.

*Id. 373 Mass. at 328, 367 N.E.2d 613* (quoting *Austin v. Hatch, 159 Mass. 198, 199, 34 N.E. 95 (1893)*); see also *Resolution Trust Corp. v. Carr, 13 F.3d 425, 430 (1st Cir. 1993)* ("It is common knowledge in the real world that the potential price to be realized from the sale of real estate . . . usually is considerably lower when sold 'under the hammer' than the price obtainable when it is sold by an owner not under distress and who is able to sell at his convenience and to wait until a purchaser reaches his price."); *BFP v. Resolution Trust Corp., 511 U.S. 531, 538, 128 L. Ed. 2d 556, 114 S. Ct. 1757 (1994)* (noting

the "glaring discrepancy between the factors relevant [*42] to an appraisal of a property's market value, on the one hand, and the strictures of the foreclosure process on the other" and commenting that" no one would pay as much to own such property as he would pay to own real estate that could be sold at leisure and pursuant to normal marketing techniques").

The case of *Fairhaven Savings Bank v. Callahan, 391 Mass. 1011, 462 N.E.2d 112 (1984)*, is instructive. In Fairhaven, the Supreme Judicial Court upheld the rejection by the trial court judge of a claim by the defendant mortgagor that a $ 10,000.00 purchase price on a property securing a $ 40,000.00 debt was "so inadequate as to constitute a breach of fiduciary duty as a matter of law." *Id. at 1012*. The court held that the "standard applied in circumstances such as this is whether the purchase price at foreclosure as compared with the market price was so grossly inadequate as to invalidate the sale." Id. (citing *Chartrand v. Newton Trust Co., 296 Mass. 317, 320-21, 5 N.E.2d 421 (1936)*). The "burden of proving commercial unreasonableness" falls on the party challenging the foreclosure. See *Carr, 13 F.3d at 429-30*. Finding no evidence of the [*43] market value of the subject property in the record, the Fairhaven court could not conclude that the trial judge had erred. Here, too, there is insufficient evidence of a "market price" of the Property that would permit a reasonable factfinder to conclude that the foreclosure auction price was so "grossly inadequate" in comparison as to indicate "bad faith or lack of reasonable diligence," *Chartrand, 296 Mass. at 320*, and to justify invalidating the sale.

The Capizzis have failed to adduce any competent evidence to support their allegation that the Property was worth $ 4,000,000.00. In their proposed amended counterclaims, they point to the recommendation of a real estate broker that if the Property was subdivided to include a two-acre "buildable lot" they market it for between $ 3,700,000.00 and $ 4,100,000.00. But as Michael Capizzi acknowledged during his deposition testimony, subdividing the Property was neither an automatic nor a one-step process. He and his next-door neighbor had discussed combining their properties to create a single lot and then jointly presenting a subdivision proposal to the Town of Lincoln, but the idea had not progressed significantly. [*44] If the neighbors were not able to reach agreement on lot-combining, Mr. Capizzi observed, "neither party could do anything other than have a single lot unless there was a swap of property and a change of some side yard easements and other things." Furthermore, a special variance would be required by the Town of Lincoln to subdivide the lots without first combining them, an exemption the Capizzis had not sought. The Capizzis have produced no evidence

of an appraisal value of the Property as constituted at the time of the foreclosure, and cannot successfully advance an "inadequate sale price" argument based on a marketing price suggestion contingent on an unrealized subdivision possibility. See *Fairhaven, 391 Mass. at 1012* (citing *Chartrand, 296 Mass. at 320*, regarding the burden of party challenging sale price at foreclosure auction to produce evidence of "commercial unreasonableness"). It is worth mentioning that even were the Capizzis to adduce evidence of a "market value" for the Property significantly higher than $ 1,200,000.00, they would not be assured success in surviving a motion for summary judgment. As noted by the First Circuit following [*45] its review of Massachusetts case law on the subject, "we find ample suggestion that a price deficiency of as much as 39 percent of fair market value [i.e., a foreclosure sale price of only 39% of the fair market value] can support the granting of a dispositive motion." *Carr, 13 F.3d at 430*.

The argument by TAT that the sale price obtained for the Property at the foreclosure auction was inadequate also falters. TAT asserts that on account of the prior $ 2,000,000.00 offer by Florence, the $ 1,200,000.00 auction-winning bid was "not the highest value sale price" for the Property. That the unpursued Florence "offer" was higher than the price later obtained at auction does not dictate the conclusion that the auction price was inadequate, much less that it was "so gross[ly inadequate] as. to indicate bad faith or lack of reasonable diligence," *Chartrand, 296 Mass. at 320*, as would be necessary to void the sale. For the reasons discussed supra in section II.B.2.e., I find no sufficient showing that SRC acted in bad faith or failed to exercise reasonable diligence with regard to Florence and his expressed interest in purchasing the Property. [*46] Florence was informed of the upcoming auction and was offered the opportunity to bid on the Property at auction, but for reasons apparently unrelated to either the Property or the foreclosure process, Florence was no longer interested. In any event, as discussed above, it is expected that the price "under the hammer" will be less than what could be obtained under normal market circumstances. TAT has failed to demonstrate "bad faith or lack of reasonable diligence" on the part of SRC justifying finding fault with the sale. See *Bowser, 324 Mass. at 493* ("If we assume in favor of the defendants that it could have been found that the price at which the property was sold was inadequate (although there was no evidence as to what the fair market value of the property was at the time of sale), that fact, without more, would not show bad faith or lack of diligence.").

g. Statutory Non-compliance by SRC and Garrett

Finally, TAT and the Capizzis both allege that SRC, having not registered to business in Massachusetts as a

foreign corporation as required by *Mass. Gen. Laws ch. 181, § § 3-4*, may not seek recovery in the courts of the Commonwealth because of *Mass. Gen. Laws* [*47] *ch. 181, § 9*. n10 TAT further alleges that the foreclosure was defective on account of Garrett, Inc. not possessing an auctioneer's license. n11 Neither allegation is sufficient to survive summary judgment.

n10 *Mass. Gen. Laws ch. 181, § 9* provides, in relevant part, that:

> Every foreign corporation which fails to file an initial certificate or an amended certificate as required by section four shall, for each such failure and for each year that each such failure shall continue, be fined not more than five hundred dollars. No such failure shall affect the validity of any contract involving the foreign corporation, but no action shall be maintained or recovery had in any of the courts of the commonwealth by the foreign corporation as long as such failure continues.

n11 TAT does not dispute that Garrett Healy, the president of Garret, Inc., possesses a valid auctioneer's license.

In response to the foreign corporation registration issue, SRC maintains first that it is not "seeking relief" in [*48] the courts but rather "turning the surplus proceeds from a foreclosure over to the court for distribution," and second, that because it is an out-of-state corporation "engaged exclusively in interstate commerce, with little, if any incidental activity in Massachusetts," the statute is inapplicable.

This interpleader action properly is pending in federal district court pursuant to the court's diversity jurisdiction under *28 U.S.C. § 1332*. So far as I can tell, SRC has never commenced state court proceedings against the Capizzis or any other party to this litigation. The foreign corporation registration allegations made by TAT and the Capizzis' against SRC do not give rise to an independent cause of action nor do they support any of the pending claims in this case. Accordingly, I disregard them as irrelevant.

The allegations by TAT regarding the auctioneer's license is a red herring. The foreclosure auction of the Property was conducted by Garret Healy, the president and owner of Garret, Inc. and the holder of a duly-issued

State Auctioneer License from the Division of Standards of the Commonwealth of Massachusetts. The text of the applicable statute, *Mass.* [*49] *Gen. Laws ch. 100, § 2*, provides that "no person shall engage in the business of or act as an auctioneer in the commonwealth, directly or indirectly . . . unless licensed under the provisions of this chapter." The licensing requirement clearly applies to a person, not a business, and, as a result, the contention by TAT that the foreclosure was defective on account of Garrett, Inc. not possessing an auctioneer's license fails on its face.

## C. Duffy's Motion for Summary Judgment

Third-party defendant Duffy has moved for summary judgment against the Capizzis on all five causes of action they raise by way of counter -- and cross-claim: (1) declaratory judgment and accounting; (2) breach of contract; (3) unlawful and fraudulent foreclosure; (4) violation of ch. 93A; and (5) wrongful eviction. As Duffy correctly points out, while only the last of these claims is made directly against him, the first might have implications for his rights as purchaser of the Property. Having addressed the first four claims at length in Section II.B. supra and found them wanting, I turn my attention now only to the wrongful eviction claim made against Duffy by the Capizzis.

As set forth above [*50] in Section I.A., Duffy purchased the Property at the September 26, 2003 foreclosure auction for $ 1,200,000.00. In order to recover possession of the Property from the Capizzis, Duffy commenced a summary process proceeding against them in the Concord District Court and, following a trial, received a judgment for possession and monetary damages on December 18, 2003. The Capizzis appealed the judgment but their appeal was rendered void due to their failure to perfect it by posting the required bond. Execution thereafter issued to Duffy who levied upon it, evicting the Capizzis from the Property over the course of March 17 and 18, 2004.

On March 16, 2004, the day before Duffy was due to levy on the execution, the Capizzis filed a lawsuit against him and SRC in this court, C.A. No. 04-10533-DPW, raising allegations similar to those in the present action and also seeking a temporary restraining order against Duffy levying on the execution. I denied the request for injunctive relief on March 16, 2004 and the Capizzis thereafter voluntarily dismissed the case. On March 17, 2004, the Capizzis filed yet another civil action against SRC and Duffy, C.A. No. MICV 2004-01041, this time in the [*51] Middlesex Superior Court, unsuccessfully making essentially the same claims the have raised again in the present action. The appeal by the Capizzis of this decision to the Massachusetts Court of Appeals remains pending. I am bound to accord res judicata effect to the

Superior Court judgment despite the pendency of the appeal. *O'Brien v. Hanover Ins. Co., 427 Mass. 194, 200–01, 692 N.E.2d 39 (1998); 28 U.S.C. § 1738.*

Duffy also contends that this court is barred from considering the wrongful eviction claim asserted by the Capizzis due to the Rooker-Feldman doctrine, n12 which stands for the proposition that "lower federal courts are without subject matter jurisdiction to sit in direct review of state court decisions," *Hill v. Town of Conway, 193 F.3d 33, 34 (1st Cir. 1999)* (internal quotations and citations omitted), such jurisdiction belonging only to the state appellate courts and, ultimately, to the United States Supreme Court. See *Rooker v. Fidelity Trust Co., 263 U.S. 413, 415-16, 68 L. Ed. 362, 44 S. Ct. 149 (1923); District of Columbia Court of Appeals v. Feldman, 460 U.S. 462, 482-'6, 75 L. Ed. 2d 206, 103 S. Ct. 1303 (1983).* The Capizzis counter that they [*52] "are not challenging the Concord District Court proceeding, but rather the action of Duffy in bringing that proceeding." Finding this both a distinction without a difference and a misstatement of the relief sought, I will grant summary judgment for Duffy on this counterclaim.

n12 As the First Circuit set forth in *Hill v. Town of Conway, 193 F.3d 33 (1st Cir. 1999)*, the Rooker-Feldman doctrine is the distillation of two Supreme Court decisions: *Rooker v. Fidelity Trust Co., 263 U.S. 413, 68 L. Ed. 362, 44 S. Ct. 149 (1923)* and *District of Columbia Court of Appeals v. Feldman, 460 U.S. 462, 75 L. Ed. 2d 206, 103 S. Ct. 1303 (1983).* See *Hill, 193 F.3d at 34 n.1* (detailing history of Rooker-Feldman doctrine).

Pursuant to what they have titled a "wrongful eviction" claim the Capizzis seek monetary damages from Duffy, "including damages for loss or destruction or damage to personal property removed . . . upon levy of the eviction execution." The Capizzis purport to ground this claim upon the assertion that [*53] Duffy "wrongfully purchased" their home at the foreclosure sale and evicted them therefrom "when he and his attorney were fully aware that the foreclosure was fraudulent and illegal and that the foreclosure sale . . . was null and void." As discussed in greater detail in section II.B.2. supra, the Capizzis have failed to establish that the foreclose by SRC was "fraudulent and illegal" or that the foreclosure sale was "null and void." But the Capizzis' claim against Duffy, in which they seek relief for damages allegedly sustained because they suffered an eviction authorized by a state court of competent jurisdiction, is barred both by res judicata as a general

proposition and particularly, as a matter of federal jurisdiction, by the Rooker-Feldman Doctrine.

The award of possession and monetary damages by the Concord District Court to Duffy in his summary process action against the Capizzis necessarily was grounded upon a finding by the state court that Duffy held good title to the Property and had a superior claim for possession vis-a-vis the Capizzis. See *Mass. Gen. Laws ch. 238, § 1*, Persons entitled to summary process [for possession of land] ("if a mortgage [*54] to land has been foreclosed by a sale under power therein contained or otherwise . . . and the seller or any person holding under him refuses to surrender possession thereof to the buyer . . . the person entitled to the land or tenements may recover possession thereof under this chapter"); see also *Wayne Inv. Corp. v. Abbott, 350 Mass. 775, 215 N.E.2d 795 (1966)* ("The purpose of summary process is to enable the holder of the legal title to gain possession of premises wrongfully withheld. Right to possession must be shown and legal title may be put in issue.").

The Capizzis contend that via their self-titled "Wrongful Eviction" claim that they are challenging "the action of Duffy in bringing" the summary process action, rather than the proceeding itself. They seek damages, however, flowing from the lawful consequence of that proceeding (i.e., the levying upon the execution) and base their claim on allegations that speak to whether Duffy had legal title to the Property, a determination already made in favor of Duffy by the state court in the context of the summary process action. In situations where "the relief for which plaintiffs prayed would, if granted, effectively void the [*55] state court's judgment," *Hill, 193 F.3d at 40* (quoting *Snider v. City of Excelsior Springs, Missouri, 154 F.3d 809, 811-12 (8th Cir. 1998))*, or if the plaintiff's claim is "inextricably intertwined" with the state court proceedings, see *Feldman, 460 U.S. at 482 n.16*, the Rooker-Feldman doctrine precludes federal court jurisdiction.

The Capizzis were limited in the defenses they could raise in the summary process action. The Supreme Judicial Court has clearly articulated what foreclosure-related defenses can be raised to a summary process action:

> Legal title is established in summary process by proof that the title was acquired strictly according to the power of sale provided in the mortgage; and that alone is subject to challenge. If there are other grounds to set aside the foreclosure the defendants must seek affirmative relief in equity. . . . The issue of lack of good faith is not available to a defendant in summary process.

## III. CONCLUSION

For the reasons set forth more fully above, I:

Grant the summary judgment motions: (1) in favor of SRC against TAT and the Capizzis [89], in favor of Duffy against the Capizzis [95], and in favor of Garrett [85];

Deny the motions to amend by TAT [52] and by the Capizzis [73]; and

Deny the motion to strike by SRC [106] .

SRC shall file on or before January 26, 2005 a proposal for final judgment resolving any remaining issues, including proper disposition of the interpled fund. The remaining parties may file responsive submissions on or before February 2, 2005.

DOUGLAS P. WOODLOCK

UNITED STATES DISTRICT JUDGE