# APPENDIX



751 N.E.2d 934 (Table)                                                    Page 1

51 Mass.App.Ct. 1101, 751 N.E.2d 934 (Table), 2001 WL 128582 (Mass.App.Ct.)
**Unpublished Disposition**

**(Cite as: 51 Mass.App.Ct. 1101, 751 N.E.2d 934, 2001 WL 128582 (Mass.App.Ct.))**

**H**
NOTICE: THIS IS AN UNPUBLISHED OPINION.

Appeals Court of Massachusetts.
Vincent BARLETTA & others [FN1]

FN1. We note that a suggestion of death of the plaintiff Barletta was filed in the Superior Court.

v.

OGDEN MARTIN SYSTEMS OF HAVERHILL, INC., & others.
**No. 99-P-334.**

Feb. 15, 2001.

By the Court (ARMSTRONG, C.J., PERRETTA & BECK, JJ.).

MEMORANDUM AND ORDER PURSUANT TO RULE 1:28
**\*\*\*1** From the allowance of a motion for summary judgment for the defendants, the plaintiffs appeal. Pursuant to an oral agreement that grew out of "a very complicated transaction," the plaintiffs claim they are entitled to a payment of two million dollars from the defendants.

The motion judge ruled that an unambiguous written release could not be made ambiguous by extrinsic **parol evidence.** The **letter** clearly released "all" claims, and the 1986 oral agreement was swept into the 1987 release.

On appeal, the plaintiffs deny the plain meaning of the language and resort to a procrustean interpretation of the language of the 1987 release in order to justify their argument that the 1986 oral agreement is not included. Their contentions warrant no discussion beyond that set out in the motion judge's memorandum of decision (A.528-535) and the appellees' brief at 20-50.

*Judgment affirmed.*

51 Mass.App.Ct. 1101, 751 N.E.2d 934 (Table), 2001 WL 128582 (Mass.App.Ct.) Unpublished Disposition

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.                                                                Page 1

Not Reported in F.Supp., 1997 WL 260064 (D.Mass.)
**(Cite as: Not Reported in F.Supp.)**

**C**
Not Reported in F.Supp., 1997 WL 260064
(D.Mass.)
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,D. Massachusetts.
James F. LYDON, Thomas M. Murphy, Jr., Robert
F. Matthews, Thomas H. Secky, Charles J.
Coughlin, Richard Provencher, John J. Keough,
James F. Lydon Insurance Agency, Inc., and
Thomas M. Murphy, Jr. Insurance Agency, Inc.,
Plaintiffs,
v.
NATIONWIDE MUTUAL INSURANCE
COMPANY, et al., Defendants.
**C.A. No. 91-11971-NG.**

May 9, 1997.

Robert E. Richards, Jr. , Serino, Ley, Young &
Grumbach , Boston, MA, James E. Grumbach ,
Zimble & Brettler, Boston, MA, for James F.
Lydon, Robert F. Matthews, Thomas H. Secky,
Thomas M. Murphy, Jr., Charles J. Coughlin,
Richard Provencher, John J. Keough.
Robert E. Richards, Jr. , Serino, Ley, Young &
Grumbach , Boston, MA, William J. Royal ,
Boston, MA, James E. Grumbach , Zimble &
Brettler, Boston, MA, for James F. Lydon Ins. Co.
and Thomas M. Murphy, Jr., Ins. Agency, Inc.
Paul M. McDermott , Hale & Dorr, Boston, MA,
for Nationwide Mut. Ins. Co.

GERTNER, District Judge.
***1** Accepted and Adopted.

*REPORT AND RECOMMENDATION
REGARDING DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT (DOCKET NO. 104)
AND PLAINTIFFS' CROSS-MOTION FOR
PARTIAL SUMMARY JUDGMENT (DOCKET NO.
112)*

KAROL, United States Magistrate Judge.
In 1988 and 1989 Nationwide Mutual Insurance
Company ("Nationwide Mutual") terminated
several of its Massachusetts agents. Some of those
terminated agents brought this lawsuit against
Nationwide Mutual and its affiliates (collectively, "
Nationwide"), eventually alleging a potpourri of
claims, including breach of agency contract (as
written and as orally amended), wrongful
termination, violation of chapter 175, section 162D
of the Massachusetts General Laws (which sets
minimum commission rates), unfair competition,
quantum meruit, wrongful enforcement of
covenants not to compete, wrongful withholding of
deferred compensation, intentional infliction of
emotional distress, and unfair and deceptive trade
practices, in violation of chapter 93A of the
Massachusetts General Laws. FN1 Nationwide
asserted counterclaims against certain plaintiffs for
breach of lease agreement, breach of contract, and
overpayment. (Nationwide's Answer Pls.' Third
Am. Compl. and Am. Counterclaims, Docket no.
88.) Following the close of discovery, plaintiffs
and Nationwide filed the pending cross motions for
summary judgment. Nationwide sought summary
judgment on all of plaintiffs' claims and partial
summary judgment (as to liability only) on its own
Second and Third Counterclaims. (Nationwide's
Mot. Summ. J., Docket no. 104) Plaintiffs sought
partial summary judgment (as to liability only) on
Counts I, II, and VII of its Second and Third
Amended Complaints. (Pls.' Cross-Mot. Partial
Summ. J., Docket no. 112.) For reasons stated
below, I recommend that Nationwide's motion be
ALLOWED in part and DENIED in part.
Specifically, I recommend that Nationwide's motion
be ALLOWED as to all plaintiffs' claims with the
exception of Count VII (violation of Mass. Gen.
Laws ch. 175, § 162(D)) and as to Nationwide's
Third Counterclaim (for failure to repay
commissions) and that Nationwide's motion
otherwise be DENIED. I further recommend that
plaintiffs' motion be DENIED.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 2

Not Reported in F.Supp., 1997 WL 260064 (D.Mass.)
**(Cite as: Not Reported in F.Supp.)**

FN1. Plaintiffs are individuals James F. Lydon ("Lydon"), Thomas M. Murphy, Jr. ("Murphy"), Robert F. Matthews ("Matthews"), Thomas H. Secky ("Secky"), Charles J. Coughlin ("Coughlin"), Richard Provencher ("Provencher"), and John J. Keough, Jr. ("Keough"), as well as two corporations through which Lydon and Murphy, respectively, conducted their business, James F. Lydon Insurance Agency, Inc. and Thomas M. Murphy, Jr. Insurance Agency, Inc.

### I. *BACKGROUND* FN2

FN2. Unless otherwise noted, the record discloses no genuine dispute regarding facts stated in this section.

#### A. *Agency Agreements*

Each of the seven individual plaintiffs was a party to Nationwide's standard form Massachusetts Agent's Agreement; each of the two corporate plaintiffs was a party to Nationwide's standard form Corporate Agency Agreement. (Tighe Aff., Exs. 1-9, Docket no. 106.) There were no material differences between the two forms. The agreements provided that agents were independent contractors whose agencies were terminable at will by either party, with or without cause. Nationwide retained the right, upon termination, "to continue to provide insurance services to any and all customers and to continue to solicit such customers for additional business." (Mass. Agent's Agreement (" Agent Agreement") ¶ 10; Corporate Agency Agreement ("Corp.Agreement") ¶ 10.) Nationwide also retained complete discretion at all times to determine what types of coverage it would offer. FN3

FN3. The individual agency agreements provided:
The insurance business being subject to changing laws, regulations, and conditions, it is understood and agreed that each Company retains the right to change, alter

or amend such rules, regulations, prices, and terms, including the right to limit, restrict, or discontinue entirely the acceptance or writing of any policies, coverages, lines or kinds of insurance, at any time it deems it advisable to do so, and without notice to or consent of the Agent.
(Agent Agreement ¶ 13; *see also* (Corp. Agreement ¶ 12 (containing substantially similar provision to Agent Agreement ¶ 13).)

With limited exceptions, agents, during the term of the agreement, were required to represent Nationwide exclusively. If they resigned or were terminated within five years of their appointment, they were prohibited outright from competing with Nationwide for a period of time within a prescribed area. If they resigned or were terminated five or more years after their appointment, they were not prohibited outright from competing, but they forfeited certain deferred compensation if they did so within a one year period from a location within 25 miles of their former place of business. Since all plaintiffs were terminated more than five years after their appointment, all were subject to the forfeiture provision.

**\*2** Concerning compensation, the agreements incorporated by reference certain commission schedules, including separate schedules for present and deferred compensation. The deferred compensation schedule was called the "Schedule of Agent's Security Compensation," ("Compensation Schedule") (Compensation Schedule, Tighe Aff., Ex. 10), and payments under it were referred to as ASCP benefits. ASCP benefits were payable only to agents that had been with Nationwide a minimum of five years. They were comprised of two components: Deferred Compensation Incentive Credits, or DCIC, and Extended Earnings. Both components were payable over a period of no less than 25 months and in amounts that varied as a function of the amount of business the agent had generated during his or her tenure with Nationwide. These are the benefits that the agent would forfeit if he or she competed with Nationwide during the first year after cancellation. (Compensation Schedule, ¶ (I)(f).)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 3

Not Reported in F.Supp., 1997 WL 260064 (D.Mass.)
**(Cite as: Not Reported in F.Supp.)**

Other terms of the agency agreement also concerned compensation. Two are of particular significance to the pending motions. First, each agent, in exchange for the "comprehensive program" of benefits made available by Nationwide, expressly agreed "to accept this overall comprehensive compensation program instead of any mandatory or statutorily imposed level of compensation." (Agent Agreement ¶ 7; *see also* Corp. Agreement ¶ 7 (stating that corporate plaintiffs would be compensated "solely in accordance with the general conditions and schedules").) Second, each agent agreed to pay back to Nationwide compensation "for premiums later returned or credited to the customer." (Agent Agreement ¶ 8; Corp. Agreement ¶ 8.)

Finally, the written agency agreement contained a separate provision that expressly required that all amendments be "in writing signed by you [i.e., the agent] and an officer of the Companies." (Agent Agreement ¶ 16; Corp. Agreement ¶ 16.)

### B. *Plaintiffs' Terminations*

Beginning at least as early as the first half of 1987, Nationwide was concerned about declining profitability in the Northeast, particularly in Massachusetts. Much of the decline was associated with automobile insurance. Nationwide undertook various studies to see what could be done to reverse the downward trend, including one that was completed in June 1987 by Nationwide's Massachusetts Auto Task Force. That study identified six agents (five of whom would later become plaintiffs in this lawsuit) as accounting for a substantial portion of the loss and recommended, among other things, "that the region cancel the contracts of those agents," while "encourag[ing] [them] to keep their book of business." (Mass. Auto Task Force Staff Report ¶ II(c), Grumbach Aff. ¶ 4, Pls.' Ex. 3.) FN4 The study did not expressly state whether the "book of business" the terminated agents would be "encouraged to keep" was all their business or just the automobile portion, FN5 and it did not discuss the relationship between this recommendation and the forfeiture provision of the Compensation Schedule.

FN4. There are various exhibits and transcripts attached to the Grumbach Affidavit (Docket no. 113.). I will refer to these documents in the same manner as the Grumbach Affidavit.

FN5. It seems clear from the context, however, including the fact that the study was done by the "Auto Task Force" and analyzed and was concerned only about losses in the automobile portion of Nationwide's Massachusetts business, that it was referring only to the automobile portion of the agent's "book of business".

*3 Nationwide management accepted the Task Force's recommendations in July 1987 and dispatched two representatives to meet with the affected agents and to advise them of their impending terminations. Meetings in fact took place during the first two weeks of July. Some of the facts regarding what the Nationwide representatives said at those meetings are disputed. Viewing the evidence in the light most favorable to plaintiffs, the representatives orally advised Lydon (for himself and his company), Murphy (for himself and his company), Keough, Coughlin, and Provencher that Nationwide had decided to exercise its right to terminate their agency agreements but that, if they voluntarily resigned within thirty days, they could keep their complete books of business (i.e., compete with Nationwide in all areas) and still receive their ASCP benefits.

Within a few weeks of the meetings, four of the five plaintiffs who now claim that Nationwide made oral offers to them-Lydon, Murphy, Keough, and Coughlin-acknowledged in writing the receipt of those offers. Lydon, in a handwritten note dated July 20, 1987, characterized the offer as "fair" and reminded Nationwide that he was waiting for it "to iron out the details of payment." (Memorandum from Lydon to Rossi of 7/20/87, Grumbach Aff. ¶ 4, Pls.' Ex. 216.) Murphy confirmed in his handwritten note dated July 21, 1987, that Nationwide had requested his resignation and stated: "Please call me and let me know who I have to meet with to get this resignation completed and my extended earnings and DCIC squared away."

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                Page 4

Not Reported in F.Supp., 1997 WL 260064 (D.Mass.)
**(Cite as: Not Reported in F.Supp.)**

(Memorandum from Murphy to Rossi of 7/21/87, Grumbach Aff. ¶ 4, Pls.' Ex. 216.) Keough stated in a letter dated July 23, 1987, "I am prepared to accept the offer of Nationwide to resign in exchange for the company meeting the conditions of their offer," and he added that he "would like the opportunity to meet with whomever necessary from Nationwide so that they can provide me with a written confirmation of their offer in order that there may be an amicable and smooth transition and to work out the details of that transition." (Letter from Keogh to Townsend of 7/23/87, Grumbach Aff. ¶ 4, Pls.' Ex. 217.) Finally, Coughlin sent Nationwide a letter dated August 7, 1987, in which he purported to "confirm in writing the oral agreement we reached regarding my resignation from Nationwide Insurance Company" and to set out his understanding of the inducements that Nationwide had purportedly offered "in exchange for my resignation within thirty days." (Letter from Coughlin to Rossi of 8/7/87, Grumbach Aff. ¶ 6, Coughlin Ex. 29.) FN6

> FN6. An oral offer was also made to Provencher, but he did not confirm it in writing. He testified, however, that he responded to the offer by telling the Nationwide representative who communicated it to him that he would not resign until the offer was put in writing. (Provencher Dep. at 67, *located in* Tighe Aff., Ex. 11.)

Nationwide never put any of these offers in writing and never expressly acknowledged that they had been made. In obvious response to some of the notes and letters it had by then received, however, it did send each plaintiff who had claimed to receive an offer a letter dated July 30, 1987, in which it alluded to "some misunderstanding and miscommunication concerning ... Nationwide's marketing strategy in Massachusetts;" acknowledged that discussions had taken place about "options" "concerning other available carriers; " and announced that "Home Office has directed a task force" to undertake a new study of Nationwide's "position and marketing strategy in Massachusetts." (Letter from Pontell to Coughlin,

et al. of 7/30/87, Tighe Aff., Ex. 26.) Although Nationwide's letter neither admitted nor denied that any oral offers had been made or accepted, it went on to state, "We will continue to assist you in your efforts to improve your loss situation in auto and continue to direct your efforts into multi-line markets," *id.,* thus implying, at least, that Nationwide contemplated an ongoing relationship.

*4 While numerous disputes, both factual and legal, swirl around the events of July 1987 and their significance, two material facts are undisputed: (1) no plaintiff ever in fact resigned (Nationwide's Statement of Undisputed Facts ("Nationwide's Fact Statement"), *located in* Defs.' Supplemental Mem. Supp. Mot. Summ. J. ("Nationwide's Mem. ") at 19, Docket no. 144; Plaintiffs' Statement of Disputed and Undisputed Facts ("Pls.' Fact Statement") ¶ 50, Docket no. 118), and (2) for at least a year and a half, all plaintiffs continued to attend agents' meetings, write new Nationwide policies, and receive commissions, including renewal commissions and commissions on the new Nationwide policies they continued to write, (Nationwide's Mem. at 19-20). It is also undisputed that the parties never agreed to accelerate the payment of ASCP benefits. (Nationwide's Mem. at 21.) FN7 After the foregoing events of July 1987, Nationwide remained dissatisfied with the performance of certain of its businesses in Massachusetts, particularly automobile insurance.

> FN7. The fact that the parties did not agree to accelerate the payment of ASCP benefits is undisputed both because plaintiffs do not refute Nationwide's claim to that effect, *see* Local Rule 56.1 (" Material facts of record set forth in the statement required to be served by the moving party will be deemed for purposes of the motion to be admitted ... unless controverted"), and because plaintiffs themselves rely on the continued effectiveness of the original payment schedule as a premise for their argument that, as a matter of law, it was unnecessary to reach agreement on a new payment

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 5

Not Reported in F.Supp., 1997 WL 260064 (D.Mass.)
**(Cite as: Not Reported in F.Supp.)**

schedule in order to amend the agency agreement in other respects. *See* Pls.' Mem. Opp. Defs.' Mot. Summ. J. and in Supp. Pls.' Cross-Mot. Partial Summ. J. (" Pls.' Mem.") at 12 ("[T]he absence of agreement on timing is not fatal" because " the [agency] Agreement provides a schedule for payment of ASCP benefits").

It made various changes in its operations during the second half of 1987 and during 1988 in an attempt to improve profitability. Many of these changes, for reasons discussed below, were perceived by agents as being detrimental to their interests. In 1989, apparently as part of this ongoing effort to improve profitability, Nationwide began terminating agents whose business was perceived to be unprofitable or who were suspected of violating the exclusivity provision of the agency agreement, or both. All plaintiffs were terminated pursuant to written cancellation notices issued by Nationwide during the 16-month period from March 1989 through July 1990. (Nationwide's Mem. at 27.) Each plaintiff competed with Nationwide within the one year period following his termination. (*Id.* at 7.) Nationwide took the position that each plaintiff thus forfeited his right to receive ASCP benefits. This lawsuit followed.

### C. The Parties' Allegations

Most of plaintiffs' claims are set forth in a six-count Second Amended Complaint. (Second Am. Compl., Docket no. 31) A seventh count is set forth in a Third Amended Complaint. (Third Am. Compl., Docket no. 143.) Because many of the counts include overlapping allegations or allegations that appear to have been abandoned, plaintiffs' present claims are more easily understood if they are not tied to specific counts. Generally, plaintiffs assert four primary claims:

1. At least five plaintiffs claim they are being wrongfully deprived of ASCP benefits as a result of Nationwide's refusal to honor oral agreements they and Nationwide reached in July 1987.

2. The forfeiture provision in the Compensation

Schedule is void as against public policy.

3. Nationwide committed various breaches of contract, as a result of which (a) plaintiffs are entitled to damages FN8 and (b) it would be inequitable to permit Nationwide to enforce the forfeiture of ASCP benefits.

> FN8. Plaintiffs do not appear to be seeking reinstatement.

*5 4. Plaintiffs are entitled to receive commissions at the minimum level mandated by chapter 175, section 162D of the Massachusetts General Laws, notwithstanding the express waivers they signed.

In addition to these four primary claims, plaintiffs assert a number of secondary claims based on the same facts as the primary claims, including unfair competition, intentional infliction of emotional distress, quantum meruit, and violation of chapter 93A of the Massachusetts General Laws.

The two counts of Nationwide's counterclaim that are relevant to the pending motions are Counts II and III. In Count II, Nationwide seeks damages for plaintiffs' pre-termination breaches of the exclusivity provision of the agency agreement. FN9 In Count III, it seeks to recoup the commissions plaintiffs were paid on premiums that Nationwide later had to return to customers in the ordinary course following termination. FN10

> FN9. Nationwide contends, and plaintiffs do not deny, that four of the plaintiffs-Coughlin, Keough, Matthews, and Secky-placed homeowners and fire insurance with carriers other than Nationwide before they were terminated. (Nationwide's Mem. at 25-26, 38-39.) Presumably, these are the only plaintiffs as to whom Nationwide is seeking summary judgment on Count II of its counterclaim.

> FN10. Nationwide contends, and plaintiffs do not deny, that five plaintiffs-Coughlin, Murphy, Lydon, Provencher, and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                Page 6

Not Reported in F.Supp., 1997 WL 260064 (D.Mass.)
**(Cite as: Not Reported in F.Supp.)**

Secky-were paid full commissions on premiums that Nationwide later had to return to policyholders. (*Id.* at 39.) Presumably, these are the only plaintiffs as to whom Nationwide is seeking summary judgment on Count III of its counterclaim.

## II. *DISCUSSION AND ANALYSIS*

### A. *The Summary Judgment Standard*

The standard for summary judgment is familiar. Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). At the outset, the moving party must aver that there is an absence of evidence to support the non-moving party's position. *Garside v. Osco Drug, Inc.,* 895 F.2d 46, 58 (1st Cir.1990). To avoid summary judgment, the opposing party must produce affirmative evidence demonstrating a genuine issue for trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986) ; *Mesnick v. General Elec. Co.,* 950 F.2d 816, 825 (1st Cir.1991). "[T]he nonmovant may not rest upon mere allegations, but must adduce specific provable facts demonstrating that there is a triable issue." *Brennan v. Hendrigan,* 888 F.2d 189, 191 (1st Cir.1989). Nor may the opposing party "derail summary judgment by the primitive expedient of insisting that his opponent's evidence should be disbelieved." *Abbott v. Bragdon,* 107 F.3d 934, 1997 WL 85096, at *6 (1st Cir. March 5, 1997). While summary judgment should be used sparingly where motive, intent, or state of mind are at issue, it is nevertheless available where plaintiff "rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Medina-Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir.1990). In reviewing the nonmovant's case, "the court must look at the record in the light most favorable to the party opposing the motion and must indulge all inferences favorable to that party," *Stepanischen v. Merchants Despatch Transp. Corp.,* 722 F.2d 922, 928 (1st Cir.1983) ; see Mack v. *Great Atlantic & Pacific Tea Co.,* 871 F.2d 179, 181 (1st Cir.1989), subject, nevertheless, to the caveat that the court "

must disregard improbable or overly attenuated inferences, unsupported conclusions, and rank speculation." *Abbott,* 107 F.3d 934, 1997 WL 85096, at *2 (1st Cir. March 5, 1997). Where, as here, the parties have filed cross motions for summary judgment, the two motions must be considered independently, with all inferences drawn in favor of plaintiffs with respect to Nationwide's motion and in favor of Nationwide with respect to plaintiffs' motion.

### B. *Nationwide's Motion*

#### (a) *The Enforceability of The July 1987 Oral Agreements*

**\*6** Nationwide acknowledges that, for purposes of its motion for summary judgment, the court must assume that representatives of Nationwide indeed made oral offers to five of the seven individual plaintiffs to the effect that, if they resigned within 30 days, they would be permitted to compete with Nationwide in all product lines and retain full ASCP benefits. It claims, however, that for a number of reasons, no oral contract was formed that is binding on Nationwide. Although I am not persuaded by all of Nationwide's arguments, I agree with Nationwide's conclusion.

There are at least four significant problems with plaintiffs' claim that Nationwide must honor the oral agreements purportedly reached in the summer of 1987.

1. Even if it is assumed, as it must be, that Nationwide made oral offers to plaintiffs, it is far from clear that any plaintiff, with the possible exception of Coughlin, ever purported to accept Nationwide's offer. Thus, Lydon, Murphy, and Keough all used language in their correspondence that conspicuously stopped short of making an unequivocal and unconditional commitment to Nationwide such as would normally be required in an acceptance. *See generally,* E. Allan Farnsworth, *Contracts* § 3.13, at 149 (2d Ed.1990) (where an offer invites an acceptance by a promise, the acceptance "must be an expression of commitment"

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                      Page 7

Not Reported in F.Supp., 1997 WL 260064 (D.Mass.)
**(Cite as: Not Reported in F.Supp.)**

and not merely an "acknowledgment of receipt of the offer or an expression of interest," and "the commitment must not be conditional on any further act by either party"). FN11 To be specific, Lydon characterized the offer as "fair," but, far from saying he accepted it, he reminded Nationwide that he was still waiting for it "to iron out the details of payment." Similarly, Murphy was careful not to commit himself to acceptance of Nationwide's offer; rather, he requested that Nationwide call him "to let [him] know who [he] ha[d] to meet with to get this resignation completed and [his] extended earnings and DCIC squared away." Keough also chose his words carefully, saying only that he was "*prepared to* accept the offer," while at the same time requesting a meeting "with whomever necessary from Nationwide" so that he could obtain "written confirmation" of it. (emphasis supplied.) I doubt that the foregoing language, as a matter of law, conveys a commitment that is sufficiently unequivocal and unconditional to satisfy the requirements for contract formation. *See Hutchinson v. Plant,* 218 Mass. 148, 153-154, 105 N.E. 1017, 1020 (1917) (discussing whether plaintiff's purported acceptance was sufficiently definite to create a contract). I do not rely upon this ground, however, and will not pursue it further, because Nationwide did not squarely make this argument.

> FN11. The problem is even more substantial for Provencher, who expressly told Nationwide that he would not resign until Nationwide put its offer in writing.

2. Nationwide did argue, however, albeit under the rubric of "equitable estoppel," that plaintiffs cannot enforce the oral agreements because it is undisputed that no plaintiff in fact resigned. Nationwide is correct, although I prefer to couch the analysis in ordinary contract terms.

**\*7** Nationwide asked only one thing of plaintiffs in exchange for allowing them to compete post-termination without forfeiting their ASCP benefits. It asked that they resign within thirty days, thereby obviating the need for Nationwide to exercise its right to terminate them. It is

undisputed not only that no plaintiff ever resigned, but that all continued to write policies, accept new and renewal commissions, attend meetings of Nationwide agents, and receive mailings sent to agents. Whether Nationwide's offer is characterized as a promise by Nationwide (i.e., to waive the non-compete clause) in exchange for performance by plaintiffs (i.e., resignation within thirty days), or a promise by Nationwide in exchange for a promise by plaintiffs that they would resign within thirty days, the result is the same: Nationwide's promise to waive the non-compete clause never became effective. In the first case, Nationwide's offer would never have ripened into a contract because it is undisputed that plaintiffs did not render the requested performance-resignation within thirty days. Similarly, if Nationwide made a promise to waive the non-compete clause in exchange for promises by plaintiffs that they would resign within thirty days, the doctrine of "constructive conditions of exchange" would relieve Nationwide of its duty to perform if plaintiffs failed to honor their promises. *E.g., Ward v. American Mutual Liability Ins. Co.,* 15 Mass.App. 98, 100, 443 N.E.2d 1342, 1343 (1983) ("It is well established that a material breach by one party excuses the other party from further performance under the contract."); *See generally,* Farnsworth, *Contracts* § 8.9, at 604-05, (under the doctrine of "constructive conditions of exchange," "the court supplies a term making the first party's promise conditional on performance of the return promise;" "[o]nly by the clearest language can the parties make a promise to which the concept of constructive conditions does not apply"). In either case, therefore, plaintiffs' failure of performance would relieve Nationwide of any reciprocal obligation.

Plaintiffs attempt to defeat the effect of their admitted failure to resign by arguing in their memorandum that they "*sought to* effectuate their resignations, but were continually rebuffed by Nationwide." (Pls.' Mem. at 13.) For two independent reasons, I reject this argument. First, plaintiffs do not cite any evidence in their principal brief to support this assertion, and the evidence they cite in their reply brief (Pls.' Mot. Leave Submit Reply Brief, and Reply Brief at 2, Docket no. 119 (citing Rossi Dep. at 66; Pls.' Exs. 4, 216, 217;

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                 Page 8

Not Reported in F.Supp., 1997 WL 260064 (D.Mass.)
**(Cite as: Not Reported in F.Supp.)**

Defs.' Ex. 29)) does not fill the gap. Nor have I been able to find any supporting evidence based upon my own review of the summary judgment record. To the contrary, it appears from the record that, for at least a year after the flurry of activity in July 1987, there were no further references by either party to the matter and no changes in the way Nationwide treated plaintiffs relative to the way it treated other agents.

**\*8** Second, either the deal between plaintiffs and Nationwide was complete, in which case all plaintiffs had to do was tender their resignations and there was nothing for Nationwide to rebuff, or it was not, in which case there could not have been a binding agreement until all material terms were resolved.

I conclude, therefore, that even without consideration of Nationwide's other arguments regarding the ineffectiveness of the oral agreements allegedly made in July 1987, any claims by plaintiffs premised upon the existence of such agreements must be rejected.

3. Nationwide also argues that an oral agreement to permit plaintiffs to compete and still collect ASCP benefits would be barred by the statute of frauds as a contract that could not be performed within a year. Mass. Gen. Laws ch. 259, § 1, Fifth. FN12 I again must agree with Nationwide.

> FN12. No action shall be brought:
>
> Fifth, Upon an agreement that is not to be performed within one year from the making thereof;
> Unless the promise, contract or agreement upon which such action is brought, or some memorandum or note thereof, is in writing and signed by the party to be charged therewith or by some person thereunto by him lawfully authorized.
> Mass. Gen. Laws ch. 259, § 1.

" 'The general rule [in Massachusetts] is that an oral modification ... of a written contract which originally was and as modified is within the statute of frauds cannot be wholly or in part the *foundation of an action.*' " *Johnston v. Holiday Inns Inc.,* 565 F.2d 790, 793 (1st Cir.1977) (quoting *Lampasona v. Capriotti,* 296 Mass. 34, 38, 4 N.E.2d 621, 623 (1936)). There are, no doubt, exceptions to the general rule, most notably the "*Cummings* rule," described in *Johnston* as "a doctrine accepted in Massachusetts under which 'in defence to an action on the written contract [within the Statute of Frauds], the defendant may show that he has performed it according to an oral agreement for a substituted performance.' " *Id.* (quoting *Rosenfeld v. Standard Bottling & Extracts Co.,* 232 Mass. 239, 245, 122 N.E. 299, 300 (1919) (citing *Cummings v. Arnold,* 44 Mass. (3 Met.) 486 (1842) )). The First Circuit went on to explain the *Cummings* rule as one under which "a plaintiff could not sue upon the oral modification," but "a defendant was entitled to set it up as a defense." *Johnston,* 565 F.2d at 794. In other words, the rule "relies on the distinction between a plaintiff's cause of action on a parol modification [which is prohibited] and a defendant's reliance on such a modification [which is not]." *Id.* While, as a matter of policy, one might quarrel with the formal distinction drawn by *Cummings* and most later cases between affirmative and defensive use of an oral amendment to a contract within the statute of frauds, a federal district court sitting in a diversity action is not free to disregard established state law. *Eirie R.R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938); *see also Daigle v. Maine Medical Center, Inc.,* 14 F.3d 684, 689 (1st Cir.1994) ("A federal court sitting in diversity jurisdiction and called upon in that role to apply state law is absolutely bound by a current interpretation of that law formulated by the state's highest tribunal.")

Massachusetts does, however, recognize a narrow exception to the rule that oral amendments to contracts within the statute of frauds may be used as shields but not as swords. That narrow exception deals with the case in which a plaintiff attempts to sue on a contract within the statute of frauds and is met with the defense that the defendant's obligation was discharged by plaintiff's own failure to perform within the time requirements set forth in the written agreement. When met by such a defense, plaintiff

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1997 WL 260064 (D.Mass.)
**(Cite as: Not Reported in F.Supp.)**

is permitted to claim in rebuttal that its time for performance was extended by an oral agreement. *See Rex Lumber Co. v. Acton Block Co.,* 29 Mass.App.Ct. 510, 515, 562 N.E.2d 845, 848 (1990) (citing *Stearns v. Hall,* 63 Mass. 31, 9 Cush. 31 (1851) for the proposition that "a plaintiff may enforce a contract within the Statute of Frauds which has been modified by an oral agreement to extend the time for performance, even though the plaintiff must rely on that extension to show his own compliance with the contract terms"). Massachusetts thus has attempted to balance the equities of the extended performance situation with the policies underlying the statute of frauds. The fact that, having done so, it has been careful to confine the exception to that particular fact pattern confirms that it would be inappropriate for this court to extend the exception to more substantive modifications such as the one alleged here. *See also Rosenfeld v. Standard Bottling & Extracts Co.,* 232 Mass. 239, 245, 122 N.E. 299, 300 (1919) (refusing to permit plaintiff to invoke *Cummings* rule to sue on a substantive oral modification to a written contract within the statute of frauds).

**\*9** The question remains whether the agreements regarding the payment of ASCP benefits, as written and as purportedly orally amended, are within the statute of frauds. Under the original agreement, the payout of ASCP benefits was to take place over a minimum period of 25 months. It is undisputed that there was no agreement regarding the acceleration of that payout period. Thus, neither the original agreement nor the amended agreement could be performed within a year. Plaintiffs respond that Nationwide might have voluntarily undertaken to accelerate the payment of ASCP benefits, and the fact that it might have done so takes the agreement out of the operation of the statute. (Pls.' Mem. at 13.) It cites no authority for this proposition, however, and I have found none. FN13 Since the agency agreement, as amended, cannot be performed within a year, and since there is no writing signed by Nationwide confirming the purported amendment, the amendment is unenforceable under the statute of frauds.

FN13. Plaintiffs cite *Joseph Martin, Inc. v.*

*McNulty,* 300 Mass. 573, 16 N.E.2d 4 (1938) and *Doherty v. Doherty Ins. Agency, Inc.,* 878 F.2d 546 (1st Cir.1989) to support their argument. These cases, however, support the proposition that a contract is not within the statute of frauds if it "may, *by its terms,* be fully performed within the year." *Doherty,* 878 F.2d at 551 (internal quotation marks omitted) (emphasis added). But a contract which, by its terms, provides for performance over a period of no less than 25 months is not one which, by its terms, may be performed within a year. The fact that it is capable of being amended so that, as amended, it is capable of being performed within a year is beside the point. It is important to note that plaintiffs did not argue, and I do not decide, whether the agreement, as written and orally modified, falls outside the statute of frauds because Nationwide's obligation to pay plaintiffs' ASCP benefits over a period of no less than 25 months is merely a bonus or salary term. Several courts, although none apparently within Massachusetts, have held that contract terms which fall in this category do not bring a contract within the statute of frauds, even though execution of the term must take place beyond a one year period. *See, e.g., Hodge v. Evans Financial Corp.,* 823 F.2d 559, 565 (D.C.Cir.1987) (" Courts have specifically and consistently held that the presence of bonus or salary terms payable after one year does not bring a long-term indefinite employment contract within the statute [of frauds]. ") (citing *Miller v. Riata Cadillac Co.,* 517 S.W.2d 773 (Tex.1974) ; *White Lightning Co. v. Wolfson,* 68 Cal.2d 336, 66 Cal.Rptr. 697, 438 P.2d 345 (Cal.1968) ; *Murphy v. Buschman-Jennings, Inc.,* 382 S.W.2d 29 (Mo.App.1964)); *see also Proctor v. MacDonald,* 689 A.2d 1330, 1997 WL 96647, at \*3 (N.H. Mar.7, 1997) (holding that agreement which contemplated commissions for leases and renewals was not within the statute of frauds despite the fact that lease renewals

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 10

Not Reported in F.Supp., 1997 WL 260064 (D.Mass.)
**(Cite as: Not Reported in F.Supp.)**

took place beyond one year, because " plaintiffs fully performed their part of the agreement" within one year); *Dumas v. Auto Club Ins. Ass'n,* 437 Mich. 521, 473 N.W.2d 652, 692 (Mich.1991) (Levin, J. dissenting) ("The question whether a contract can be performed within a year depends on the duration of the contract, and not on the time of performance of a particular term of the contract.")

4. The fourth significant problem with plaintiffs' attempt to rely upon an oral modification of the standard agency agreement is that the agreement contains a "no oral modification" clause. It is certainly true in Massachusetts that such clause is not an absolute bar to all oral modifications. *Eg., Cambridgeport Savings Bank v. Boersner,* 413 Mass. 432, 439, 597 N.E.2d 1017, 1022 (1992). Rather, Massachusetts recognizes that parties to a contract may waive any provision, including one that requires that all modifications be in writing. The difficulty in this area of the law is determining whether the evidence is sufficient to support a finding by the jury not just that the parties reached agreement in principle on a substantive modification, but also that they agreed to waive a contract provision that would have given them the opportunity to consider the modification in final written form before committing themselves to it. Putting it more precisely, the difficult question is whether evidence that would minimally suffice *in the absence of the clause* to support a finding that the parties reached agreement in principle on a substantive modification is, without more, sufficient to support a finding that the party now attempting to invoke the clause orally waived it.

On the one hand, a rule that evidence sufficient to support a finding that an agreement in principle was reached on a substantive modification is per se sufficient to support a finding that the clause barring oral modifications was waived would effectively render the clause a nullity. One could argue that this would be a good result because clauses of this kind are often unfairly invoked by the dominant party after it has induced detrimental reliance by the subordinate party. On the other hand, instances in which the weaker party has been induced to rely to

its detriment upon the purported oral modification can and are adequately addressed through the doctrine of equitable estoppel, under which the aggrieved party obtains reliance damages if its reliance was reasonable, but may not otherwise enforce the contract to obtain benefit of the bargain damages. Moreover, no oral modification clauses have a valid business purpose, to the extent they serve to reduce legitimate uncertainty about such fertile grounds for dispute as whether the parties intended to bind themselves to a modification of some kind; what the precise terms of the modification were; and whether the party who purported to approve the purported modification had actual authority to do so.

**\*10** Competing policy considerations such as these no doubt informed the court's statement in *Cambridgeport Savings* that "evidence of a subsequent oral modification must be of sufficient force to overcome the presumption that the integrated and complete agreement, which requires written consent to modification, expresses the intent of the parties." *Id.,* n. 10. It is also noteworthy that the court, in the same footnote in which it made the foregoing statement, cited, with apparent approval, two cases from other jurisdictions which required proof that was "clear and convincing" or " clear, precise, and convincing," in contrast to evidence that was "vague, indefinite, or ambiguous." *Id.* (citing *EDO Corp. v. Beech Aircraft Corp.,* 911 F.2d 1447, 1454 (10th Cir.1990) ; *Nicolella v. Palmer,* 432 Pa. 502, 248 A.2d 20 (Pa.1968)) (internal quotation marks omitted). I infer from this that courts in Massachusetts are, at a minimum, not to assume that evidence that would suffice to prove an oral modification under ordinary circumstances is always sufficient to support a finding that the parties intended to waive a no oral modification clause. Rather, for analytical purposes, the court must treat the latter issue as a separate question, as to which the evidence must be sufficiently clear and convincing to overcome the " presumption" that waiver was not intended.

Applying these principles, the evidence is not, in my judgment, sufficiently "clear, precise, and convincing" to overcome the "presumption" that the parties did not intend to waive the no oral

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                              Page 11

Not Reported in F.Supp., 1997 WL 260064 (D.Mass.)
**(Cite as: Not Reported in F.Supp.)**

modification clause. Even accepting plaintiffs' correspondence to Nationwide in July and August 1987 at face value, there is considerable uncertainty about what the terms of the purported amendment were; about whether the two Nationwide representatives who spoke to plaintiffs had actual authority to make the offers they purported to make; and, most important, about whether the parties anticipated that the offers and acceptances would be confirmed in writing, with every "i" dotted and "t" crossed, before any agreement in principle ripened into a mutually binding agreement. These are precisely the kinds of uncertainty that no oral modification clauses are legitimately designed to address. I thus conclude that no reasonable jury could find on the basis of evidence this "vague, indefinite, and ambiguous" that the parties intended to waive the no oral modification clause.

To summarize, I recommend the granting of summary judgment in favor of Nationwide on plaintiffs' oral modification claim on three independent grounds: (a) plaintiffs never in fact resigned, (b) the purported oral modification is barred by the statute of frauds, and (c) the evidence is insufficient to overcome the presumption that the parties did not intend to be bound without a writing.

### (b) Enforceability of the Forfeiture Provision

Beginning at page 16 of their memorandum, plaintiffs make several arguments to the effect that the forfeiture provision is unenforceable. None has merit.

*11  1. Plaintiffs first argue that Nationwide modified the forfeiture clause by its oral offers. For the three reasons already given, Nationwide's oral offers did not ripen into enforceable obligations.

2. Next, plaintiffs argue that Nationwide may not enforce the forfeiture provision because it committed breaches of express or implied covenants of the agency agreement as written. For reasons that will be discussed below, Nationwide did not violate any terms of the agency agreement and is therefore not precluded from enforcing the forfeiture provision on this ground.

3. Plaintiffs next suggest, in what can charitably be described as a less than fully-developed argument, that the forfeiture clause is unenforceable because, as written, it conflicts with the "employer's duty of good faith and fair dealing in the context of an at-will contract." (Pls.' Mem. at 17.) Plaintiffs acknowledge the many cases cited by Nationwide that have rejected public policy challenges to the very forfeiture clause in question, FN14 but plaintiffs claim, nevertheless, that those cases "are not persuasive" because the courts that decided them were less concerned with good faith and fair dealing than courts in Massachusetts are. (Pls.' Mem. at 17.) I cannot agree. The cases cited by Nationwide are well-reasoned and persuasive, and plaintiffs' assertion that the concept of good faith and fair dealing is a more "entrenched element of Massachusetts jurisprudence," *id.,* than it is elsewhere is entirely without support.

> FN14. *See, e.g., James H. Washington Ins. Agency v. Nationwide Mut. Ins. Co.,* 95 Ohio App.3d 577, 643 N.E.2d 143, 150 (Ohio.Ct.App.1993) ( "Nationwide's prohibition against employment with other insurance companies protect[s] legitimate business interest; ... the 'time and territory ' restrictions of one year and twenty-five miles [i]s a reasonable restriction to protect Nationwide's interest; ... [and] the restriction impose[s] no undue hardships on an agent because the agent is free to work for another company outside the restricted area and receive renewal commissions, or work for another company within the restricted area and forfeit renewal commissions."), (internal citations omitted), *appeal dismissed,* 71 Ohio St.3d 1203, 640 N.E.2d 1145 (Ohio 1994); *see also Wolcott v. Nationwide Mut. Ins. Co.,* 664 F.Supp. 1533, 1541-42 (S.D.Ohio 1987) (holding forfeiture provision enforceable), *aff'd in part* and *rev'd in part,* 884 F.2d 245, 249 (6th Cir.1989); *Smith v. Nationwide Mut.* Ins. Co., No. Sh-C-85-158, slip op. at 4-7 (W.D.N.C. Aug. 9, 1985) (copy at Tighe Aff., Ex. 14) (same); *Brodzinski v.*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                              Page 12

Not Reported in F.Supp., 1997 WL 260064 (D.Mass.)
**(Cite as: Not Reported in F.Supp.)**

*Nationwide Mut. Ins.* Co., No. 36055, slip op. at 3-4, (Ohio Ct.App. Aug. 18, 1977) (copy at Tighe Aff., Ex. 12) (same); *Kedzi v. Nationwide Mut. Ins. Co.,* No. 35683, slip. 5-7 (Ohio Ct.App. Aug. 11, 1977) (copy at Tighe Aff., Ex. 13) (same).

Moreover, it is apparent that plaintiffs misunderstand the significance of the implied covenant of good faith and fair dealing in the at-will employment context. The covenant has most frequently been invoked to prevent an employer from terminating an at-will employee for the purpose or with the effect of depriving the employee of compensation that the employee had already earned and which, with the mere passage of time, would have become payable. *See, e.g., Fortune v. National Cash Register Co.,* 373 Mass. 96, 104-105, 364 N.E.2d 1251, 1257 (1977); *see also Gram v. Liberty Mut. Ins. Co.,* 384 Mass. 659, 672, 429 N.E.2d 21, 29 (1981). The doctrine has no application where, as here, the former agent does not earn the additional compensation unless and until it fulfills a material, post-termination obligation to the former employer. *See, e.g., King v. Driscoll,* 424 Mass. 1, 7, 673 N.E.2d 859, 863 (1996) (holding that plaintiff's claim for a breach of the covenant of good faith and fair dealing fails, " because he ... failed to present evidence that he was denied compensation for work performed").

This is not to say that plaintiffs are without recourse to prevent overreaching by Nationwide. Under the leading case of *Cheney v. Automatic Sprinkler Corp. of Am.,* 377 Mass. 141, 147, 385 N.E.2d 961, 965 (1979), forfeiture for competition clauses are subject to the same standards of reasonableness that are used to determine the enforceability of noncompetition clauses generally. Under such standards, the restriction will be applied as written if it operates within a reasonably limited time and place and serves the purpose of protecting the employer's trade secrets, confidential information, or goodwill. *Id.* Further, to the extent the clause is determined to be unreasonably broad, it will be restructured and enforced. *Id.*

*\*12 Applying this test, plaintiffs make no serious attempt to demonstrate that the forfeiture clause

here is unreasonably broad, and for good reason. It operates only for one year and only within a 25 mile radius of the agent's former place of business. It could hardly be more limited and still serve the purpose of protecting Nationwide's goodwill among existing and prospective policyholders. *See, e.g., Shipley Co. v. Kozlowski,* 926 F.Supp. 28, 30 (D.Mass.1996) (declaring one year non-competition clause valid); *Shipley Co. v. Clark,* 728 F.Supp. 818, 826-27 (D.Mass.1990) (same); *Marine Contractors Co. v. Hurley,* 365 Mass. 280, 290, 310 N.E.2d 915, 921 (1974) (declaring a three-year covenant not to compete reasonable); *All Stainless, Inc. v. Colby,* 364 Mass. 773, 778-79, 308 N.E.2d 481, 485-86 (1974) (holding a two-year restriction with geographical restriction to former sales territory was reasonable.) I therefore reject plaintiffs' public policy challenge to Nationwide's forfeiture for competition clause. FN15

> FN15. Plaintiffs assert in conclusory terms that the reasonableness of the forfeiture clause is "fact-laden." (Pls.' Mem. at 19.) They do not identify any particular factual disputes, however, other than suggest an inconsistency between Nationwide's claim that plaintiffs were terminated for being unprofitable and Nationwide's present concern that plaintiffs will siphon business away from Nationwide if plaintiffs are allowed to compete. Plaintiffs do not cite, however, and I have not found, any authority for the dubious proposition that Nationwide, as a condition of enforcing the clause, must prove on a policyholder by policyholder basis that all the business it is trying to protect will be profitable in the long run. In fact, the case law supports the opposite conclusion, i.e., the clause will be enforced unless the amount forfeited by plaintiffs is unreasonable, in light of the possible damages to Nationwide from plaintiffs' competition. *See, e.g., Kroeger v. Stop & Shop Companies.,* 13 Mass. Ct.App. 310, 321-22, 13 Mass.App.Ct. 310, 432 N.E.2d 566, 573 ("It is ... not necessary to establish the precise monetary damages

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1997 WL 260064 (D.Mass.)
**(Cite as: Not Reported in F.Supp.)**

which flow from the breach of a covenant not to compete; a promise to pay a specific amount as damages ... will be given effect. This is because the task of quantifying the consequences of violating a non-competition clause is a particularly difficult and elusive one.") (citations omitted), *rev. denied*, 386 Mass. 1102, 440 N.E.2d 1175 (1982).

4. Plaintiffs next argue that Nationwide should be " judicially estopped" from enforcing the forfeiture clause because, when a Nationwide representative described Nationwide's compensation program in an affidavit he filed in other, unrelated litigation regarding the applicability of chapter 175, section 162D of the Massachusetts General Laws to Nationwide agents, he did not alert the court in that case to the fact that the ASCP benefits were potentially forfeitable. Plaintiffs also suggest in a perfunctory way that the forfeiture clause is unenforceable because Nationwide waived it years earlier in two instances unrelated to them and is unconscionable because it came as an unfair surprise to them, is one-sided, and affects their pensions and retirement savings. FN16 Suffice it to say that these arguments are without legal or factual support, or both.

> FN16. Plaintiffs concede, however, that ASCP benefits are not protected by ERISA because they are unfunded. (Pls.' Mem. at 19.)

To summarize, the forfeiture clause is not unenforceable for reasons of public policy.

### (c) *Breaches of Contract*

Plaintiffs assert that Nationwide committed numerous breaches of contract, as a result of which they are entitled to damages and Nationwide may not enforce the forfeiture provision of the Compensation Schedule. Plaintiffs' argument focuses on three events: (1) Nationwide's withdrawal from Commonwealth Automobile Reinsurers ("CAR") and its "reinterpretation" of the

agency agreement; (2) changes in Nationwide's product line; and (3) institution of the Massachusetts Agents' Expectations ("MAE") program.

1. *Withdrawal from CAR and "Reinterpretation" of Agency Agreement.* It is undisputed that, in late 1987, Nationwide notified its Massachusetts agents that it had decided to withdraw from CAR, a regulated organization of automobile insurers who agreed to reinsure high risk Massachusetts drivers who otherwise would have been unable to obtain compulsory automobile coverage. In connection with its withdrawal from CAR, Nationwide advised its agents that it had "reinterpreted" its agreement with them to permit them to place the coverage for such high risk drivers with other CAR member companies. At the same time, Nationwide advised its agents that they could voluntarily continue to place such coverage with Nationwide if they chose to do so, and, if they did so, the premiums and losses on such policies would be included in the calculation of their loss ratios. FN17

> FN17. Drawing all reasonable inferences in favor of plaintiffs, I shall assume that Nationwide's reminder that losses on policies written for high risk drivers would be charged to the agent's loss ratio was intended to, and did, act as a deterrent to the agent's exercising its option to place such risk with Nationwide.

**\*13** Plaintiffs claim that Nationwide's withdrawal from CAR and its "reinterpretation" of the agency agreement to permit them to place coverage for high risk drivers with other CAR members violated the terms of the agency agreement. Their argument is not persuasive.

In the first place, plaintiffs do not explain in their memorandum (and could not explain at oral argument) how they were hurt by Nationwide's withdrawal from CAR and "reinterpretation" of the agreement to permit them to place high risk coverage either with Nationwide or with other CAR members, at their option. More fundamentally, plaintiffs do not cite any provision of the agreement

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                Page 14

Not Reported in F.Supp., 1997 WL 260064 (D.Mass.)
**(Cite as: Not Reported in F.Supp.)**

that prohibited Nationwide from unilaterally withdrawing from CAR and announcing that it would waive enforcement of the provision that prohibited agents from writing automobile coverage for high risk drivers with other carriers. Indeed, even if Nationwide had decided to withdraw altogether from the automobile insurance business, it would have been entirely within its rights to do so under paragraph 13 of the Agent Agreement and paragraph 12 of the Corp. Agreement. FN18 Therefore, even if plaintiffs would have been better off if Nationwide had remained in CAR and continued to prohibit them outright from writing automobile insurance polices with other carriers, Nationwide did not violate the agreement when it unilaterally decided to withdraw from CAR and give plaintiffs a partial release from their exclusivity obligations.

> FN18. In addition, Nationwide claims (and plaintiffs do not deny) that "[i]f at any time an agent offered business to Nationwide (as the agent was required to do under ¶ 4) and Nationwide declined to accept the risk (as it was entitled to do under ¶ 13), it is undisputed that Nationwide permitted the agent to 'broker' that business to a carrier other than Nationwide." (Defs.' Mem. at 12-13.)

*2. Changes in Nationwide's Product Line.* Plaintiffs complain that "Nationwide did not market life insurance in Massachusetts for a number of months in 1988" and that they "were not provided a group health product to market." (Pls.' Mem. at 15.) Plaintiffs claim that this violated the Preface of the agency agreement, which states that one objective of the agreement is "[t]o assist the Agent in establishing and maintaining a growing agency which is profitable to both the Agent and [Nationwide]." (Agent Agreement, Preface; Corp. Agreement, Preface.) Plaintiffs thus assume that a general statement of objectives in the Preface, which statement reflects an equal concern for the profitability of both Nationwide and the agent, supersedes the express authorization given to Nationwide in paragraph 13 of the Agent Agreement and paragraph 12 of the Corp.

Agreement "to limit, restrict, or discontinue entirely the acceptance or writing of any policies, coverages, lines or kinds of insurance, at any time it deems it advisable to do so and without notice to or consent of the Agent." (Agent Agreement ¶ 13; Corp. Agreement ¶ 12.) Plaintiffs cite no authority for the proposition that general language in a Preface, neutral on its face, takes precedence over specific language in the body of an agreement that favors one party or the other in a particular application. Further, it is self evident that such construction, if adopted, would generate hopeless confusion, if not render the entire contract meaningless. Plaintiffs' argument must therefore be rejected.

**\*14** *3. The MAE Program.* In late 1987, in conjunction with Nationwide's withdrawal from CAR, Nationwide announced that it would be implementing the MAE program, under which it would take agents' loss ratios into account in determining whether to retain them as agents. Plaintiffs claim that this program was established " to intimidate [Nationwide's] high loss ratio agents to resign." (Pls.' Mem. at 15.) Plaintiffs do not assert that they resigned or that they were intimidated or injured in any way by the MAE program, and they do not explain how or why, in their view, the program violated the contract. It is undisputed that Nationwide had the right to terminate its relationship with any agent at any time, with or without cause; it is far from clear that there was anything wrong with Nationwide's stating in advance what criteria it would apply in determining whether it would exercise that right.

To summarize, Nationwide is entitled to summary judgment on all plaintiffs' breach of contract claims, including the claim that Nationwide is estopped by any such breach from enforcing the forfeiture provision contained in the Compensation Schedule.

*(d) The Waivability of Mass. Gen. Laws ch. 175, § 162D*

Chapter 175, section 162D of the Massachusetts General Laws provides, in pertinent part, that certain automobile insurers, including Nationwide during the relevant time period, *see Nationwide*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 15

Not Reported in F.Supp., 1997 WL 260064 (D.Mass.)
(Cite as: Not Reported in F.Supp.)

*Mut. Ins. Co. v. Commissioner* of Ins., 397 Mass. 416, 421, 491 N.E.2d 1061, 1064 (1986) (" *Nationwide* "), "shall pay each agent the indicated expense premium commission as established by the Commissioner." Plaintiffs claim that the rates at which they were paid by Nationwide were below the minimum rates established by the Commissioner of Insurance. Nationwide asserts several defenses to this claim, including that plaintiffs waived their right to be paid commissions at the rates set by the Commissioner and that this claim is partially barred by the running of the limitations period set forth in the agency agreement. FN19 Plaintiffs respond that the right in question is not waivable and that the contractual limitations period does not apply to this particular claim because it does not arise under the contract. Their first point is well taken; their second is not.

> FN19. There is a genuine dispute about whether the rates paid by Nationwide, properly computed, fell short of the rates prescribed by statute.

Under Massachusetts law, not all statutory rights may be waived. *See, e.g., Kraft v. Police Com'r of Boston,* 410 Mass. 155, 157, 571 N.E.2d 380, 382 (1991) ; *Spence v. Reeder,* 382 Mass. 398, 413, 416 N.E.2d 914, 923-24 (1981). FN20 The test is whether acceptance of the waiver "would destroy the very purpose of the statute." *Spence,* 382 Mass. at 413, 416 N.E.2d at 924. The purpose of section 162D is to assure that all agents will be " compensated at a fair and adequate rate," *Nationwide,* 397 Mass. at 424, 491 N.E.2d at 1066, thus "assuring the quality of the services rendered to the consuming public by insurance agents." *Id.,* 397 Mass. at 423-24, 491 N.E.2d at 1066. This is " an important public purpose." *Id.,* 397 Mass. at 423, 491 N.E.2d at 1065. The fact that the legislature deemed it necessary, in order to achieve this purpose, to enact section 162D is compelling evidence that it concluded that agents lacked sufficient bargaining power to extract fair and adequate compensation from insurance companies on their own. Under such circumstances, it would obviously "negate the legislative purpose in enacting [section 162D]," *Kraft,* 410 Mass. at 158,

571 N.E.2d at 382, to permit insurance companies to prevail upon agents to waive such right. I conclude, therefore, that rights set forth in section 162D are non-waivable.

> FN20. To avoid confusion, the question of whether a particular statutory right may be waived must be distinguished from the analytically separate question whether a contract that purports to include a waiver of a non-waivable right is necessarily entirely void for illegality. Not all contracts that include purported waivers of non-waivable rights are entirely void for illegality. *Eg., Begelfer v. Najarian,* 381 Mass. 186-89, 409 N.E.2d 167, 173-75 (1980). Since neither party claims that the agency agreements are entirely void for illegality if the right to be paid at rates prescribed by the Commissioner is non-waivable, and since there is no compelling public policy reason to declare the agency agreements void in their entirety under such circumstances, I shall give this issue no further consideration.

**\*15** The question remains whether plaintiffs' claim for additional compensation based on the statutory rate is subject to the three-year contractual period of limitations. If so, in light of the fact that plaintiffs filed their complaint on December 20, 1990, any claim for additional compensation for the period preceding December 20, 1987 would be time-barred.

It is undisputed that suits brought "under" the agency agreement had to be commenced within three years after the claim accrued. (*See* Agent Agreement ¶ 20; Corp. Agreement ¶ 20.) FN21 Plaintiffs contend that a claim that seeks payment of commissions in an amount prescribed by statute is not a suit under the agency agreement. I disagree. Plaintiffs expressly agreed *in the agency agreement* to "accept [Nationwide's] overall comprehensive compensation program instead of any mandatory or statutorily imposed level of compensation." (Agent Agreement ¶ 7; *see also* Corp. Agreement ¶ 7.) They are now seeking to have this particular provision of their contract set aside. To that extent,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                              Page 16

Not Reported in F.Supp., 1997 WL 260064 (D.Mass.)
**(Cite as: Not Reported in F.Supp.)**

this lawsuit is brought "under" the contract. Thus, plaintiffs may seek to prove that the commissions Nationwide paid on automobile insurance policies were below the levels required, but they may not recover damages for the period preceding December 20, 1987.

> FN21. "It is generally accepted that contracting parties may provide a limitations period within which action on the contract must be commenced, so long as the time period is not unreasonably abbreviated." *Reynolds Industries v. Mobil Oil Corp.,* 618 F.Supp. 419, 422 (D.Mass.1985); *see also Hays v. Mobil Oil Corp.,* 930 F.2d 96, 100 (1st Cir.1991) (deciding under Massachusetts law that " one-year contractual limitations period [for bringing claim arising out of the contract], although brief, is valid and enforceable"); *Pizzeria Uno of Kingston, Inc. v. Independence Mall Group,* 1995 WL 419932, at *8 (Mass.Supp.Ct. Jul. 13, 1995) (holding that clause in contract requiring a suit arising out of the contract be brought within two years was enforceable and declaring that "[u]nder ... Massachusetts ... law, parties may agree to contract provisions that shorten the period of limitations policy"). Plaintiffs do not challenge the validity or applicability of this principle or contend that three years is an "unreasonably abbreviated" period within which to bring suit.

*(e) Plaintiffs' Secondary Claims*

Beginning at the bottom of page 19 of their memorandum, plaintiffs argue that summary judgment is inappropriate on their claims for, *inter alia,* bad faith, unfair competition, unfair and deceptive trade practices, intentional infliction of emotional distress, and unjust enrichment. (Pls.' Mem. at 19.) Their argument concludes at page 20. The brevity of the argument is testament to the shallowness of these claims.

Plaintiffs' first argument in opposition to summary

judgment on these "non-contract" claims, in its entirety, is that "Nationwide's argument [Defs.' Mem. at 25-34] lacks credibility because of its skewed view of the facts." (Pls.' Mem. at 19.) This is clearly an insufficient basis on which to conclude that a material fact is genuinely in dispute.

Plaintiffs' second argument, in its entirety, is that Nationwide's failure to honor the oral offers made to some of them, its "unilateral reinterpretation of the Agreement and its employment of the MAE Program-could certainly be found to violate its duty of good faith and fair dealing" and may support a claim that Nationwide "unfairly competed with at least 5 of the plaintiffs." (Pls.' Mem. at 19-20.) I have previously addressed each of these contentions and concluded that in each instance Nationwide was within its rights. For this reason, and also because plaintiffs have not sufficiently developed their argument, I find this argument to be unpersuasive. For the same reason, plaintiffs' argument that the foregoing conduct constitutes a violation of chapter 93A of the Massachusetts General Laws is unpersuasive.

**\*16** Little need be said regarding plaintiffs' claims for intentional infliction of emotional distress and unjust enrichment. As to the former, plaintiffs argue only that "summary judgment is not the appropriate forum to determine whether Nationwide's actions were 'utterly intolerable' or the plaintiffs' emotional distress 'severe.' " (Pls.' Mem. at 20.) To the contrary, summary judgment is entirely appropriate, where, as here, the nonmovant "rest[s] upon mere allegations" and fails to "adduce specific provable facts demonstrating that there is a triable issue." *Brennan v. Hendrigan,* 888 F.2d 189, 191 (1st Cir.1989). As to the latter, plaintiffs' entire argument is that "Nationwide has clearly been unjustly enriched and hence the claim should not be dismissed." (Pls.' Mem. at 20.) This perfunctory statement is not enough to defeat Nationwide's well-pleaded motion for summary judgment.

The only remaining claim that plaintiffs discuss in this section is their claim for statutory commissions pursuant to chapter 175, section 162D of the Massachusetts General Laws. For reasons already

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                      Page 17

Not Reported in F.Supp., 1997 WL 260064 (D.Mass.)
**(Cite as: Not Reported in F.Supp.)**

stated, this claim has potential merit.

This completes the discussion of the portion of Nationwide's motion that deals with plaintiffs' claims. To summarize, the only claim that has potential merit is plaintiffs' claim for statutory commissions on automobile insurance policies plaintiffs wrote for the period after December 20, 1987. I therefore recommend that summary judgment be GRANTED to Nationwide on all plaintiffs' claims with the exception of Count VII. As to Count VII, I recommend that Nationwide's motion be DENIED, to the extent such count seeks to recover the deficiency for the period after December 20, 1987.

### (f) *Nationwide's Counterclaims*

Nationwide moves for partial summary judgment (as to liability) on its Second Counterclaim, in which it alleges a breach by at least three plaintiffs of their contractual obligation to deal exclusively with Nationwide. Although it appears undisputed that some of the plaintiffs, in violation of their agency agreements, dealt with other carriers before they were terminated, I recommend that partial summary judgment as to liability be denied, because Nationwide has pointed to no evidence that demonstrates that it suffered injury in fact as the result of such dealings. *See Simpson v. DiNardo,* 862 F.Supp. 13, 17 (D.Mass.1994) (declaring that damages must be proved in order to sustain a cause of action for breach of contract); *Singarella v. City of Boston,* 342 Mass. 385, 387, 173 N.E.2d 290, 291 (1961) (stating that proof that "plaintiffs have suffered damage" is an essential element in ordinary contract actions).

On the other hand, I recommend that partial summary judgment as to liability be granted to Nationwide on its Third Counterclaim, which alleges that Coughlin, Murphy, Lydon, Provencher, and Secky were paid full commissions on policies as to which Nationwide later had to refund or credit some of the premium to the policyholder. There is no dispute that this occurred or that, under the form agency agreement, plaintiffs are liable to return such overpayments to Nationwide. Plaintiffs' only

defense is that Nationwide is not entitled to enforce this provision of the agency agreement because Nationwide was itself in breach. (Pls.' Memo. at 21.) Not only is there no legal support for plaintiffs' theory, but, for reasons already discussed, there is no factual support for it either.

### C. *Plaintiffs' Motion*

**\*17** Based on the same arguments they presented in opposition to Nationwide's motion for summary judgment, plaintiffs seek summary partial judgment as to liability on Count I (declaratory judgment), Count II (breach of contract), and Count VII (Mass. Gen. Laws ch. 175, § 162D). For the same reasons I recommended that Nationwide's motion be granted as to all plaintiffs' claims other than Count VII, I recommend that plaintiffs' motion be denied as to Counts I and II. I further recommend that plaintiffs' motion be denied as to Count VII, on the ground that there is a genuine dispute about whether Nationwide in fact paid commissions that were below the statutory rate.

### III. *CONCLUSION*

For all the foregoing reasons, I recommend that Nationwide's motion (Docket no. 104) be ALLOWED in part and DENIED in part. Specifically, I recommend that Nationwide's motion be ALLOWED as to all plaintiffs' claims with the exception of Count VII (violation of Mass. Gen. Laws ch. 175, § 162(D)) and as to Nationwide's Third Counterclaim (for return of overpaid commissions) and that Nationwide's motion otherwise be DENIED. I further recommend that plaintiffs' motion (Docket no. 112) be DENIED.

### IV. *IMPORTANT NOTICE OF RIGHT TO OBJECT AND WAIVER OF RIGHT TO APPEAL FOR FAILURE TO DO SO WITHIN TEN DAYS*

The parties are hereby advised that under the provisions of Rule 3(b) of the Rules for United States Magistrates in the United States District Court for the District of Massachusetts, any party

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 18

Not Reported in F.Supp., 1997 WL 260064 (D.Mass.)
**(Cite as: Not Reported in F.Supp.)**

who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court WITHIN 10 DAYS of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has indicated that failure to comply with this rule shall preclude further appellate review by the Court of Appeals of the District Court's order entered pursuant to this Report and Recommendation. *See United States v. Valencia-Copete,* 792 F.2d 4 (1st Cir.1986) ; *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603 (1st Cir.1980) ; *United States v. Vega,* 678 F.2d 376 (1st Cir.1982) ; *Scott v. Schweiker,* 702 F.2d 13 (1st Cir.1983); *see also Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).

D.Mass.,1997.
Lydon v. Nationwide Mut. Ins. Co.
Not Reported in F.Supp., 1997 WL 260064 (D.Mass.)

Briefs and Other Related Documents (Back to top)

• 1:91cv11971 (Docket) (Jul. 26, 1991)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in N.E.2d

Not Reported in N.E.2d, 1998 WL 52239 (Mass.Super.)

**(Cite as: 1998 WL 52239 (Mass.Super.))**

C

Only the Westlaw citation is currently available.

Massachusetts Superior Court.
M.H. PROMOTION GROUP, INC., Plaintiff
v.
CINCINNATI MILACRON INC. and Thomas F.
Schimpff, Jr., Defendants
**No. CIV. A. 96-0832C.**

Jan. 28, 1998.

MEMORANDUM AND ORDER ON
DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT

GANTS, J.

**\*1** The defendants, Cincinnati Milacron Inc.
("Milacron") and Thomas F. Schimpff, Jr.
("Schimpff"), have moved for summary judgment
under Mass. R. Civ. P. 56(c) on all counts of the
Complaint. For the reasons stated below, the motion
is *ALLOWED* as to Count V of the Complaint,
claiming breach of contract, and *DENIED* as to
Counts I through IV of the Complaint, claiming
promissory estoppel, fraud and deceit, tortious
misrepresentation, and violations of Chapter 93A.

BACKGROUND

In evaluating a summary judgment claim, I am
obliged to rely only on facts not in dispute and
disputed facts viewed in the light most favorable to
the party opposing summary judgment, which in
this case is the plaintiff. *Beal v. Board of Selectmen
of Hingham,* 419 Mass. 535, 539, 646 N.E.2d 131
(1995). According to that vision of the case,
Milacron owned property on New Bond Street in
Worcester that it stopped using in 1992. It sought to
sell the property but was not successful in finding a
buyer, and in 1995 began to look for potential
tenants.

The plaintiff, M.H. Promotion Group ("MHPG"),
was a growing T-shirt business that, early in 1996,
was looking to move to a new facility in the
Worcester area with the additional commercial
space it needed to keep apace of its rapid growth.
MHPG consulted with James Umphrey, the vice
president of a Worcester-based real estate
brokerage firm, who showed MHPG a number of
properties, including Milacron's New Bond Street
site. MHPG expressed interest in the New Bond
Street property, and negotiations commenced
regarding the leasing of that property.

Early in those negotiations, one of the brokers used
by Milacron to market its property, Eyal Shapira,
told Umphrey, MHPG's broker, that Milacron had
previously tried to sell the property but had now
decided to lease the building, get it fully tenanted,
address the property's environmental problems, and
then try to sell the property. Schimpff, Milacron's
Real Estate Manager, told Umphrey that Milacron
did not believe it could sell the property at the time
because of the environmental problems, and
decided that it wanted to lease the building.

Milacron and MHPG exchanged a number of lease
proposals. Then, on February 1, 1996, Umphrey
faxed to Shapira a four-page proposal to lease space
at the New Bond Street site, providing for, among
other terms, a five-year initial lease period, two
three-year options to extend, annual rents for each
year of the initial lease period (beginning at
$140,000 for the first year) and the option years,
and numerous improvements to be made by the
landlord to the facility to meet the needs of MHPG.
The last paragraph of MHPG's proposal contained
the following language:

This proposal sets forth the proposed business
terms and conditions of the contemplated lease
but is not intended to constitute a legally binding
agreement or create any legally binding
obligation on either party. This proposal is further
subject to the execution of Owner's building

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                                                  Page 2

Not Reported in N.E.2d, 1998 WL 52239 (Mass.Super.)

**(Cite as: 1998 WL 52239 (Mass.Super.))**

standard lease and is subject to cancellation and/or withdrawal for any reason by either party without notice at any time prior to the execution of a mutually agreeable lease.

**\*2** Shortly after this proposal was received, Umphrey, along with MHPG's Treasurer (David Hurowitz) and Human Resources Director (Andrew Miller), met at the New Bond Street site on February 6, 1996 with Schimpff and Ed Wortman, Milacron's Project Manager for building construction and improvements, who was based in Cincinnati. At this and subsequent meetings which carried over until the next day, Schimpff assured Hurowitz that Milacron had abandoned its efforts to sell the building and that he had the authority to enter into a lease agreement. They agreed on all pertinent lease terms identified in the February 1 proposal, including the duration of the lease, the amount of the rent, the improvements that were to be done, and the commencement date of the lease. At the conclusion of the last of these series of meetings on February 7, Schimpff told Hurowitz, "If those are all your improvements, then you got yourself a building." Hurowitz responded, "Great, you got yourself a tenant." They shook hands and Schimpff added, "You got yourself a landlord here, kid." Schimpff said a lease would be on its way within a week's time.

Hurowitz, immediately after the handshake, told Schimpff that he had some equipment he was looking at to meet his growing customer demands. On February 12 and 13, Hurowitz traveled to Buffalo and purchased $140,000 worth of equipment on behalf of MHPG. This equipment would not fit into MHPG's current space and was purchased in reliance on the oral representations of Schimpff and the consequent expectation that MHPG would be moving into the larger New Bond Street space in March 1996. On or about February 16, Miller asked Umphrey to ask Schimpff if MHPG could store this equipment at the New Bond Street facility, and Schimpff agreed. MHPG understood Milacron's willingness to allow them informally to store equipment at the facility before the lease was executed to indicate that their tentative agreement was still on track.

MHPG also hired a production manager, Donald Frank, to operate the new equipment, all in the expectation that the equipment would be installed in the new facility in March 1996. Indeed, Mr. Frank entered on the MHPG payroll in March 1996.

On December 15, 1995, Schimpff had received a letter from a broker informing him that Great Northern Recycling was interested in purchasing the New Bond Street site. Only hours after having shaken Hurowitz's hand on February 7, 1996 and telling him that "you got yourself a landlord," Schimpff met with representatives of Great Northern Recycling to explore its possible purchase of this site. At that meeting, Great Northern made an offer to purchase the property, and Milacron counter-offered the next day. Schimpff at this time believed that Great Northern Recycling was not interested in having tenants in the building if it were to purchase it.

This meeting with Great Northern Recycling set in motion a series of discussions that ultimately resulted in Great Northern buying the New Bond Street property. Milacron preferred to sell the property and put off any lease discussions with MHPG until it could determine whether the sale to Great Northern would go through. Milacron never sent the lease to MHPG it promised; it sent instead simply a blank lease form. Roughly two weeks after the February 7 handshake, after two or three calls from Umphrey asking about delivery of the promised lease in which Schimpff made no mention of Milacron's discussions with Great Northern, Schimpff finally told Umphrey that Milacron was not going to do the deal.

**\*3** Once MHPG learned that Milacron was not going to rent it the New Bond Street property, it went in search of alternative space, but had little success. Great Northern offered to rent MHPG the same space, but at more then three times the rent agreed to by Milacron. MHPG rejected Great Northern's offer. MHPG finally located other space, but it was far from Worcester, inaccessible by public transportation, and cost $620,000 more over the five-year lease term than what it would have paid had the New Bond Street lease been honored.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d

Not Reported in N.E.2d, 1998 WL 52239 (Mass.Super.)

(Cite as: 1998 WL 52239 (Mass.Super.))

Page 3

MHPG concedes that it recognized that there would be a formal written lease and that no such lease was ever executed. It nonetheless claims damages on counts of promissory estoppel, fraud and deceit, tortious misrepresentations, Chapter 93A violations, and breach of contract.

DISCUSSION

To prevail on summary judgment, the moving party must establish that there is no genuine issue of material fact on every element of a claim and that it is entitled to judgment on that claim as a matter of law. See generally Mass. R. Civ. P. 56(c); *Highlands Insurance Co. v. Aerovox, Inc.,* 424 Mass. 226, 232, 676 N.E.2d 801 (1997). Where, as here, the party opposing summary judgment has the burden of proof at trial, the moving party is entitled to summary judgment if it "demonstrates, by reference to material described in Mass. R. Civ. P. 56(c), unmet by countervailing materials, that the party opposing the motion has no reasonable expectation of proving an essential element of that party's case." *Kourouvacilis v. General Motors Corp.,* 410 Mass. 706, 716, 575 N.E.2d 734 (1991). "To be successful, a moving party need not submit affirmative evidence to negate one or more elements of the other party's claim." *Id.* It is sufficient to demonstrate that "proof of that element is unlikely to be forthcoming at trial." *Flesner v. Technical Communications Corp.,* 410 Mass. 805, 809, 575 N.E.2d 1107 (1991).

Milacron contends that the Statute of Frauds bars the breach of contract claim. That statute provides that:

No action shall be brought: ...
Upon a contract for the sale of lands, tenements or hereditaments or of any interest in or concerning them; or ...
Upon an agreement that is not to be performed within one year from the making thereof;
Unless the promise, contract or agreement upon which such action is brought, or some memorandum or note thereof, is in writing and signed by the party to be charged therewith or by some person thereunto by him lawfully authorized.
G.L. c. 259, § 1. There is no dispute that the oral

New Bond Street lease claimed by MHPG falls within the scope of the Statute of Frauds: the lease concerns a tenancy interest in land and is five years in duration, and there was no writing signed by anyone authorized by Milacron that reflects the terms of the purported oral agreement.

*4 In addition, under a separate statute, not cited by either party, this oral agreement, even if intended to last five years, would be limited to a tenancy at will. General Laws, c. 183, § 3 provides:

An estate or interest in land created without an instrument in writing signed by the grantor or by his attorney shall have the force and effect of an estate at will only, and no estate or interest in land shall be assigned, granted or surrendered unless by such writing or by operation of law.

MHPG, however, cites a long list of Massachusetts cases that have held that the Statute of Frauds does not bar relief when the plaintiff has been misled to his detriment and the denial of relief would cause an injustice. See, e.g., *Greenstein v. Flatley,* 19 Mass.App. 351, 474 N.E.2d 1130 (1984); *Simon v. Simon,* 35 Mass.App. 705, 625 N.E.2d 564 (1994); *Levin v. Rose,* 302 Mass. 378, 381-382, 19 N.E.2d 297 (1939)("It is settled that the statute [of frauds] is not a bar where the denial of relief, to one who has been misled to his harm, would cause an unjust and unconscientious injury and loss.") Milacron acknowledges these precedents but insists they do not apply to the undisputed facts of this case, since it contends that MHPG cannot establish a promise sufficient to form the basis for a promissory estoppel claim. Most importantly, it argues that it is undisputed that all parties contemplated a written lease agreement, and that, as a matter of law, no "promise" could be found because reliance on an oral promise under such circumstances would be patently unreasonable, especially by the capable businessmen associated with MHPG, one of whom was formerly an associate at a major Boston law firm. See *Rhode Island Hospital Trust National Bank v. Varadian,* 419 Mass. 841, 850, 647 N.E.2d 1174 (1995)(an oral promise regarding a $43.5 million construction loan was not a " 'promise' in the contractual sense" when both parties contemplated a written agreement governing its

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                Page 4

Not Reported in N.E.2d, 1998 WL 52239 (Mass.Super.)

**(Cite as: 1998 WL 52239 (Mass.Super.))**

intricacies and "therefore no amount of reliance on the part of the promissees would give rise to a contract by virtue of reliance").

This case forces a hard look at the basic principles of contract and promissory estoppel in the context of the legislative mandates set forth in the Statute of Frauds and G.L. c. 183, § 3. If the alleged misconduct of Milacron can create an enforceable contract via promissory estoppel, then the Statute of Frauds and G.L. c. 183, § 3 mean nothing in any case involving reliance. Yet, if they bar all relief, then these statutes may be used as instruments of inequity. As detailed below, I choose a middle path: when the Statute of Frauds and G.L. c. 183, § 3 bar enforcement of an agreement in contract, reliance does not justify a contract action but only an action in tort. The consequence of this legal distinction is that, in these cases, damages are limited to those available in a tort action: the actual loss proximately caused by the reliance, in other words, the amount needed to place the plaintiff in the same position he would have been in had the tortious representation never been made. *Vmark Software, Inc. v. EMC Corp.,* 37 Mass.App. 610, 619, 642 N.E.2d 587 (1994). The promissee will not be entitled to the usual contract measure of damages: the benefit of his bargain, that is, the amount needed to place the plaintiff in the same position as if the promise had been performed. *Vmark Software, Inc. v. EMC Corp.,* 37 Mass.App. at 611 n. 2, 642 N.E.2d 587.

**\*5** Massachusetts law has long permitted a cause of action founded on reliance where the promisor made a promise that he reasonably should have known would induce reliance, it did indeed induce reliance, and the promisee who reasonably relied on the promise suffered injury because the promise was not fulfilled. See, e.g., *Levin v. Rose,* 302 Mass. 381-382; *Simon v. Simon,* 35 Mass.App. at 711-712, 625 N.E.2d 564. This cause of action, when characterized as promissory estoppel, is based in contract, and, when justice requires, can make the relied-upon promise binding if justice can only be avoided by enforcement of the promise. Restatement (Second) of Contracts, § 90. See also *Simon v. Simon,* 35 Mass.App. at 711, 625 N.E.2d 564; *Boylston Development Group, Inc. v. 22*

*Boylston Street Corp.,* 412 Mass. 531, 542, 591 N.E.2d 157 (1992); *Greenstein v. Flatley,* 19 Mass.App. at 357, 474 N.E.2d 1130. However, this same conduct may also yield a cause of action based in tort, usually characterized as claims of reliance, fraud and deceit, negligent misrepresentation, or Chapter 93A violations. Indeed, in most of the cases cited by the defendant MHPG, the relief sought and granted was not based on contract or promissory estoppel, but on violations of Chapter 93A. See, e.g., *Greenstein v. Flatley,* 19 Mass.App. at 356, 474 N.E.2d 1130; *Wasserman v. Agnastopoulos,* 22 Mass.App. 672, 497 N.E.2d 19 (1986).

In the instant case, a tort measure of damages, apart from any multiple damages that potentially could be sought on the Chapter 93A claim, would permit the plaintiff to recover for its reliance damages, that is, its additional costs resulting from the actions it took in reliance on its belief that the Milacron lease would commence in March 1996. However, if that same conduct, combined with reasonable reliance, were to transform that promise into a contract, the measure of damages potentially could be far greater. While reliance damages, that is, "expenditures made in reliance upon a contractual obligation that was not performed," are permitted in appropriate contract cases, "[t]he long-established general rule for breach of contract recovery in Massachusetts is that the wronged party should receive the benefit of his bargain, i.e. be placed in the same position as if the contract had been performed." *Vmark Software, Inc. v. EMC Corp.,* 37 Mass.App. at 611 n. 2, 642 N.E.2d 587. In the instant case, if benefit of the bargain damages were awarded--the difference between the rent MHPG would have paid under the oral lease and the rent it is presently paying for equivalent space--the plaintiff would receive far more money than if reliance damages were awarded. As a result, it matters a great deal whether the conduct alleged here is sufficient to make out a claim of contract, thereby raising the possibility of benefit of the bargain damages, or is limited to claims sounding in tort, thus limiting the plaintiff to reliance damages.

**\*6** I find as a matter of law, based on the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d, 1998 WL 52239 (Mass.Super.)

**(Cite as: 1998 WL 52239 (Mass.Super.))**

undisputed facts and those disputed facts viewed in the light most favorable to MHPG, that summary judgment must be granted on the breach of contract claim--Count V of the Complaint. There is good reason why the Legislature enacted a Statute of Frauds; the requirement of a writing in all agreements involving land and all agreements that cannot be performed within one year greatly reduces the danger of fraud and error in interpreting such agreements. *Kuhlmann v. HyCrest Ranches, Inc.,* 4 Mass.App. 542, 545, 353 N.E.2d 673 (1976) . The common law permits this requirement to be negated only in those cases where, if the Statute were applied, the law would be siding with the wrong person--he who made a promise with the intent to induce the promisee to rely on it, and then reneged on that promise after the promisee had reasonably relied on the promise to his detriment. See, e.g., *Simon v. Simon,* 35 Mass.App. at 711-713, 625 N.E.2d 564. The basic principle is that a wrongdoer should not be allowed to benefit from his wrong. This Court can honor that equitable purpose and yet respect the legislative purpose behind the Statute of Frauds, certainly given the undisputed facts of this case, by finding that the Statute of Frauds forbids the oral lease agreement from being enforced as a contract but does not bar claims in reliance and tort based on the allegations of unkept promises and induced reliance. The consequence of this finding is to bar benefit of the bargain damages but permit reliance damages, thereby fully compensating the promisee for all damages resulting from his unfortunate but reasonable reliance on the unkept promises of the promisor but denying him the damages that would have resulted had the written lease been executed and breached.

There are at least five reasons for this finding. First, it best preserves the purpose and clear meaning of the Statute of Frauds; an oral promise concerning land may create legal obligations, but it does not create an enforceable contract. Equitable estoppel, while characterized by MHPG as an equitable bar to the invocation of the Statute of Frauds as a defense to a contract claim, is not that at all; it states a separate and distinct cause of action of reliance. It cannot transform a promise into an

enforceable contract but it can prevent injustice by compensating the promisee for any harm he suffered by relying on that unkept promise to his detriment. As the Supreme Judicial Court declared in *Boylston Development Group, Inc. v. 22 Boylston Street Corp.:*

A successful assertion of equitable estoppel requires: (1) "a representation or conduct amounting to a representation intended to induce a course of conduct on the part of the person to whom the representation is made[;] (2)[a]n act or omission resulting from the representation, whether actual or by conduct, by the person to whom the representation is made[;] (3) [and d]etriment to such person as a consequence of the act or omission."

*7 412 Mass. at 542, 591 N.E.2d 157 quoting *Cellucci v. Sun Oil Co.,* 2 Mass.App. 722, 728, 320 N.E.2d 919 (1974). Whether one characterizes this cause of action as sounding in contract or tort, it remains an equitable claim, and thereby limited in remedy to its equitable purpose--to undo the detriment caused by reliance on the misrepresentation. [FN1]

> FN1. The plaintiff, based on its Complaint, recognizes the distinction between the damages appropriate to a reliance claim and those appropriate to a breach of contract claim. It filed separate claims for promissory estoppel (Count I) and breach of contract (Count V). On its promissory estoppel claim, it seeks "damages the Court finds that MHPG has sustained as a result of its reliance on Cincinnati Milacron's promise to lease space to MHPG." Complaint at 11. On its breach of contract claim, it seeks damages "the Court finds that MHPG has sustained as a result of Cincinnati Milacron's breach of contract." Complaint at 11.
> The consequence of this summary judgment decision is to permit the promissory estoppel claim to go forward but to dismiss the breach of contract claim. Whether the estoppel claim sounds in contract or in tort, the practical consequence is the same in view of the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d

Not Reported in N.E.2d, 1998 WL 52239 (Mass.Super.)

**(Cite as: 1998 WL 52239 (Mass.Super.))**

damage allegations in the complaint--the plaintiff is limited to reliance damages.

Second, this interpretation is most consistent with the language of the Statute of Frauds, which declares that "[n]o action shall be brought ... [u]pon a contract for the sale ... of any interest in or concerning [land]" unless the contract is in writing and signed by the promisor. G.L. c. 259, § 1. Read literally, this statute bars plaintiff in this case from even bringing a contract claim based on the oral lease. Its language does not bar a claim other than one in contract, and does not bar a claim based on something other than the contract, such as a misrepresentation or broken promise.

Third, a claim in contract is barred by the language of G.L. c. 183, § 3, which limits oral agreements such as this concerning an interest in land to "the force and effect of an estate at will only." Consequently, even if one were to construe the oral promise of a lease to be enforceable as a lease, that lease would be at will only, and benefit of the bargain damages would not be appropriate because the landlord lawfully could declare it terminated on its first day.

Fourth, it reflects the undisputed understanding among the parties. The plaintiff contends that it reasonably believed it had a lease based on the February 7, 1996 statements of the parties that the terms were agreed to and they each now had a landlord and a tenant, punctuated by the traditional handshake reflecting an oral agreement. Yet, plaintiff at this very moment knew that there was no lease, because there was discussion then and there about receipt of a written lease agreement. Indeed, plaintiff concedes that it knew that there was to be a written lease agreement, so it had to know that the promises that were exchanged were something less than a lease. Rather, viewed in the light most favorable to the plaintiffs, they could be seen as promises to execute a written lease on the terms that had been agreed to orally. In short, plaintiff believed it had the promise of a lease, not a lease. To permit a claim of breach of the lease to go forward to trial, with its possibility of benefit of the bargain damages, ignores this distinction. Milacron

never executed a lease and MHPG knows it did not, so it should not be liable for contract damages as if it had executed that lease. *Ucello v. Cosentino,* 354 Mass. 48, 51-52, 235 N.E.2d 44 (1968)(unsigned agreement not enforceable when parties proposed to be bound by it only when all had signed it); *Rhode Island Hospital Trust National Bank v. Varadian,* 419 Mass. at 850, 647 N.E.2d 1174 (oral promise is not binding agreement when both parties contemplated written agreement setting forth details of transaction). If Milacron did make a promise, it should be at risk of liability for reliance damages resulting only from its promise to execute a lease, not contract damages from a lease it never executed.

**\*8** Fifth, MHPG acknowledges that it seeks an equitable remedy in estoppel, but it would be inequitable to enforce the oral promise as an executed written contract on behalf of MHPG. In its final written proposal to Milacron, written just six days before the oral promise it now claims was a binding lease, MHPG made it crystal clear that it would not be legally bound by anything other than a mutually agreeable executed written lease. See infra for the language of the February 1, 1996 proposal. MHPG cannot have it both ways; it cannot declare that it will be bound only by a written lease agreement, then later seek to bind Milacron to an oral promise to lease and invoke equity in its behalf. See *Greenfield Country Estates Tenants Assn., Inc. v. Deep,* 423 Mass. 81, 90, 666 N.E.2d 988 (1996) (equitable relief may not be granted where it will allow one party an inequitable advantage).

I must deny summary judgment on the remaining claims. All of them are variations on the theme of estoppel, and estoppel is ordinarily a question of fact reserved for the jury. *Simon v. Simon,* 35 Mass.App. at 712, 625 N.E.2d 564; *Levin v. Rose,* 302 Mass. at 382, 19 N.E.2d 297. The evidence presented by the plaintiff, if believed by the jury and interpreted by them in a favorable light, is sufficient to raise triable issues regarding reliance. The case law is clear that it may be tortious conduct to make a promise, then fail to inform the promisee that the promise may not or will not be honored when the promisor knew or should have known that the promise may have induced detrimental reliance

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                                      Page 7

Not Reported in N.E.2d, 1998 WL 52239 (Mass.Super.)

**(Cite as: 1998 WL 52239 (Mass.Super.))**

by the promissee. See, e.g., *Greenstein v. Flatley,* 19 Mass.App. at 355-357, 474 N.E.2d 1130. In this case, there is sufficient evidence that Milacron promised to lease the New Bond Street facility to MHPG, then quickly realized that it may renege on that promise once it began negotiating seriously with Great Northern for the sale of the property. Yet, it failed to inform MHPG of that possibility even though it knew or reasonably should have known that MHPG was beginning to make business decisions in reliance on the lease being executed. In addition, there is evidence sufficient to permit a jury to find a knowing misrepresentation if it believes that Schimpff told MHPG that Milacron had given up trying to sell the property at a time when Milacron not only was actively looking for buyers but had a prospective buyer express renewed interest in such a purchase. Since this conduct, if proven, fits "within the penumbra of some common-law, statutory, or other established concept of unfairness," *PMP Associates, Inc. v. Globe Newspaper Co.,* 366 Mass. 593, 596, 321 N.E.2d 915 (1975), it may support a Chapter 93 claim as well as the claims of promissory estoppel, fraud and deceit, and tortious representation. See *Greenstein v. Flatley,* 19 Mass.App. at 356, 474 N.E.2d 1130.

**\*9** I have considered and reject the defendant's contention that no reliance on the promise to lease could be reasonable as a matter of law when the plaintiff contemplated that a written lease would be prepared and recognized that the lease was not final until that written document was executed. See *Rhode Island Hospital Trust National Bank v. Varadian,* 419 Mass. at 850, 647 N.E.2d 1174. As I have found, this is a sound reason to dismiss the contract claim, but it does not warrant dismissal of the reliance claims. Even though MHPG knew that there would be no enforceable lease until the written lease was executed, the evidence permits the jury to find that it reasonably expected such a lease to be executed, that it made known to Milacron that it was taking steps in reliance on MHPG's promise to finalize the lease, and that Milacron did not act reasonably to forestall such detrimental reliance by promptly informing MHPG that it was negotiating with a prospective buyer for the property. This is sufficient to make out the reliance claims, with

reliance-related damages.

ORDER

For the reasons stated above, it is hereby *ORDERED* that summary judgment is granted on behalf of all defendants as to Count Five of the Complaint. Summary judgment is denied as to Counts One through Four.

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



800 N.E.2d 726 (Table)

60 Mass.App.Ct. 1108, 800 N.E.2d 726 (Table), 2003 WL 22992122 (Mass.App.Ct.)
**Unpublished Disposition**

**(Cite as: 60 Mass.App.Ct. 1108, 800 N.E.2d 726, 2003 WL 22992122 (Mass.App.Ct.))**

Page 1

**H**

**Briefs and Other Related Documents**

NOTICE: THIS IS AN UNPUBLISHED OPINION.

Appeals Court of Massachusetts.
Walter J. BERIONT,
v.
GTE LABORATORIES, INC., & another. [FN1]

FN1. Bruce Reichlen.

**No. 02-P-401.**

Dec. 19, 2003.

MEMORANDUM AND ORDER PURSUANT TO
RULE 1:28

***1 Walter J. Beriont appeals from an order of summary judgment by the Superior Court on several claims that arose out of circumstances surrounding allegedly defamatory statements by a fellow employee, Bruce Reichlen, at GTE Laboratories, Inc. (GTE Labs). We affirm the judgment on the claims of intentional interference with contractual relations, breach of contract, wrongful termination and promissory estoppel. Concluding that the Superior Court judge erred in ruling that one of the alleged defamatory statements was not susceptible of a defamatory meaning, we vacate the order for summary judgment on the claims related to that statement and remand for further proceedings.

*Facts and Procedural History.* Walter Beriont was employed as an engineer and inventor by GTE Labs in February of 1996 when Bruce Reichlen, a fellow employee who was in charge of a department other than the one Beriont worked in, accused him of being "dishonest," a "liar" and a "thief." On two occasions the statements were made to Beriont alone, but there was evidence presented that Reichlen also made such statements to another GTE employee. Beriont complained about these comments to supervisors and to GTE's human resources department. GTE conducted an investigation into the incidents. In September of 1996 Beriont filed suit to recover for defamation and intentional interference with contractual relations. The parties engaged in litigation and involved negotiations to settle the dispute and end the litigation, but such efforts were ultimately unsuccessful. Beriont was terminated in March of 1997. Beriont amended his complaint to include claims against GTE for breach of contract, wrongful termination, and promissory estoppel.

*Defamation.* Beriont describes several instances in which he alleges he was defamed by Reichlen. [FN2] Two instances were private conversations, perhaps better described as confrontations between the two, with no one else present. The Superior Court correctly concluded that these instances did not amount to actionable defamation since they lacked an essential element, publication to a third party.

> FN2. Beriont alleges in his brief a total of eight instances of defamation. The Superior Court, however, addressed only four instances. A review of the record indicates that some of the events that Beriont says constituted multiple instances of defamation should be viewed as single instances.

Beriont also alleges that Reichlen committed further acts of defamation during GTE's investigation into the initial alleged acts. The investigation was undertaken at Beriont's behest. In granting summary judgment, the Superior Court judge observed that "the plaintiff cannot be

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

800 N.E.2d 726 (Table)

60 Mass.App.Ct. 1108, 800 N.E.2d 726 (Table), 2003 WL 22992122 (Mass.App.Ct.)
**Unpublished Disposition**

**(Cite as: 60 Mass.App.Ct. 1108, 800 N.E.2d 726, 2003 WL 22992122 (Mass.App.Ct.))**

permitted to invite an investigation by the employer and then claim harm when that investigation is conducted." We agree. It is appropriate to view a request for an investigation into an act of defamation in an employment context as constituting consent for the defamatory statement to be repeated to investigators in the context of the investigation. See Restatement (Second) of Torts § 583 (1977). See also *Dellorusso v. Monteiro,* 47 Mass.App.Ct. 475, 478 (1999).

Finally, Beriont alleges that Reichlen defamed him by telling another GTE employee, John Brockman, that Beriont was a thief. In allowing the defendants' motion for summary judgment, the Superior Court judge concluded that the statement, considered in context, referred to Beriont taking equipment from one GTE laboratory and placing it in another laboratory, rather than taking equipment for his own use. As such, the judge concluded, the statement neither imputed criminal conduct nor assailed Beriont's business or professional reputation and therefore did not constitute defamation per se. This conclusion was error.

***2** In order to make out a claim of defamation, a plaintiff must show that the defendant made a statement concerning the plaintiff to a third party, that the statement could damage the plaintiff's reputation in the community, that the defendant was at fault in making the statement, and either that the statement caused the plaintiff to suffer economic loss or that the statement falls in one of the categories of statements that are actionable without proof of economic loss. *Ravnikar v. Bogojavlensky,* 438 Mass. 627, 630 (2003). See also Restatement (Second) of Torts, § 558 (1977). Two categories of statements that are actionable without proof of economic loss are those that charge the plaintiff with criminal conduct and those that may prejudice the plaintiff's profession or business. *Ravnikar v. Bogojavlensky, supra* at 630.

The statement that Beriont alleges Reichlen made to Brockman--that Beriont is a thief--is susceptible of being understood to charge Beriont with having committed criminal conduct. Beriont produced

evidence in the form of an affidavit by Brockman to show that this is how Brockman understood the statement. Furthermore, even if the statement should more properly be viewed, as the motion judge saw it, as "a statement between two employees of the same company who are referring to the moving of equipment by an employee of the company from one laboratory to another laboratory," it would nevertheless constitute a statement that could prejudice the plaintiff's profession or business. "One who publishes a slander that ascribes to another conduct, characteristics or a condition that would adversely affect his fitness for the proper conduct of his lawful business, trade or profession ... is subject to liability without proof of special harm." *Id.* at 631, quoting from Restatement (Second) of Torts, § 573. An assertion that an employee moved equipment from one laboratory to another without proper authorization or notice, coming in the form of a statement that the employee is a "thief," impugns the employee's professional conduct. It is not difficult to see that such a charge in the context of a collaborative research environment could constitute a serious and potentially harmful accusation.

It is true, as the motion judge observed, that whether a statement is susceptible of conveying a defamatory meaning is a question of law for the court. See *Jones v. Taibbi,* 400 Mass. 786, 792 (1987). But in this case it was error for the judge to conclude that the statement that Beriont was a thief was not susceptible of conveying a defamatory meaning. While it would be possible for a fact finder to conclude that the statement was not defamatory, "[w]here the communication is susceptible of both a defamatory and nondefamatory meaning, a question of fact exists for the jury." *Ibid.,* citing Restatement (Second) of Torts, § 614 (1977).

The defendants maintain that no one questioned Beriont's honesty or thought he was a liar or a thief. GTE brief 31; Reichlen brief 17 and 21. Counsel for the defendants further asserted at oral argument that no one thought the statements by Reichlen had any merit. These assertions are of no avail in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

800 N.E.2d 726 (Table)                                                              Page 3

60 Mass.App.Ct. 1108, 800 N.E.2d 726 (Table), 2003 WL 22992122 (Mass.App.Ct.)
**Unpublished Disposition**

**(Cite as: 60 Mass.App.Ct. 1108, 800 N.E.2d 726, 2003 WL 22992122 (Mass.App.Ct.))**

defeating Beriont's claim, however, since it is not necessary that a statement actually injure the plaintiff's reputation in order to be defamatory. Rather, the statement need only be one that is capable of injuring the plaintiff's reputation. See Restatement (Second) of Torts § 559 comment d. See also *Tartaglia v. Townsend,* 19 Mass.App.Ct. 693, 696 (1985). Furthermore, it is not necessary to show that the hearer believed the defamatory statement in order for it to be actionable. *Shafir v. Steele,* 431 Mass. 365, 372 (2000). *Marble v. Chapin,* 132 Mass. 225, 226 (1882).

***3** Beriont brought a further defamation claim against GTE under the doctrine of respondeat superior based upon Reichlen's statement. The Superior Court judge allowed GTE's motion for summary judgment dismissing this claim because she had dismissed the related defamation claim against Reichlen. Because we vacate the summary judgment order on the defamation claim against Reichlen, the summary judgment order regarding the related claim against GTE is also vacated. [FN3]

> FN3. Whether GTE could be found liable under a theory of respondeat superior will depend on a determination of whether the alleged defamation was made within the scope of Reichlen's employment. See *Wang Labs., Inc. v. Business Incentives, Inc.,* 398 Mass. 854, 859 (1986). The determination whether conduct falls within the scope of employment is a question of fact. See *Pinshaw v. Metropolitan Dist. Commn.,* 402 Mass. 687, 694 (1988).

*Intentional interference.* Beriont alleges that Reichlen intentionally interfered with his employment contract with GTE. [FN4] The Superior Court judge concluded that Beriont failed to show that Reichlen knowingly induced GTE to breach its contract with Beriont; and that, as a result, his claim lacked an essential element of intentional interference. We agree. See *Draghetti v. Chmielsewski,* 416 Mass. 808, 816 (1994).

> FN4. Beriont also argues in his brief that

Reichlein interfered with Beriont's efforts to settle with GTE, but he did not make that claim in his complaint and it was not addressed by the Superior Court. GTE A, 44-46.

*Breach of contract.* Beriont alleges that GTE breached an agreement to resolve the ongoing employment dispute and litigation. There is ample support in the record for the Superior Court judge's conclusion that the parties to the proposed settlement agreement understood it had to be reduced to writing and be reviewed by the parties' attorneys before it would be operative. The judge was correct in concluding that Beriont therefore failed to show the existence of an enforceable settlement agreement. Thus, it was proper to grant GTE's motion for summary judgment on Beriont's breach of contract claim.

*Wrongful termination.* Beriont alleges that he was wrongfully terminated from his position at GTE Labs. It is undisputed that GTE Labs fired Beriont for failing to end his litigation against the company.

The Superior Court judge correctly concluded that Beriont is properly considered an at-will employee since he failed to produce an employment agreement with a definite period of employment. See *Jackson v. Action for Boston Community Dev., Inc.* 403 Mass. 8, 9 (1988). As a general principle, an employer can terminate the employment of an at-will employee at any time for any reason, or for no reason at all. *Upton v. JWP Businessland,* 425 Mass. 756, 757 (1997). However, an at-will employee can succeed in imposing liability on an employer for terminating his employment in violation of "a clearly established public policy." *Ibid.*

In order to succeed in his claim, Beriont must show that his termination violated a clearly established public policy. While the public policy exception has been construed as including the assertion of certain legal rights, it has not been construed to include situations in which an employee is maintaining litigation against an employer. See *King v. Driscoll,*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

60 Mass.App.Ct. 1108, 800 N.E.2d 726 (Table), 2003 WL 22992122 (Mass.App.Ct.)
**Unpublished Disposition**

**(Cite as: 60 Mass.App.Ct. 1108, 800 N.E.2d 726, 2003 WL 22992122 (Mass.App.Ct.))**

418 Mass. 576, 581- 587 (1994). Therefore, it was not error for the Superior Court judge to allow GTE's motion for summary judgment on Beriont's wrongful termination claim.

*Promissory estoppel.* Beriont asserts that GTE Labs is liable to him on a theory of promissory estoppel. In essence, he alleges that he reasonably relied on promises by GTE regarding the resolution of the dispute when he declined employment with another subsidiary of GTE Corporation. It is undisputed that Beriont received assurances that certain individuals believed the dispute could be resolved and that they would work to try to achieve that goal. In addition, there was discussion about what items a finalized settlement agreement would include. However, Beriont fails to show the existence of a promise sufficient to satisfy a promissory estoppel claim. To do so, he would have to show a promise that would suffice to support a contract. The assertions of belief and intention and the discussion of terms of a settlement in the context of negotiation do not suffice. "An element of promissory estoppel is that the party invoking it must have reasonably relied on the alleged promise to his detriment.... Inchoate negotiations are no better basis for reliance than for an action on the purported contract as such." *Hall v. Horizon House Microwave, Inc.* 24 Mass.App.Ct. 84, 93-94 (1987).

***4** Furthermore, in addition to failing to show a promise sufficiently definate to support a promissory estoppel claim, Beriont also fails to make an adequate showing that he relied on the promise to his detriment. See *Ibid.* See also *Rooney v. Paul D. Osborne Desk Co., Inc.* 38 Mass.App.Ct. 82, 83 (1995). While he indicates that he declined a job offer, he does not indicate how that has resulted in his detriment, such as by forcing him to take an inferior position. It is not clear from the record that he has suffered detriment. In fact, it is apparent from the record that he did not even inquire as to whether the job offer that he declined could be renewed. It was not error for the Superior Court to grant GTE's motion for summary judgment on Beriont's promissory estoppel claim.

We do not address several other arguments in Beriont's pro se brief because they fail to rise to the level of appellate argument. See Mass. R.A.P. 16(A)(4), as amended, 367 Mass. 921 (1975).

The judgment is affirmed with respect to the intentional interference, breach of contract, wrongful termination and promissory estoppel claims. With respect to the defamation and respondeat superior defamation claims involving the statement allegedly made by Reichlen to Brockman, the judgment is vacated and the matter is remanded for further proceedings in accordance with this order.
    *So ordered.*

60 Mass.App.Ct. 1108, 800 N.E.2d 726 (Table), 2003 WL 22992122 (Mass.App.Ct.) Unpublished Disposition

### Briefs and Other Related Documents (Back to top)

• 2002 WL 32759401 (Appellate Brief) Brief for the Appellee Bruce Reichlen (Sep. 26, 2002)Original Image of this Document (PDF)

• 2002 WL 32759402 (Appellate Brief) Brief of Defendant - Appellee GTE Laboratories Incorporated (Sep. 26, 2002)Original Image of this Document with Appendix (PDF)

• 2002 WL 32759403 (Appellate Brief) Brief for the Appellant (Jul. 23, 2002)Original Image of this Document with Appendix (PDF)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.