# EXHIBIT A

Case 1:04-cv-11487-RWZ    Document 19-2    Filed 09/16/2005    Page 1 of 8

Serta Mattress Company
*A Division of National Bedding Company*
191 Waukegan Road
Northfield, Illinois 60093
847.501-4099 *fax* 847.501-4109

Mr. Paul Croft
Serta Mattress Company
61 Leona Drive
Middleborough, MA 02346

Dear Mr. Croft:

This letter confirms our agreement regarding your employment with National Bedding Company (the "Company"). This Agreement is being entered in connection with the transactions contemplated by the Asset Purchase Agreement (the "Asset Purchase Agreement") dated as of June 22, 1999, among the Company, (S-N Bedding Co., Inc. ("S-N BC"), Star Bedding Co. of Pittsburgh, Inc. ("Star BC") and Silentnight Holdings PLC ("SHP"). This Agreement will be effective only upon consummation of the transactions contemplated by the Asset Purchase Agreement ("Closing").

In consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the terms of your employment with National Bedding are as follows:

1. Subject to the terms and upon the conditions set forth herein, the Company hereby agrees to employ you for a two-year term commencing on the date hereof and expiring on June 22, 2001 (the "Designated Term"), which term will automatically renew for periods of one-year thereafter, unless earlier terminated as herein provided (the "Term"). During the Term, you shall serve in the capacity of a Vice President of the Middleborough Division of the Company. Your duties and responsibilities under this Agreement shall be such, commensurate with your position with the Company, as shall be assigned to you from time to time during the Term by the Board of Directors of the Company (the "Board"). You hereby accept such employment and agree to render the services and perform the duties described above. During the Term, you shall (i) devote your best efforts and full time and services to promote the business and the business interests of the Company, (ii) perform to the best of your ability the duties that shall be assigned to you hereunder in a diligent, trustworthy, businesslike and efficient manner, and (iii) not engage, without the prior written consent of the Board, in other employment.

2. During the Term, the Company shall pay you a salary at an annual rate of $200,000 per year or such higher rate as the Board may designate from time to time (the "Annual Salary"). The Annual Salary shall be payable in accordance with the payroll policies of the Company as from time to time in effect, less such deductions as the Company is required to withhold under applicable law and regulations.

3. During the Term, you shall be eligible to receive an annual performance bonus award in an amount not to exceed 50% of the Annual Salary ("Bonus Award"). The amount of the Bonus Award, if any, shall be determined by the Board in its sole discretion, from time to time. The Bonus Award for the balance of calendar year 1999 shall be 50% of your Annual Salary, prorated from the date of Closing through December 31, 1999.

4. During the Term, you shall be entitled to participate in all of the Company's employee benefit programs for which all senior executive employees of the Company are generally eligible (the benefits under such programs are referred to herein collectively as the "Benefits"). In addition, you shall be entitled to no less than four weeks of vacation each year.

5. The Company shall pay or reimburse you for all expenses reasonably and necessarily incurred by you during the Term in the performance of your services under this Agreement which are consistent with the Company's policies in effect from time to time with respect to travel, entertainment and other business expenses. Such payment or reimbursement shall be made upon

presentation of such documentation as the Company requires of its senior executive employees prior to making such payments or reimbursements.

6. Upon termination of your employment with the Company or any of its Affiliates for any reason (including termination pursuant to Paragraph 12 herein) other than death or disability, or by you with Good Reason (defined below), the Company shall pay you an amount equal to twice the amount of your Annual Salary in effect at the time of your termination (the "Additional Payment") in exchange for your continuing adherence to the Covenants Against Competition (defined on Exhibit A) for an additional period of one year commencing on the date of the termination of your employment by the Company or any of its Affiliates or their respective successors or assigns, (the "Restricted Period"). The Additional Payment shall be payable over a two-year period in accordance with the payroll policies of the Company as from time to time in effect, less such deductions as the Company is required to withhold under applicable law and regulations. As used in this Agreement, the term "Cause" shall mean "cause" under applicable law and shall include the following: (i) the sale, use or possession by you of illegal drugs, (ii) fraud, embezzlement or misappropriation by you of any amount of money or other assets or properties of the Company or any Affiliate or successor thereof; (iii) a felony, a crime involving moral turpitude or your engagement in conduct outside the ordinary course of business which results in material loss, damage, or injury to the Company; or (iv) a judgment of harassment by you of any employee of the Company or any Affiliate or successor thereof.

7. In the event of your death during the Term, this Agreement shall terminate, except that your legal representatives shall be entitled to receive at the times provided for herein (i) the Annual Salary earned up to the date of your death, and (ii) unpaid Benefits accrued up to the date of your death.

8. If during the Term you become physically or mentally disabled so that you are unable substantially to perform your services hereunder for (i) a period of 90 consecutive days, or (ii) for shorter periods aggregating 90 days during any 365-day period, the Company may at any time after the last day of the 90 consecutive days of disability or the day on which the shorter periods of disability equal an aggregate of 90 days terminate your employment under this Agreement by written notice to you. In the event that your employment under this Agreement is terminated pursuant to this Paragraph 8, you shall be entitled to receive (i) the Annual Salary earned up to the date of such termination, and (ii) unpaid Benefits accrued up to the date of such termination. Nothing contained in this Paragraph 8 shall be deemed to extend the Term or to constitute a breach of this Agreement.

9. If the Company exercises its right to terminate you for Cause, the Company's obligation to you shall be limited to the Additional Payment and the payment, at the times and upon the terms provided for herein, of accrued and unpaid Annual Salary and Benefits vested up to the effective date specified in the Company's notice of termination.

10. If you are terminated without Cause during the Designated Term or you terminate your employment with the Company or any of its Affiliates for Good Reason (as defined below), the Company's obligation to you shall be limited to the Additional Payment and the payment, at the times and upon the terms provided for herein, of (i) your Annual Salary for the remaining Designated Term of this Agreement, and (ii) accrued and unpaid Benefits and accrued and unpaid bonus, if any, vested up to the effective date specified in the Company's notice of termination. The amounts set forth in this Paragraph 10 shall be payable to you only if you have not breached the provisions of Paragraph 14 hereof.

11. Any termination of your employment by you in breach of the terms hereof shall entitle the Company to discontinue payment of all Annual Salary, Benefits and any Bonus Awards accruing from and after the date of such breach, and shall be deemed a breach of this Agreement.

12. You may terminate your employment with the Company or any of its Affiliates effective after the Designated Term upon giving written notice to the Company six months' prior to the end of the

Designated Term or the end of any subsequent one year renewal period; provided, however, that (i) if the Board requires you to perform your duties and responsibilities set forth herein primarily at any location other than within 50 miles of your present office location in Middleborough, Massachusetts (excluding business-related travel) or (ii) in the event there is a sale of all of the capital stock of the Company or a sale of substantially all of the assets of the Company to a non-Affiliate of the Company (collectively "Good Reason"), you may terminate your employment with the Company or any of its Affiliates effective at any time during the Designated Term upon giving six months' written notice to the Company. The Company may terminate this Agreement effective after the Designated Term upon giving written notice to you 60 days prior to the end of the Designated Term or the end of any subsequent one year renewal period.

13. In the event that the Company engages in an underwritten commitment public offering during the Term and adopts a stock option plan in connection therewith pursuant to which senior executives are entitled to participate, the Company will grant to you stock options commensurate with and on terms and conditions substantially similar to those granted to a Sales Manager/Officer if you are then employed by the Company pursuant to this Agreement.

14. You shall be bound by the provisions of Exhibit A which is attached hereto and incorporated herein by reference.

15. You hereby represent and warrant to the Company that (i) the execution, delivery and performance of this Agreement by you does not and will not conflict with, breach, violate or cause a default under any contract, agreement, instrument, order, judgment or decree to which you are a party or by which you are bound, (ii) you are not a party to or bound by any employment agreement, noncompete agreement or confidentiality agreement with any other person or entity and (iii) upon the execution and delivery of this Agreement by the Company, this Agreement shall be a valid and binding obligation of yours, enforceable against you in accordance with its terms.

16. As used in this Agreement: (i) "Affiliate" with respect to any Person means any other Person controlling, controlled by or under common control with, or the parents, spouse, lineal descendants or beneficiaries of, such Person; and (ii) "Person" means any individual, corporation, partnership, limited liability company, firm, joint venture, association, joint-stock company, trust, unincorporated organization, governmental or regulatory body or other entity.

17. This Agreement (including Exhibit A) contains the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior discussions and agreements, written or oral, with respect thereto.

18. Should either party hereto or their successors retain counsel for the purpose of enforcing, or preventing the breach of, any provision hereof, including by instituting any action or proceeding in a court to enforce any provision hereof or to enjoin a breach of any provision of this Agreement or for any other remedy, then the successful party shall be entitled to be reimbursed by the other party for all costs and expenses incurred thereby, including, but not limited to, reasonable fees and expenses of attorneys and expert witnesses, including costs of appeal. If such successful party shall recover judgment in any such action or proceeding, such costs, expenses and fees may be included in and as part of such judgment. The successful party shall be the party who is entitled to recover his or her or its costs of suit, whether or not the suit proceeds to final judgment. If no costs are awarded, the successful party shall be determined by the court.

19. This Agreement shall inure to the benefit of and shall be binding upon your heirs and legal representatives and upon the successors and assigns of the Company. This Agreement is a personal service contract and it may not be assigned by you; the Agreement is, however, expressly assignable by the Company, but only in connection with the sale of all or substantially all of the assets of the Company or in connection with a merger of the Company in which the Company is not the surviving entity.

If this letter confirms our agreement, please acknowledge your acceptance of these terms by signing a copy of this letter below and returning it to my attention.

Sincerely yours,

NATIONAL BEDDING COMPANY

By: _____
Burton Kaplan, Chairman of the Board

ACKNOWLEDGED AND AGREED TO
this 27 day of June, 1999

_____
Paul Croft

2251969 02

-4-

EXHIBIT A

1. You acknowledge that (i) the Company, Star BC and S-N BC have been engaged in the wholesale business of manufacturing and marketing mattresses, beds and related bedding products (the "Company Business"); (ii) the Company Business is conducted in the "Areas of Primary Responsibility" currently serviced by S-N BC and Star BC in the following states: Massachusetts, Pennsylvania, New York, Maine, Connecticut, Maryland, Ohio, Rhode Island, New Hampshire, Vermont and West Virginia (the "Territory"); (iii) your work for the Company will give and your work for S-N BC has given you access to trade secrets of, and confidential information concerning, the Company; (iv) the agreements and covenants contained in this Agreement are essential to protect the business and goodwill of the Company; and (v) you have means to support you and your dependents other than by engaging in the Company Business and the provisions of this Agreement will not impair such ability. You also acknowledge and agree that the restrictions imposed upon you by this Exhibit A and the purposes for such restrictions are reasonable and are designed to protect the good will, trade secrets, confidential and proprietary business information and the continued success of the Company without unduly restricting your future employment by others. Accordingly, you covenant and agree as follows:

   a. <u>Confidential Information; Personal Relationships</u>. You acknowledge that the Company has a legitimate and continuing proprietary interest in the protection of confidential information of it and its Affiliates and that, prior to the date hereof, the Company and S-N BC have invested substantial sums, and the Company will continue to invest substantial sums, to develop, maintain and protect confidential information. You agree that, during the Term and at all times thereafter, you shall, and shall cause your Affiliates to, keep secret and retain in strictest confidence, and shall not use or disclose to any Person for your benefit or the benefit of others any proprietary, confidential or secret knowledge, data or matters, whether transmitted in writing, orally, visually or otherwise, used in, associated with or related to the Company or S-N BC, their Affiliates, the current or anticipated business of the Company or its Affiliates, the research and development activities of the Company or its Affiliates and those of any party granting rights to the Company or which has been identified to you, either orally or in writing, together with analyses or documents which contain or otherwise reflect such matters ("Confidential Information"), including know how, technology, financial information, trade secrets, customer lists, names or identities, details of client or consultant contracts, pricing policies, operational methods, marketing plans or strategies, product development techniques or plans, business acquisition plans, new personnel acquisition plans, methods of manufacture, drawings, specifications, personnel data, processes, formulas, designs and design projects, computer programs, inventions and research projects of the Company, its Affiliates or any other entity which may hereafter become an Affiliate thereof, unless otherwise in the public domain other than as a result of disclosure by you or his Affiliates. Without limiting the foregoing, you acknowledge and agree that the Confidential Information consists of trade secrets and confidential and proprietary business information of the Company and S-N BC and is subject to the protection of any applicable trade secrets act.

   b. <u>Property of the Company</u>. All memoranda, notes, lists, records, engineering drawings, technical specifications and related documents and other documents or papers (and all copies thereof) relating to S-N BC, the Company, the Company Business, any of the Company's Affiliates, any entity which might thereafter become an Affiliate thereof or the business of such Affiliates, including such items stored in computer memories, microfiche or by any other means, made or compiled by or on behalf of you during the course of your employment by S-N BC preceding the date hereof or by the Company after the date hereof, or made available to you during the course of your employment by S-N BC preceding the date hereof or by the Company after the date hereof relating to the Company, its Affiliates or their respective successors or assigns or any entity which may hereafter become an Affiliate thereof, shall be the property of the Company, and shall be delivered to the Company promptly upon the termination of your employment with the Company or at any other time upon request.

   c. <u>Original Material</u>. You acknowledge that the compensation paid to you by the Company during your employment by the Company is intended to and does compensate you for your originality, innovativeness and inventiveness as it relates to the Company Business. You agree that any information, inventions, innovations, discoveries, improvements, ideas, developments, methods, designs, reports, charts, drawings, analyses, reports, concepts, original works of authorship or similar information relating to the Company Business or the business of the Company's Affiliates, including methods, technology, customer lists, reports, records, brochures, instructions, manuals, computer apparatus, programs and manufacturing techniques, whether or not protectable by patent or copyright, that have been originated, developed, made, conceived, authored or reduced

to practice by you alone or jointly with others during your employment with S-N BC, the Company, their Affiliates or their respective successors or assigns ("Intellectual Property") shall be the property of and belong exclusively to the Company and that you will not make (apart from his duties to the Company) or permit anyone else to read or to make any copy, abstract or summary of any document belonging to the Company or its Affiliates. You shall promptly and fully disclose to the Company the origination or development by you of any Intellectual Property and shall provide the Company with any information that it may reasonably request about the Intellectual Property. Upon expiration or termination of this Agreement, you shall not use, duplicate, reveal or take with you any Intellectual Property or other materials of the Company. You shall assign to the Company all the Intellectual Property and all of his rights thereto and therein and shall sign all documents necessary or appropriate to enable the Company to register or otherwise perfect the Company's ownership of the Intellectual Property, including for the preparation and prosecution of copyright applications, patent applications, design applications or similar filings and the procurement and maintenance thereof.

    d. <u>Post-Employment Property</u>. You agree that any and all intellectual property which you invent, discover, originate, make, conceive, create or author either solely or jointly with others and which is the result of or is derived from Confidential Information and is reduced to writing, drawings or practice, if any, after the termination of your employment by the Company or any of its Affiliates for any reason, with or without cause, shall be the sole and exclusive property of the Company. You shall promptly and fully disclose and assign all such property to the Company.

    e. <u>Noncompetition</u>. During the Term and during the Restricted Period, if any, you shall not (except in your capacity as an employee of the Company or any of its Affiliates), and shall not permit any of your Affiliates to, directly or indirectly, in any capacity, including as an employee, consultant, partner, shareholder, owner of securities, lender, officer, director, principal, agent or trustee of any Person, (i) engage or participate in the Company Business in the Territory; or (ii) enter the employ of, or render any other services to, any Person (as defined below) in or out of the Territory engaged in or competitive with the Company Business in the Territory; <u>provided, however,</u> that you may own, directly or indirectly, solely as an investment, securities of any Person traded on any national securities exchange or listed on the Nasdaq Stock Market if you are not a controlling Person of, or a member of a group which controls, such Person and you do not, directly or indirectly, own 1% or more of any class of equity securities, or securities convertible into or exercisable or exchangeable for 1% or more of any class of equity securities, of such Person. You specifically acknowledge that the compensation paid to you during your employment by the Company is intended to and does compensate you for any inconveniences or economic deprivation resulting from your agreement not to compete with the Company.

    f. <u>Employees of the Company and its Affiliates</u>. During the Term and during the Restricted Period, if any, you shall not, without the prior written consent of the Board, directly or indirectly, hire or solicit, or cause others to hire or solicit, for employment by any Person other than the Company or any Affiliate thereof, any employee of the Company or its Affiliates or their respective successors or assigns or any person who was an employee of any of such parties at any time within the six-month period immediately prior to the date on which such hiring would take place, or encourage any such employee to leave such employee's employment.

    g. <u>Customers of the Company and its Affiliates</u>. During the Term and during the Restricted Period, if any, you shall not, except by reason of and in your capacity as an officer of the Company, directly or indirectly, solicit for your own benefit, or for the benefit of any Person (other than the Company or its Affiliates), any customer, supplier, licensee or other business relation of the Company, its Affiliates or their respective successors or assigns or request or advise any such party to curtail or cancel its business relationship with the Company, its Affiliates or their respective successors or assigns.

    h. <u>Covenants Against Competition</u>. The covenants set forth in subparagraphs (e), (f) and (g) above are referred to herein as the "Covenants Against Competition".

  2. <u>Rights and Remedies Upon Breach</u>. If you breach, or threaten to commit a breach of, any of the provisions contained in Section 1 of Exhibit A of this Agreement (the "Restrictive Covenants"), the Company shall have the following rights and remedies, each of which rights and remedies shall be independent of the others and severally enforceable, and each of which is in addition to, and not in lieu of, any other rights and remedies available to the Company under law or in equity:

    a. <u>Specific Performance.</u> The right and remedy to have the Restrictive Covenants specifically enforced by any court of competent jurisdiction, it being agreed that any breach or threatened breach of the Restrictive Covenants would cause irreparable injury to the Company and that money damages would not provide an adequate remedy to the Company.

    b. <u>Accounting.</u> The right and remedy to require you to account for and pay over to the Company all compensation, profits, moneys, accruals, increments or other benefits derived or received by you as the result of any action constituting a breach of the Restrictive Covenants.

    c. <u>Severability of Covenants.</u> You acknowledge and agree that the Restrictive Covenants are reasonable and valid in duration and geographical scope and in all other respects. If any court determines that any of the Restrictive Covenants, or any part thereof, is invalid or unenforceable, the remainder of the Restrictive Covenants shall not thereby be affected and shall be given full effect without regard to the invalid portions.

    d. <u>Blue-Pencilling.</u> If any court determines that any of the Restrictive Covenants, or any part thereof, is unenforceable because of the duration or geographical scope of such provision, such court shall have the power to reduce the duration or scope of such provision, as the case may be, and, in its reduced form, such provision shall then be enforceable.

    e. <u>Enforceability in Jurisdictions.</u> The Company and you intend to and hereby confer jurisdiction to enforce the Restrictive Covenants upon the courts of Illinois, Massachusetts, Maine, New York, Pennsylvania, or any other jurisdiction within the geographical scope of such Restrictive Covenants where any breach of, or threatened breach of, any of the Restrictive Covenants has occurred. If the courts of any one or more of such jurisdictions hold the Restrictive Covenants unenforceable by reason of the breadth of such scope or otherwise, it is the intention of the Company and you that such determination not bar or in any way affect the right of the Company to the relief provided above in the courts of any other jurisdiction within the geographical scope of such Restrictive Covenants, as to breaches of such Restrictive Covenants in such other respective jurisdictions, such Restrictive Covenants as they relate to each jurisdiction being, for this purpose, severable into diverse and independent covenants.