# EXHIBIT D

Page 1

1                UNITED STATES DISTRICT COURT

2                 DISTRICT OF MASSACHUSETTS

3

4

5    - - - - - - - - - - - - - - x

6    PAUL CROFT,

7         Plaintiff,                    Case No.:

8      v.                               04-11487-RWZ

9    NATIONAL BEDDING COMPANY d/b/a

10   SERTA MATTRESS COMPANY,

11        Defendant.

12   - - - - - - - - - - - - - - x

13                                **ORIGINAL**

14

15   VOLUME I                      Pages 1 - 326

16

17        DEPOSITION of PAUL CROFT, a witness called by

18   counsel for the Defendant, taken pursuant to the

19   Federal Rules of Civil Procedure before Jane M.

20   Borrowman, RPR, No. 001420, and Notary Public in and

21   for the Commonwealth of Massachusetts, at Seyfarth

22   Shaw, World Trade Center East, Two Seaport Lane,

23   Boston, Massachusetts, on January 13, 2005, commencing

24   at 9:55 a.m.

```
 1      APPEARANCES:

 2


 3          BURNS & LEVINSON, LLP

 4          By Laura R. Studen, Esq.

 5          125 Summer Street

 6          Boston, Massachusetts   02110-1624

 7          617.345.3000

 8        Lstuden@burnslev.com

 9          For the Plaintiff.

10

11          SEYFARTH SHAW, LLP

12          By Daniel B. Klein, Esq.

13          World Trade Center East

14        Two Seaport Lane, Suite 300

15          Boston, Massachusetts   02210-2028

16        617.746.4800

17        Dklein@seyfarth.com

18        For the Defendant.

19

20

21     ALSO PRESENT:   Robert Sherman.

22

23

24
```

1       with the label B&L 089.  Do you see the date

2       at the top?  I know it's referring to year end

3       December 31st, 2001.

4  A.   I can't read that.

5           MS. STUDEN:  What's the B&L number

6       on it?

7           MR. KLEIN:  Eighty-nine.

8           MS. STUDEN:  Eighty-nine.

9  BY MR. KLEIN:

10  Q.   In fact, the next one, 90, does that look like

11      7-9-01?

12  A.   I can't tell.

13  Q.   Well, in any event, other than those documents

14      there, and we'll ask about those and others as

15      well, any documents that do seem to have been

16      dated prior to September of 2001, did you

17      obtain those from Serta?

18          MS. STUDEN:  Objection.

19  BY MR. KLEIN:

20  Q.   You can answer.

21  A.   Yeah.  I mean, it would have been in my course

22      of doing my job.

23  Q.   So you maintained documents during your

24      employment with Serta?

1    A.    Correct.

2    Q.    And after you were terminated in September of

3          2001, you kept these documents?

4    A.    I made no effort to keep them, but I mean,

5          when it turned into this, I mean, that's why I

6          had to search.

7    Q.    So you did not return those documents upon

8          your termination?

9    A.    I returned a lot of stuff, like my laptop and

10         things like that, but I don't -- I don't

11         recall.  I don't recall -- I don't recall

12         being asked for like all the documents.  I

13         don't know.

14   Q.    Any documents that are in your possession

15         today that you produced in this case that

16         relate to Serta, are any of the documents that

17         you produced documents that you obtained from

18         Jeremiah Reardon?

19              MS. STUDEN:  Objection.

20              THE WITNESS:  They may.  I mean,

21         that's what I'm saying, I don't know.  I know

22         that I was asking what the bonus finished up

23         at, in other words, meaning for our profit

24         percentage.  So it would have been on a

```
 1        notes, lists, records and other related

 2        documents to Serta?

 3   A.   I believe so.

 4             MS. STUDEN:  Objection.  Take a

 5        pause, give me a chance to object.

 6             MR. KLEIN:  I should have said that

 7        at the beginning.  It's part of protocol.

 8        Sometimes your counsel is going to object.

 9             MS. STUDEN:  He knows that.

10             MR. KLEIN:  It's just for the form,

11        you still answer, but let her get her

12        objections in.

13             Do you need me to read back the

14        question?

15             THE WITNESS:  Please.

16             MR. KLEIN:  Okay.  Can you just read

17        that back.

18             (Whereupon, the record was read back

19        by the court reporter as requested.)

20             MS. STUDEN:  Objection.  You can

21        answer.

22             THE WITNESS:  Yes.

23   BY MR. KLEIN:

24   Q.   And the documents that you just reviewed, were
```

Page 22

1          those business documents related to Serta?

2     A.   I believe --

3               MS. STUDEN:  Objection.

4               THE WITNESS:  I believe so.

5               MR. KLEIN:  And you understand that

6          you were required to return those at your

7          termination?

8               MS. STUDEN:  Objection.

9               THE WITNESS:  I believe so.

10              MR. KLEIN:  As well as any other

11         business related documents related to Serta?

12              MS. STUDEN:  Objection.

13              THE WITNESS:  I believe so.

14              MR. KLEIN:  Any reason you didn't

15         return those documents at your termination?

16              MS. STUDEN:  Objection.

17              THE WITNESS:  I didn't even know I

18         was required to.

19              MR. KLEIN:  Could we go off the

20         record for a second?

21              (Discussion held off the record.)

22              MR. KLEIN:  At any point in time

23         since your termination, have you shared any of

24         Serta's business documents with anyone else?

1     sales, I don't remember his title, but he was

2     at Sealy of Albany.  And I worked for a

3     mattress chain which was doing business with

4     Sealy of Randolph and, at that time, they were

5     infighting within the Sealy name and there

6     were what they call in the industry "the Sealy

7     wars."  And after I worked for a retailer,

8     then, they came and solicited us to change

9     from Sealy of Randolph to Sealy of Albany.

10    And, yeah, I didn't deal directly with Bob,

11    but I would go to someone else, so I knew what

12    -- if that's your question.

13  Q.  Did you ever apply for a job with Bob Sherman

14    at Sealy?

15  A.  Did I ever apply for a job.  I may have.  I

16    may have.

17  Q.  Do you recall how that resulted?

18  A.  A standard form letter, I believe.

19  Q.  Were you hired or not?

20  A.  No.  Just that they -- and I'm not a hundred

21    percent, but I mean, it was some form letter

22    that they would keep a resume on file or

23    whatever.

24  Q.  And you worked at SN Bedding until the asset

Page 42

```
 1            purchase by National Bedding Company in 1999?

 2    A.    That's correct.

 3    Q.    And that was -- that deal closed in July 1999?

 4    A.    I believe so.

 5    Q.    Let's mark this as the next exhibit.

 6                 (Whereupon, Croft Exhibit No. 5 was

 7            marked for identification.)

 8    Q.    I'm showing you what's been marked as Exhibit

 9            5.  Take a moment to look through it, tell me

10            when you're ready for me to ask you about it.

11    A.    (Witness reviewing.)  Okay.

12    Q.    Do you recognize this document, sir?

13    A.    I didn't until you just put it in front of me.

14    Q.    Do you recognize it now?

15    A.    Yes.  I do.

16    Q.    Okay.  What is it?

17    A.    I believe it was a pay out that we got from SN

18            Bedding prior to this acquisition.  And then,

19            I guess, without reading it in detail, I guess

20            it was waiving any future claims, et cetera,

21            you know.  So it was some type of payment at

22            the end of my employment with SN and my start

23            of employment with National Bedding.

24    Q.    And is that your signature on page 4 of this
```

```
 1         Like I didn't look at that and check to see if

 2         that was even accurate.  I mean, you know, in

 3         other words, whatever that document says.  I

 4         don't know if that was a final document or

 5         just a document.  I don't know.

 6    Q.   What document are you describing?

 7    A.   Just some document that listed all -- what all

 8         the people -- I remember seeing myself and

 9         Kevin and Jeremiah and -- I'm drawing a

10         blank on his name -- Ed Rogers and Bob

11         Delvecchio.

12    Q.   Okay.  In paragraph 2, it mentions a letter to

13         Laura Studen from David Tarbet that reflected

14         the amount of your payment.  Do you still

15         possess that letter?

16    A.   I don't know.

17    Q.   Was Ms. Studen representing you at the time?

18    A.   Yes.

19    Q.   And who is Mr. Tarbet?

20    A.   He was a lawyer for SN Bedding, I believe.

21    Q.   Did Ms. Studen represent Mr. Toman at the

22         time?

23    A.   I don't know.  I believe so.

24    Q.   And, Mr. Reardon, do you know whether
```

Page 54

1  Q.    And you said that National Bedding was known

2        not to do contracts, you said they didn't do

3        contracts?

4  A.    Correct.  In other words, you know -- and I

5        don't recall specifically, but I remember

6        saying to Kevin that if you want me to work

7        there, I'm not working there without a

8        contract, you know.

9  Q.    You insisted on a contract?

10 A.    Correct.

11             And, then, I remember -- and I don't

12       remember whether it was Kevin or Jeremiah or

13       whatever, but I remember somebody coming back

14       and -- we were just at lunch and talking about

15       things, and I remember a comment that they

16       don't do contracts, you know.  In other words,

17       meaning, you know, it was just summarily

18       dismissed that -- you know, it was like -- so,

19       in my own mind, you know, because there were

20       so many uncertainties going on at the time,

21       you know, so I just said okay, you know, and

22       only because I've learned that you're worth

23       more employed than unemployed and to be

24       unprepared is not a good thing, you know.  So,

```
 1           designated term of two years, expiring on June

 2           22nd, 2001?

 3    A.     Yeah.  And, then, it says:  "Which term will

 4           automatically renew for periods of one year

 5           thereafter."

 6    Q.     Right.  And it could automatically renew for

 7           periods of one year unless terminated by

 8           either party pursuant to various terms in the

 9           agreement, correct?

10    A.     Okay.

11    Q.     And during that term, according to paragraph

12           1, you were to serve as the vice president of

13           the Middleborough division?

14    A.     Correct.

15    Q.     And when did you actually start working for

16           NBC?

17    A.     I don't know.

18    Q.     Was it after the asset purchase closed?

19    A.     I don't know.  I don't know the technical --

20           you know, somebody would have to explain to

21           me, you know.  I know I was continuously paid

22           from one company to another company and, you

23           know.

24    Q.     Did the paychecks change in terms of the
```

Page 157

```
 1          January, I believe it was after the holidays
 2          and I believe it was, guessing, the first week
 3          or two weeks of January, that Bob, Jeff, Allen
 4          and Barbara Bradford all came to Middleborough
 5          and had a meeting with myself and Jeremiah
 6          independently.
 7    Q.    Of each other?
 8    A.    Correct.  We weren't in the same meeting.
 9    Q.    Okay.  So they had a separate meeting with you
10          and another meeting with Mr. Reardon?
11    A.    Correct.  I believe the same day.  I think it
12          was at night, but I don't have a clear
13          recollection of it.  And then I believe it was
14          tied into a couple day meetings with our sales
15          people, meaning, you know, they had a
16          full-blown meeting with all the sales people
17          and all that.
18    Q.    Were those meetings from around January 8th to
19          January 11th that you identified in your
20          interrogatory responses?
21    A.    I believe so.
22    Q.    And you met with Mr. Sherman, Ms. Bradford and
23          Mr. Allen?
24    A.    Correct.
```

Page 158

1  Q.  Anybody else present?

2  A.  No.

3  Q.  Did they ask to have this meeting with you or

4      did you ask for the meeting?

5  A.  I believe they asked for it.  I believe they

6      told me to be at the factory.

7  Q.  Between the time of the December 20th letter

8      going out and Mr. Sherman calling you and

9      saying you're now going to report to him and

10     this early January meeting, had you had any

11     discussions with Mr. Sherman or Mr. Allen or

12     anyone else --

13 A.  I don't recall.

14 Q.  -- about the terms of your employment?

15 A.  I don't recall.

16 Q.  Let's talk about this meeting.  Do you recall

17     who spoke first or how the meeting was

18     initiated?

19 A.  I don't remember.  I mean, I think one of the

20     first questions was, you know, do you want to

21     stay with the company or you don't, you know,

22     that type of thing or some context.  That

23     would not be a direct quote, but it was some

24     type of thing, you know, and --

1   Q.   Do you recall who said that?

2   A.   I don't remember.  I want to say Bob spoke

3        first, but I don't -- I don't recall.

4   Q.   What was your response?

5   A.   That I did want to stay with the company.

6   Q.   Where did the meeting go from there?  And I

7        want you to give me your best recollection of

8        -- as specific as you can, I know it's been a

9        while, of the conversations and who said what.

10       Basically, take me --

11  A.   I couldn't even tell you, but I mean, in

12       general --

13  Q.   Okay.

14  A.   -- I mean, it was about business and about

15       what irritated them and that type of thing.

16       There was not a lot of conversation about the

17       contract.  That's my recollection.  And the

18       contract was really strictly between myself

19       and Bob.  I mean, it was not -- I mean, my

20       meeting with them was for them to get a handle

21       on whether, you know, I had a handle on what I

22       was doing and that type of thing.  And I think

23       that's why they met with the sales people and,

24       you know, that type of stuff and -- but I

1       don't -- I wouldn't even try to recall, but my

2       recollection was that it was -- it was tension

3       filled, but it was not a in-your-face conflict

4       on either side.

5   Q.  So after you told them that you did want to

6       stay with the company, you don't think that

7       particular meeting really had much discussion

8       about your contract or the terms of your --

9   A.  No.

10  Q.  -- employment?

11  A.  No, not at all, because I have zero

12      recollection that we ever had conversations

13      with anybody but Bob, you know.

14  Q.  All right.  Did you take any notes during this

15      meeting?

16  A.  If I did, I don't have them.  I mean, meeting,

17      no.  I don't believe I did.

18  Q.  Do you recall if anyone else in the meeting

19      took notes?

20  A.  I don't recall.

21  Q.  Did you say anything in that meeting about

22      your desire to negotiate new terms?

23  A.  I don't believe so.  I don't believe so.

24  Q.  How long did you meet on that occasion?

Page 161

```
 1   A.   Don't even -- I don't know.  I mean, I just

 2        don't know.

 3   Q.   Now, did Mr. Sherman say anything during this

 4        meeting about the terms of your employment?

 5   A.   I don't recall.

 6   Q.   Did he say anything about the two year

 7        severance for the one year noncompete issue?

 8   A.   I don't recall.  No.  I think it was more a

 9        positive, more -- more that, you know, I think

10        -- I don't know.  I don't know.  I don't know

11        whether they were happy I was -- I was willing

12        to stay or whether they were -- you know.

13   Q.   Do you recall anything else that was said by

14        anyone during that meeting?

15   A.   No.

16   Q.   What was your next discussion with Mr. Sherman

17        about the terms of your continued employment?

18   A.   I think we kind of left it.  I think there

19        were a couple weeks of conversations.  And,

20        you know, I don't remember specifically, but

21        during that time, somewhere in mid January, I

22        got that notice saying my pay wasn't going to

23        be increased.

24   Q.   Okay.  Let's dig that out.  Let's have this
```

1    A.    My recollection, it was all right after that

2          meeting with Barbara and him.

3    Q.    Okay.  So that was the first time.  So at that

4          meeting, after you had this kind of

5          business-related discussion with everyone

6          present, did you and Mr. Sherman meet

7          one-on-one during those meetings?

8    A.    I don't recall.  I think it was all on the

9          telephone.

10   Q.    Okay.

11   A.    I think I talked to him and he talked to me

12         and -- and I don't recall.

13   Q.    And then you received this memo?

14   A.    I don't recall.  I don't remember --

15   Q.    Okay.

16   A.    -- when I got this.

17   Q.    Okay.  In your conversations in January with

18         Mr. Sherman, did you bring up the fact that

19         you were not happy with the pay increase, the

20         lack of pay increase?

21   A.    Yeah.  I said that's how he told me that he

22         wasn't interested in increasing my pay until

23         we come to terms.

24   Q.    Okay.  Where did the discussions go from

Page 168

```
 1         there?

 2    A.   We had more discussions and I have a basic

 3         recollection there was -- that there were

 4         telephone conversations.  I don't remember.  I

 5         don't remember whether he came to

 6         Middleborough, but I know I was out in Chicago

 7         the end of January, and I know that we had

 8         specific conversations the end of January.

 9    Q.   Those are the managers' meetings in Chicago --

10    A.   Correct.

11    Q.   -- from January 30th to February 1st?

12    A.   That sounds right.  I mean, there were -- I

13         remember the end of the month there were

14         meetings, and I remember at the break of those

15         meetings Bob and I had a direct discussion and

16         he talked about my talent and he talked about

17         the ability -- I had the ability to run the

18         whole company and all those types of things.

19         I don't remember, you know.  And we talked

20         about all -- you know, what my issues were,

21         and he told me about his issue with the --

22         with the free pay.  And I explained to him how

23         that clause came to be because some people,

24         when they don't know the formation of a
```

Page 169

```
 1           contract, they don't know how that came to be.

 2           I mean, it wasn't free pay.  It was -- because

 3           I never had any intention of ever leaving the

 4           company and saying screw you, you're going to

 5           pay me, you know, that's what my contract

 6           says.

 7    Q.     When you refer to the free pay clause, are you

 8           referring to the two year additional payment

 9           for the noncompete?

10    A.     Yeah.  The fact that we could -- we could

11           leave.  In other words, he was talking about

12           the fact that -- and I don't remember directly

13           how he worded it, but he was talking about

14           that he felt we took advantage of Burt Kaplan

15           in that -- in that Burt was a gentleman to

16           agree to a term like this, you know, and that

17           type of thing.

18    Q.     But just so we're clear, the term you're

19           referring to, the free pay, is that the two

20           year additional payment that if you quit but

21           you didn't compete for a year --

22    A.     Yeah.  With or without cause.  In other words,

23           the without cause, you know, apparently, it

24           bothered Bob.
```

1    Q.    Now --

2    A.    And that was his word to me.  I mean, I just

3          remember that because it stuck with me, the

4          free pay.

5    Q.    And how long did you meet with Mr. Sherman

6          about the terms when you were out in Chicago?

7    A.    It wasn't -- he asked me to meet with him, you

8          know, it was between the breaks.

9    Q.    Okay.  Was it more than one conversation?

10   A.    Yes.

11   Q.    Approximately how many?

12   A.    Maybe two.  I mean, I don't know.  But if I

13         had to guess, I would guess two, but I don't

14         know.

15   Q.    Was anyone else present during these

16         discussions?

17   A.    No.

18   Q.    So, Mr. Reardon was not part of these

19         discussions?

20   A.    No.

21   Q.    Were you at that point negotiating or

22         representing the interests of Mr. Reardon, as

23         well, or just yourself?

24   A.    I don't know.  I think, at that time, it was

1     whatever.  So that's all I recall.  I just

2     recall -- I don't remember the time frames for

3     it, I don't remember when it happened, but I

4     just remember in my mind no longer being

5     concerned with it because it wasn't a

6     performance thing, it's because we have this

7     pending, you know, and that's it.

8  Q.  Okay.  After you returned from Chicago, when

9     was your next discussion with Bob about the

10    terms of your employment?

11 A.  My recollection is that I didn't have a

12    discussion.  I got a phone call from him, he

13    told me to go to the fax machine.  I went to

14    the fax machine and got that fax, that's the

15    document that -- with the -- my issues, his

16    issue, and that was it.

17 Q.  Let's bring that out.  Will you mark this,

18    please.

19         (Whereupon, Croft Exhibit No. 17 was

20    marked for identification.)

21 Q.  Showing you what's been marked as Exhibit 17,

22    is this the document, the fax, that you were

23    referring to?

24 A.  Correct.

1   Q.   Okay.  Before we get into the document,

2          itself, are you saying that from the time you

3          left Chicago till the time that Bob called you

4          and said go to the fax machine, you and Bob

5          hadn't had any other discussions with each

6          other?

7   A.   I don't believe so.  But, again, if somebody

8          showed me something, you know, but my

9          recollection right now is that I didn't have

10         any other conversations.

11   Q.   And is this the document that was on the fax

12         machine when you went to --

13   A.   Yes.

14   Q.   -- the fax machine?

15   A.   Yeah.

16   Q.   And in looking at the fax line at the bottom

17         of the page, upside down, is that dated

18         February 5th, 2001?

19   A.   I believe so.  I can't read it.

20   Q.   Okay.

21   A.   I mean, it's -- it's February something.

22   Q.   So he told you on the phone go to the fax

23         machine, you then pick up this document?

24   A.   Correct.

1   Q.   What happens next?

2   A.   I don't recall.  I mean, you know, I know -- I

3         know -- and I don't remember whether I hung up

4         and then called him back or he called me back.

5         I don't remember.  I don't recall.

6   Q.   At some point, did you have a discussion with

7         Mr. Sherman about this document?

8   A.   There was nothing to discuss.  This was

9         exactly what we talked about.

10   Q.   Well --

11   A.   This -- this -- this defined everything that

12         was to be looked at.

13   Q.   What did he say to you when he said go to the

14         fax, did he say what he was faxing to you?

15   A.   I don't recall.  I don't recall.  But I know

16         when -- you know, like I know that other

17         proposal they sent me, that 10 year thing, I

18         know I did the same thing, I know I went to

19         the fax.

20   Q.   So the 10 year -- you said that he had

21         scratched out some --

22   A.   Yeah.  He had some handwritten thing.  I don't

23         remember.  I think it was, you know, late one

24         night and whatever and --

Page 179

1   Q.   And he faxed it to you?

2   A.   Correct.  That was in the machine.

3   Q.   When was that, do you know?

4   A.   I don't remember.

5   Q.   Was it before or after this?

6   A.   It was way before this.

7   Q.   It was.  Okay.

8   A.   Yeah.

9   Q.   So you don't recall what he said when he told

10       you to go to the fax machine?

11  A.   No.

12  Q.   You then pick this up?

13  A.   Right.

14  Q.   At any point, did he tell you what this

15       document was in his -- all he said was go to

16       the fax.  Did he ever describe --

17  A.   No.  I mean, that's what I'm telling you, I

18       don't remember whether I got back on the phone

19       with him, meaning I don't remember whether it

20       was -- when he said go to the fax, I don't

21       remember if I put the phone down --

22  Q.   Right.

23  A.   -- and he was still on the line, I don't

24       remember.

Page 180

```
 1   Q.   Okay.

 2   A.   Or I don't remember whether he went and faxed

 3        or had somebody fax, and then I got the

 4        document, but then we had a conversation, you

 5        know.  He said --

 6   Q.   And that's where I'm going.

 7   A.   Okay.

 8   Q.   So, now, whenever the conversation was, you

 9        had a conversation about this document?

10   A.   Correct.

11   Q.   What did Mr. Sherman say, as best as you can

12        remember it, during that conversation?

13   A.   Just -- just your salary, did address that?

14        Yeah.  Your bonus, did I address that?  And he

15        explained, you know, all the profit numbers

16        and stuff.  And I said so you're telling me if

17        sales are down, he said I want the profit

18        number up.  That was it.  Put the profit where

19        it belongs, not the sales, and that was it, I

20        mean.  And I remember having a -- and then I

21        remember saying okay.

22   Q.   Did he say to you whether this was his

23        memorializing what he thought you wanted or

24        whether he was offering this to you as the
```

Page 181

1    terms?  What did he say?

2   A.   I don't remember.  I mean, I -- he went down

3        each point.  We had the 10.  He explained to

4        me that -- and I said this does not take into

5        account sales, so if I put the profit, okay,

6        where it's supposed to be, then, this is how

7        -- he said -- and we did have a little

8        conversation back and forth, you know, and I

9        could tell he was getting irritated because he

10       was feeling like -- you know, I asked him if I

11       addressed his points, are we then going to be

12       negotiating this thing.  And that's when I

13       just -- I said that's it, I said I accept, no

14       problem, that's it.  And that's -- and that's

15       what -- the 10, the 11, because to me that's

16       -- it strictly addresses the profit, it

17       doesn't address the sales issue.

18   Q.   I'm sorry.  It doesn't address what?

19   A.   The sales issue.  Meaning, you know, you're

20       going to have numbers down and still drive the

21       profit.  I mean, you know, the point is is

22       that that is exactly -- and at that point, I

23       wasn't going to argue it because, I mean, to

24       me, he gave me a very good deal, so I wasn't

1        -- you know, but I'm not like that.  I'm not

2        -- I'm not -- I'm not a guy that looks for a

3        one-sided deal.

4   Q.   Okay.  When he discussed this with you, you

5        were just referring to the bonus that -- the

6        language that refers to the bonus, right, in

7        terms of the profits?

8   A.   This was not a discussion.  He said I -- did I

9        address your salary increase, you know,

10       concerns?  Did I address your bonus concern?

11       Do you understand how you're going to earn

12       your bonus?  And you understand if you quit,

13       okay, there's no severance, which I had -- I

14       fully understood leaving Chicago that that was

15       his big issue, that he felt it was a free pay

16       issue and that we were getting paid.  And he

17       felt personally that we took advantage of Burt

18       Kaplan, you know.  And I had nothing other

19       than the fact that I didn't want to get into

20       litigation, you know, that was the only reason

21       it was with or without cause and that was the

22       only reason that was in there.  It wasn't that

23       somebody sat down and said, boy, this is the

24       way to get two years free pay.  It was that

Page 183

```
 1        simple.  It was, you know, bing bang.  This
 2        was not a long conversation, you know.  It was
 3        "I accept" and that's it.
 4    Q.  Do you recall anything else that he said
 5        during that conversation?
 6    A.  No.
 7    Q.  Do you recall anything else that you said
 8        during that conversation?
 9    A.  "Thank you."
10    Q.  Did you say "I accept"?
11    A.  Yes.  Yeah.
12    Q.  Do you recall or do you know at the time
13        whether this document applied to you and
14        Mr. Reardon or just to you?
15             MS. STUDEN:  Objection.
16             THE WITNESS:  Don't know.
17  BY MR. KLEIN:
18    Q.  Was Mr. Reardon with you when you were looking
19        at the document?
20    A.  I don't recall.
21    Q.  Was Mr. Reardon on the phone with you and
22        Mr. Sherman when he told you to go to the fax
23        machine?
24    A.  There was one conversation where he was, and I
```

1   A.   Not that I recall.

2   Q.   And Bob asked you if these -- if this, I think

3        as you said, addressed your concerns, is that

4        right?

5   A.   Correct.

6   Q.   Okay.  Did he ever say that he was actually

7        agreeing to this or was he -- did he say that

8        does this document address your concerns?

9   A.   I have no idea.  He said did I address this,

10       did I address this, and do you understand if

11       you leave, there's no severance, dah, dah,

12       dah, dah, dah.  I said yes.  To use your term,

13       Bob, free pay, dah, dah, dah, dah, dah, you

14       know, and I accept, and that was it.

15  Q.   What was your understanding of what the --

16       let's go through it piece by piece.  What was

17       your understanding of the first line,

18       "contract length through December 31st, 2004,"

19       what did that mean to you?

20  A.   That it was through December 31st, 2004.

21  Q.   That what, what was through December 31st,

22       2004?

23  A.   That -- because all this did was amend the

24       terms.  I mean, one of the conversations,

Page 188

```
 1   A.   Yeah.  I mean, you know.

 2   Q.   So with respect to this period at the top, the

 3        contract length, your understanding was that

 4        was extending your employment through December

 5        31st, 2004, or -- or the actual contract?

 6   A.   To me, here's how I'm going to get my pay

 7        increases and my bonuses through December

 8        31st, 2004.  So that addressed it, okay, for

 9        what's that, three or four years term.

10   Q.   So your understanding was that this was

11        addressing your salary and bonuses?

12   A.   And term.

13   Q.   And term?

14   A.   Correct.

15   Q.   And when you say "term," did you -- was it

16        your understanding that you were being

17        guaranteed employment?

18             MS. STUDEN:  Objection.

19             THE WITNESS:  I have no idea.  Yes.

20        It's a contract.  I mean, I mean, you know, I

21        feel that what I got was this, this and this,

22        and what I gave up was my ability to leave

23        without -- with or without cause and -- and

24        get two years free pay.  So we never did it
```

Page 189

```
 1          for free pay so, to me, it wasn't -- it wasn't

 2          giving up anything.

 3   BY MR. KLEIN:

 4   Q.    Now, the next provision, "salary increases 5

 5          percent per year," what did that mean to you?

 6   A.    My pay times 5 percent.

 7   Q.    Starting in 2000, 2001?

 8   A.    See, I don't know, because the six -- in other

 9          words, because the salary -- my recollection

10          was that they had already -- that memo, you

11          know, and as we were getting close here -- and

12          I don't remember the time frame, you know.  I

13          don't remember.

14   Q.    You don't recall the time frame of what?

15   A.    Of the pay increase memo, meaning when I got

16          that and when -- and whether it was before or

17          after, I don't remember.

18   Q.    Okay.  Let's mark this, please.

19                  (Whereupon, Croft Exhibit No. 18 was

20          marked for identification.)

21   Q.    I'm showing you what's been marked as Exhibit

22          18.  Is this pay increase memo that you're

23          talking about a document that --

24   A.    Right.
```

Page 201

1   A.   Correct.  But, to answer your question here, I

2        never gave this any thought, you know, I mean,

3        as far as being terminated (witness shaking

4        head no.)

5   Q.   So the language above that, from what you said

6        earlier, was that if you quit, there was no

7        severance and no noncompete?

8   A.   Correct.

9   Q.   And that was a material change from the

10       original employment agreement?

11  A.   An amendment to.

12  Q.   Right.  And it was a big deal for Bob,

13       according to you, this free pay thing?

14  A.   Correct.

15  Q.   So this was a big change, correct?

16  A.   Well, for him.  But I can't speak for him.

17       Ask him.

18  Q.   Did you discuss this February 5th fax with

19       anyone around that time, other than your

20       counsel, other than --

21  A.   I don't believe so.

22  Q.   -- with Bob?

23            Did you have any other discussions

24       with Bob about this document after what you've

Page 204

```
 1   A.   Can I have that question again?

 2   Q.   Sure.  I'm just trying to make sure we've

 3        covered everything that you can remember.

 4        Anything else said by you to Mr. Sherman about

 5        the terms of your employment going forward?

 6             MS. STUDEN:  Objection.

 7             THE WITNESS:  I don't believe so.

 8             MR. KLEIN:  Anything else said by

 9        Mr. Sherman to you about the terms of your

10        employment going forward?

11             MS. STUDEN:  Objection.

12             THE WITNESS:  I don't believe so.

13   BY MR. KLEIN:

14   Q.   As far as you know, was there anything else

15        said by Mr. Reardon to Mr. Sherman about the

16        terms of your employment?

17   A.   I don't know.

18   Q.   At any point, did you authorize Mr. Reardon to

19        negotiate on your behalf?

20             MS. STUDEN:  Objection.

21             THE WITNESS:  I don't know, I mean.

22   BY MR. KLEIN:

23   Q.   Did you consider your conversations with

24        Mr. Sherman to apply to both of you, or did
```

Page 206

```
 1          question, and then we're out of here for a

 2          break, for lunch.

 3     BY MR. KLEIN:

 4     Q.   Were there any further negotiations whatsoever

 5          between you and Bob Sherman or any other

 6          executives of Serta about the terms of your

 7          employment?

 8     A.   When?

 9     Q.   After February 5th.

10     A.   I don't believe so.

11     Q.   We can go off the record.

12                    (Lunch break:  2:09 p.m.)

13                    * * * * * * * * * * * * * *

14                    (Afternoon session:  2:55 p.m.)

15                    MR. KLEIN:  Let's mark this exhibit.

16                    (Whereupon, Croft Exhibit No. 20 was

17          marked for identification.)

18                    MR. KLEIN:  I'm showing you what's

19          been marked as Exhibit 20.  I'll give you a

20          moment to flip through it.  Let me know if you

21          recognize this document.

22                    MS. STUDEN:  I recognize the little

23          sheep.

24     BY MR. KLEIN:
```

Page 234

```
 1   A.   Yes.

 2   Q.   And this is a memo from Mr. Sherman to you?

 3   A.   Correct.

 4   Q.   Do you recall receiving this document around

 5        the date of April 11, 2001?

 6   A.   I believe so.

 7   Q.   And you were a vice president at that time?

 8   A.   Yes.

 9   Q.   And pursuant to this memo, your bonus, your

10        maximum bonus, would be 50 percent of your

11        salary, is that right?

12   A.   But, again, I didn't pay attention a lot to

13        these things here, these calculations.

14   Q.   Which calculations?

15   A.   Just the whole memo, because these are just

16        like memos and just like things that I'd get

17        before that were adverse to the contract.

18        These were standard things that came from

19        people.

20   Q.   Okay.  So this memo is to you, it's not to

21        anybody else, right?  It's copied to others,

22        but it's addressed to you alone?

23   A.   Okay.

24   Q.   Right?  It states -- we'll get into your
```

Page 235

1          disagreements with it, but the memo states

2          that "your team's bonus will be 2 percent of

3          the first two million of the plant's operating

4          income"; and "every dollar over two million in

5          profit, your bonus share will be 6.18 percent

6          of that dollar," is that fair?

7    A.    That's what it says.

8    Q.    Okay.

9    A.    I never worried about it.

10   Q.    And, now, my question to you is if that

11         differs from what your understanding of what

12         your bonus --

13   A.    Yes.

14   Q.    -- program was at the time?

15   A.    Yes.

16   Q.    And is that -- your understanding was the

17         bonus program you described earlier of the

18         steps up to 10 percent --

19   A.    Yes.

20   Q.    -- in profit?

21   A.    That's correct.

22   Q.    And is this different from that?

23   A.    Yes.

24   Q.    Is this formula different?

1     memo?

2  A.   I don't see that.

3  Q.   Okay.  So there's no, at least according to

4       the memo, no penalty for not making your sales

5       goal?

6             MS. STUDEN:  Objection.

7             THE WITNESS:  But the way they

8       compute the bonus, I believe there was, but

9       I'm not -- I'm not a math major, so I don't

10      know.

11 BY MR. KLEIN:

12 Q.   Fair enough.  Now, at the time you received

13      this memo, I know you said you didn't pay much

14      attention to it, did you make any objections

15      or did you raise it to Bob Sherman or anyone

16      else that you felt it didn't reflect what you

17      agreed to?

18 A.   I don't recall.

19 Q.   You don't recall whether you did or whether

20      you didn't?

21 A.   I don't recall whether I did or I didn't.

22 Q.   And in looking at this memo, again, I know

23      you're saying that you don't think it applied

24      to you, but is it fair to say that the memo

Page 250

1      terminated on September 19th, 2001, is that

2      right?

3   A.   I believe so.

4   Q.   You were notified of that, actually, on the

5      18th by Jeff Allen?

6   A.   I'm not sure.  I mean, I wouldn't call anybody

7      a liar for the 18th or the 19th or somewhere

8      in there, whatever.

9   Q.   Well, I think that's from your own

10      description, actually, in your

11      interrogatories, when you said you don't know

12      whether that's accurate or not?

13   A.   Well, if I see it in there, because when I --

14      when -- when I was dealing with these with the

15      lawyers, it was -- I believe I looked at my

16      final expense report, so whatever that date,

17      that would have been the day I figured I got

18      terminated.

19   Q.   The expense report that we saw earlier of

20      September 18th --

21   A.   Correct.

22   Q.   -- helped you to refresh your memory that that

23      was the date that you --

24   A.   Yeah.  Because I would have only had expenses

Page 258

```
 1   A.   I don't know.  I only know what he told me.

 2        And I know the comments and scuttlebutt from

 3        before.

 4   Q.   Right.

 5   A.   So...

 6   Q.   Now, why didn't you raise this issue of your

 7        -- what you believe to be 46,000 -- 45,000

 8        plus owed in reimbursements, why didn't you

 9        raise it to the company until your attorney

10        wrote a letter on your behalf in 2004?

11                  MS. STUDEN:  Objection.

12                  THE WITNESS:  Yeah.  On that, I

13        spoke to my attorney.

14                  MS. STUDEN:  Object.

15                  THE WITNESS:  So based on -- based

16        on the advice.

17   BY MR. KLEIN:

18   Q.   In any event, you did not send in any letters

19        or call anyone at Serta asking about the

20        reimbursement after Mr. Reardon supposedly

21        submitted your forms?

22   A.   I don't believe so.

23   Q.   And you received the two years additional

24        payment for the noncompete, the severance
```

Page 259

```
 1           payment, from September of '01 to September of

 2           '03?

 3    A.    Well, that's where -- you know, I received

 4           approximately the equivalent of two years of

 5           pay, what you want to call that, but I

 6           received two years of pay, approximately.

 7    Q.    When you say approximately, what --

 8    A.    Well, there were some issues that have been

 9           dropped from this case now because of what was

10.          explained to me was the statute of limitations

11           because if there's a wage dispute, there's a

12           three year limitation, so from what the

13           original thing was.  And, again, that's an

14           attorney conference that we had, so...

15    Q.    Okay.  And I'm not asking about any wages that

16           had to do with 1999.  I'm asking about from

17           the point of your termination, meaning in

18           September of 2001, until the end of September

19           of 2003, you received two years of salary

20           payments, is that right?

21    A.    Yeah.  Two years of compensation.

22    Q.    At the amount of $212,000 per year?

23    A.    That's correct.

24    Q.    Okay.  And are you saying that at the time --
```

1       strike that.

2            At the time, was it your

3       understanding that that was the two years

4       additional payment or severance in exchange

5       for your not competing for one year?

6   A.   Again, I'd have to defer.  I had conversations

7       with my attorney, so it's not something I want

8       to talk to you about.

9   Q.   Okay.  Did you think at the time when you were

10      receiving these -- well, what did you think

11      when you were getting a check every two weeks

12      or --

13           MS. STUDEN:  Objection.

14 BY MR. KLEIN:

15   Q.   -- twice a month?

16   A.   I didn't.

17   Q.   You just thought it was free money?

18           MS. STUDEN:  Objection.

19           THE WITNESS:  I didn't.

20 BY MR. KLEIN:

21   Q.   Did you feel you were obligated not to compete

22      with Serta for a year?

23   A.   Yes.

24   Q.   Do you feel that you received the additional

Page 266

1          December of '04?

2   A.     Correct.

3   Q.     And that's what he agreed to, according to

4          you, in --

5   A.     Correct.

6   Q.     -- February of '01?

7                 Now, let's mark this.

8                 (Whereupon, Croft Exhibit No. 26 was

9          marked for identification.)

10  Q.     I'm going to show you what has been marked as

11         Exhibit 26.  Do you recognize this document?

12  A.     Yes.

13  Q.     You received this with your first check after

14         your termination?

15  A.     I'm not sure, but I may have.

16  Q.     And it stated in here that, enclosed, this

17         check representing the first semimonthly

18         payment for a two year period beginning

19         October 1st, 2001 and ending September 30th,

20         2003, is that fair?

21  A.     Uh-huh.  Yes.

22  Q.     So, at least as of receiving this letter,

23         Ms. Leon notified you in this letter that this

24         was the first of two years' worth of payments?

Page 267

1    A.    And I spoke to my lawyers about this letter.

2    Q.    That's fine.  Yet, you still said that you

3          weren't sure that this was the two years

4          additional payment for severance for the

5          noncompete?

6                MS. STUDEN:  Objection.

7                THE WITNESS:  I spoke to my lawyers

8          about this letter.

9    BY MR. KLEIN:

10   Q.    All right.  Now, during those two years, from

11         October '01 to October '03, you were getting

12         what, two checks a month as you normally did

13         for your salary?

14   A.    I don't remember how they paid me.

15   Q.    You continued getting, as you said earlier,

16         the 212,000 per year through October of '03?

17   A.    October of '03.  Yes.

18   Q.    You were not receiving any additional

19         compensation from Serta at that time?

20   A.    Additional compensation.  I don't think so.

21   Q.    You weren't receiving two separate checks, one

22         for any obligations through December '04 and

23         one for --

24   A.    No.

Page 268

1    Q.   At any point after your termination, did you

2         or your representatives inform anybody at

3         Serta that you were not receiving your

4         continued salary through December '04, as you

5         expected?

6    A.   I don't believe so.

7    Q.   In fact, it wasn't brought to Serta's

8         attention until October of 2003 from your

9         attorneys, isn't that correct?

10   A.   It may be.  I'm not sure.

11   Q.   So those two years, you never said, hey,

12        Serta, where's my salary, also, you're

13        supposed to pay me through December '04?

14              MS. STUDEN:  Objection.

15              THE WITNESS:  Right.  And this was

16        based on my conversations I had with my

17        attorneys.

18   BY MR. KLEIN:

19   Q.   Okay.  So as two years ticked by and you

20        continued to receive the additional payment

21        checks -- or we don't have to characterize it.

22        You continued to receive your salary --

23   A.   Okay.

24   Q.   -- for two years, but you were not receiving

1       double salary?

2   A.  Correct.

3   Q.  You never said anything or had your

4       representatives communicate anything to Serta

5       until late 2003 that you believed you were

6       owed salary through December of '04?

7               MS. STUDEN:  I think you've asked

8       and answered that.  I'm going to let him

9       answer that one question again.  Go ahead.

10              THE WITNESS:  Just based on legal

11      advice, in other words, that's it.

12  BY MR. KLEIN:

13  Q.  Now, as part of this action, you're bringing a

14      claim for breech of contract, is that right?

15  A.  Am I?

16  Q.  Only if you know.

17              MS. STUDEN:  If you know, you can

18      answer.

19              MR. KLEIN:  Do you know the claims

20      you're bringing in this case?

21              MS. STUDEN:  You can give your lay

22      understanding.

23              THE WITNESS:  I'm not the lawyer.

24  BY MR. KLEIN:

Page 280

```
 1            and all those things, would your employment

 2            have ended on June 22nd, 2001?

 3                    MS. STUDEN:  Objection.

 4                    THE WITNESS:  No.

 5   BY MR. KLEIN:

 6   Q.   You said in December you wanted to leave

 7        unless you got the three things you needed

 8        addressed, you said your intention was to

 9        leave.

10   A.   Right.  But, to me, my contract ran from July

11        to July because it ran from when they started

12        paying me for a two year period.  So we always

13        had a --

14   Q.   All right.  Call it July.

15   A.   Okay.

16   Q.   Even though your letter doesn't, your

17        attorney's letter.

18   A.   Okay.

19   Q.   In December, in your mind, if you didn't get

20        what you wanted, you were out of there in July

21        of 2001?

22   A.   Correct.

23   Q.   After you believed you got what you wanted in

24        February, you continued working beyond
```

Page 281

```
 1        February, you continued working beyond June,

 2        you continued working beyond July?

 3   A.   Correct.  I never --

 4   Q.   All right.

 5   A.   There was never a --

 6   Q.   My only question is, and this is more for

 7        legalese, the acts that you relied -- that you

 8        took in reliance of those promises, the act

 9        was continuing to work for Serta.

10   A.   Okay.

11   Q.   And my only question is were there any other

12        acts you did in reliance on Mr. Sherman's

13        promises other than --

14   A.   Okay.

15   Q.   -- working for Serta beyond --

16            COURT REPORTER:  I'm sorry.

17            MR. KLEIN:  I'm sorry.  Let's start

18        from scratch.

19            MS. STUDEN:  Hang on.  Before you do

20        that, I want to just talk to him for a second

21        because I don't want him going into areas

22        that...

23            (Counsel conferring with witness.)

24   BY MR. KLEIN:
```

Page 282

```
 1   Q.   Other than continuing to work for Serta beyond

 2        July 2001, did you undertake any other acts in

 3        reliance on Mr. Sherman's promises?

 4   A.   I don't believe so.

 5   Q.   Okay.  What detriment did you suffer, as you

 6        allege in paragraph 48, as a result of your

 7        reliance on Mr. Sherman's promises?

 8   A.   Give me that again.

 9   Q.   What detriment did you suffer as a result of

10        Mr. Sherman's promises to you?

11             MS. STUDEN:  Objection.

12             THE WITNESS:  We had -- to me, I had

13        a covenant not to compete, so I mean, it

14        wasn't like I could go out and look for a job.

15   BY MR. KLEIN:

16   Q.   You -- okay.  So you're saying that you were

17        not allowed to compete for one year?

18   A.   Right.

19   Q.   Okay.  You received two years of compensation,

20        is that right, after September '01?

21   A.   But I wasn't going to sit around and do

22        nothing, in other words, meaning, you know, I

23        recognize that that's how I jumped into the

24        building business.
```

Page 283

```
 1   Q.   All right.  Let me ask a different way just to

 2        make it more simpler.  Did you suffer in any

 3        way from your relying on his promises,

 4        Mr. Sherman's promises?

 5   A.   I'm suffering now.  I never got paid.

 6   Q.   Okay.  Paragraph 48, the first two -- the

 7        detriment that you suffered by relying on his

 8        promises.  In fact, that's part of your

 9        Count II.  And I just want to spell out what

10        detriment that you're referring to in

11        paragraph 48; it's not getting paid through

12        December 2004?

13   A.   Plus my expenses, plus my bonuses.

14   Q.   The things that you felt you were owed by the

15        contract?

16   A.   Right.  I mean, to me, he recognized he cut a

17        bad deal and he just squashed it.

18   Q.   Okay.  Did you suffer -- were you hurt in any

19        other way by continuing to work at Serta from

20        June 2001 to September 2001?  Did you -- were

21        you hurt?  Did you lose any other

22        opportunities?

23   A.   I mean, not that I know of.  I mean, when you

24        say opportunities, I wasn't looking for work.
```

Page 284

```
 1   Q.   Let me -- let me -- let me give you the

 2        context of what we're looking at.  What I'm

 3        asking is, had your life been different if you

 4        did terminate your employment as of June or,

 5        as you said, July of 2001?  Suppose you had

 6        terminated that, you're done with Serta in

 7        June or July, because of what Mr. Sherman

 8        promised you, you didn't do that, you

 9        continued to work, and then you got fired in

10        September, right?

11   A.   Right.

12   Q.   Did your life suffer in any way from the fact

13        that you worked from June to September at

14        Serta rather than ending your employment with

15        Serta in June, were you hurt by the fact that

16        you accepted his promises and continued

17        working beyond June?

18             MS. STUDEN:  Objection.

19             THE WITNESS:  Yeah.  I don't know, I

20        mean, but -- but, certainly, I mean.

21   BY MR. KLEIN:

22   Q.   Were you worse off by working at Serta from

23        June to September 2001 in any way?

24   A.   Yeah.  I was.  As it turns out now, I was,
```

Page 285

```
 1            sure, because, I mean, you know, they were

 2            telling me I didn't have what they told me I

 3            had.

 4    Q.     Okay.  I understand that there --

 5    A.     I was definitely hurt.

 6    Q.     Okay.  Did you -- let's break it down.  Did

 7            you apply for any jobs or have any job offers

 8            at other employment after June of 2001 through

 9            September of 2001?

10    A.     I never attempted to get a job.

11    Q.     And you never passed up any opportunities

12            because you believed you had employment with

13            Serta at that time?

14    A.     Right.

15    Q.     Even though you believed you were employed

16            with Serta through December of 2004, you

17            didn't pass up any other opportunities because

18            of that belief?

19    A.     Not that I know of, no.

20    Q.     You didn't lose any money from other sources

21            in any way by continuing to work for Serta

22            after June of 2001?

23    A.     Not that I know of, but I mean -- but I don't

24            know, if you're asking me what deals were out
```

Page 286

```
 1          there and stuff like that, I mean.

 2   Q.     I'm asking you to compare your life as it was

 3          from June to September or as it would have

 4          been if you stopped working at Serta in June.

 5          Were you worse off in any way?  You relied on

 6          his promises and you continued to work beyond

 7          June.

 8   A.     Right.

 9   Q.     Did that make your life, financially or

10          otherwise, worse than if you had ended your

11          relationship with Serta in June of 2001?

12   A.     Don't know.

13   Q.     Okay.  And you didn't apply for any jobs from

14          February of 2001 on, did you?

15   A.     Where do we get February?

16   Q.     The fax came in in February of 2001.  I know

17          you were working at Serta.  I'm just asking,

18          did you apply --

19   A.     No.

20   Q.     -- for any jobs anywhere else?  Okay.

21   A.     No.

22   Q.     When did you start your new business?

23   A.     Pretty much when I -- right around September.

24          I mean, right -- you know, right -- right when
```

Page 304

1        2001 fax?

2    A.   I believe so.

3    Q.   Have you seen this before?

4    A.   Yes.

5    Q.   Okay.  Did you authorize this being sent to

6         Mr. Sherman?

7    A.   I believe I did.  I believe they sent me a

8         copy before it went.

9    Q.   And did you at the time agree with the

10        contents of this letter?

11   A.   I believe so.

12   Q.   Looking at the second paragraph, the second to

13        last sentence, I'm going to read it, I'm going

14        to ask if you agree with the sentence.  "On

15        February 5th, 2001, the memo agreement" --

16   A.   Where are you reading?

17   Q.   I'm sorry.  Second paragraph, second sentence,

18        "On February 5th, 2001."

19   A.   Okay.

20   Q.   "On February 5th, 2001, the memo agreement

21        extended the term of employment through

22        December 31st, 2004, among other amended

23        material terms."  Do you agree with that

24        statement?

Page 305

1   A.   I believe so.

2   Q.   Now, just turn to the second page, just a

3        minor point, the damages that you claimed in

4        this letter.  The out-of-pocket expenses, D in

5        this letter, are for $65,000.  You've since

6        stated it as being 46 or $47,000.

7   A.   Again, I might have guessed.  I don't

8        remember.

9   Q.   Okay.  So you don't recall what the 65,000 was

10       based on?

11  A.   I believe it was probably me because I

12       probably guessed at all these, because you'll

13       notice the ninety 116 representing bonus --

14  Q.   That was my next question.

15  A.   Right.  And, then, I probably got an actual

16       calculation from Jeremiah or whatever.  I

17       don't know.

18  Q.   So just to clarify, the numbers that you've

19       put into your interrogatory responses, were

20       those more accurate than what was in the prior

21       letter --

22  A.   I would say that's probably a true statement.

23  Q.   Fair enough.  Let me just introduce this real

24       quick.  Mark that, please.