# EXHIBIT E

COPY

Volume I
Pages 1 to 144
Exhibits (See Index)

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
CIVIL ACTION NO. 04CV-11487-RWZ

---

PAUL R. CROFT,
    Plaintiff,

vs

NATIONAL BEDDING COMPANY d/b/a
SERTA MATTRESS COMPANY,
    Defendant.

---

        **DEPOSITION OF ROBERT SHERMAN**, taken pursuant to Notice under the Massachusetts Rules of Civil Procedure on behalf of the Plaintiff, before Linda M. Thomas, RMR, a Notary Public and Registered Merit Reporter, in and for the Commonwealth of Massachusetts at the offices of BURNS & LEVINSON LLP, 125 Summer Street, Boston, Massachusetts on January 14, 2005, commencing at 10:00 a.m.

LINDA M. THOMAS COURT REPORTING
Certified Shorthand Reporter No. 129293
Registered Merit Reporter
235 Winter Street
Walpole, Massachusetts   02081
(508) 668-5821
E-mail: lthomascourtrep@comcast.net

```
 1      A P P E A R A N C E S

 2      LAURA R. STUDEN, ATTORNEY AT LAW
        BURNS & LEVINSON, LLP
 3      125 Summer Street
        Boston, Massachusetts  02110
 4              (For the Plaintiff)

 5

        DANIEL B. KLEIN, ESQ.
 6      SEYFARTH SHAW LLP
        Two Seaport Lane
 7      Suite 300
        Boston, Massachusetts  02210
 8              (For the Defendant)

 9

        Also present:
10
        Paul R. Croft
11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1    you are referring to.
 2         Q.   In that discussion, did that discussion
 3    involve the terms of contracts for Kevin Toman,
 4    Jeremiah Reardon, and Paul Croft?
 5         A.   Yes.
 6         Q.   And tell me, as best you recall, the
 7    substance of that meeting?
 8         A.   Don't recall.
 9         Q.   How long did the meeting last?
10         A.   A couple of hours.
11         Q.   Were there any agreements reached as you
12    recall?
13         A.   No.
14         Q.   Do you recall the topics that were
15    discussed?
16         A.   No.
17         Q.   So, you have, virtually, no memory of that
18    two-hour meeting?
19              MR. KLEIN:  Objection.
20              THE WITNESS:  I remember I was upset.
21    BY MS. STUDEN:
22         Q.   Why were you upset?
23         A.   I was opposed to it.
24         Q.   What were you opposed to?
```

1   A.   Contracts, noncompete agreements, severance
2   packages.
3   Q.   So, you were upset because you were opposed
4   to the whole concept of giving contracts to Paul,
5   Kevin, and Jeremiah?
6   A.   Correct.
7   Q.   Why?
8   A.   I don't believe in them.
9   Q.   Why?
10  A.   I believe people should be able to come and
11  go as they want, and that it should be based on
12  performance, not on a legal document.
13  Q.   Have you ever had a contract?
14  A.   Yes.
15  Q.   When did you have a contract?
16  A.   January of '03.
17  Q.   And who is that contract with?
18  A.   Burt and Richard.
19  Q.   And what is the nature of that contract?
20  A.   What happens to my stock if I quit, or die.
21  Q.   Is that the only subject matter of your
22  contract?
23  A.   Basically, yes.
24  Q.   Does your contract deal with what happens if

```
 1    you don't work there anymore?
 2         A.   Yes.
 3         Q.   Does your contract --
 4         A.   Only relative to my stock.
 5         Q.   So, the January, '03, contract that you
 6    entered into deals only with your stock?
 7         A.   Yes.
 8         Q.   Prior to that, had you ever had an
 9    employment contract?
10         A.   Never.
11         Q.   Is, to your knowledge, there anyone, other
12    than Kevin, Jeremiah, and Paul, who had employment
13    contracts -- had, or have employment contracts?
14         A.   Union.
15         Q.   Anybody else?
16         A.   No one.
17         Q.   Union has a Collective Bargaining Agreement?
18         A.   Correct.
19         Q.   But, no one else working for National
20    Bedding Company has an employment contract?
21         A.   Correct.
22         Q.   Now, why did you attend only one meeting?
23    Is there a reason for that?
24         A.   I was asked to.
```

```
 1        Q.   And who were you having those conversations
 2   with?
 3        A.   Barbara, Bill West.
 4        Q.   Anyone else?
 5        A.   No.
 6        Q.   And, as a result of those conversations,
 7   were other decisions made relative to where you were
 8   going and what you were going to do with certain
 9   people?
10        A.   Yes.
11        Q.   What decisions were made?
12        A.   We were going to let Kevin go, actually when
13   the contract expired, and that we were going to let
14   Paul go a year later, or thereabouts.
15        Q.   So, you made a decision, roughly, in January
16   of '01, that you were going to let --
17        A.   No.  I am sorry.  Let me go back.  We
18   decided that we were going to allow their -- you know,
19   we didn't make any decisions.  They were leaving, I
20   guess.  What we were trying to do is figure out what
21   we were going to do and, people-wise, how we were
22   going to handle it.
23        Q.   So, would it be fair to say after you got
24   this letter in December of '00, your attitude was
```

```
 1      A.   No.
 2      Q.   And, do you recall what Paul said in
 3  response to this information?
 4      A.   Both of them responded that they would like
 5  to continue to work, and that they accepted how we
 6  were going to do price increases and bonuses.
 7      Q.   So, basically, in January of '01, after this
 8  letter, Exhibit 14, was sent out, your recollection is
 9  that you met with Paul and Jeremiah at the plant in
10  Middleborough; you laid out for them the terms and
11  conditions of their continued employment, and they
12  indicated to you, fine, we will continue to work for
13  you and we accept your terms?
14           MR. KLEIN:  Objection.
15           THE WITNESS:  Yes.
16  BY MS. STUDEN:
17      Q.   And there was no further negotiation with
18  regard to the terms of their employment?
19           MR. KLEIN:  Objection.
20           THE WITNESS:  No.  Yes.  Paul called to
21  want to pursue it.
22  BY MS. STUDEN:
23      Q.   Okay.  And, did he pursue it?
24      A.   Yes.
```

1  Q.   How did he pursue it?
2  A.   Constantly calling; sending documents back
3  and forth; discussing it at every available moment.
4  Q.   And this was throughout what time frame,
5  approximately?
6  A.   January and beginning of February.
7  Q.   Of '01?
8  A.   Correct.
9  Q.   And these negotiations were directly with
10 you?
11 A.   Correct.
12 Q.   And, you have produced in the context of
13 this litigation all the memos, or anything else that
14 you had in writing relative to these negotiations?
15 A.   Correct.
16 Q.   Okay.  And, did you ever meet directly with
17 Paul after that one meeting that you have described in
18 January in Middleborough?
19 A.   Yes.
20 Q.   Where did you meet?
21 A.   Chicago.
22 Q.   Do you recall, roughly, when that was?
23 A.   First week of February.
24 Q.   And, who was at that meeting?

1     A.   All the Sales Managers in the country.

2     Q.   And, did you have a continued negotiation
3 with Paul about the terms and conditions of employment
4 at that time?

5     A.   He continually talked about it every
6 available moment.

7     Q.   Do you recall the substance of what he was
8 seeking in that negotiation?

9     A.   He was seeking a contract.

10     Q.   And, do you have an understanding of what he
11 wanted in the contract?

12     A.   Yes. He wanted to have his own criterias
13 for bonuses and salaries.

14     Q.   Anything else?

15     A.   No. He didn't like our programs.

16     Q.   Did you also understand at that time that
17 Jeremiah had the same issues with the terms and
18 conditions that Paul had?

19     A.   No.

20     Q.   Did you ever have discussions with Jeremiah?

21     A.   No.

22     MR. KLEIN: Can we go off the record
23 for a second?

24     **(Off-the-record discussion)**

```
 1            (Brief recess; 11:23 to 11:31 a.m.)
 2   BY MS. STUDEN:
 3        Q.   Back to your meeting with Paul Croft in
 4   January of '01, you indicate that was a meeting in
 5   which all the Sales people were there?
 6        A.   Correct.
 7        Q.   And, that Paul continued to negotiate with
 8   you around the terms and conditions of his employment?
 9        A.   Correct.
10        Q.   And, did you take any notes at that time
11   with respect to your discussions with Paul about his
12   terms and conditions of his employment, as you recall?
13        A.   We had numerous pieces of paper that went
14   back and forth.
15        Q.   And you produced all the pieces of paper you
16   could find relating to these discussions?
17        A.   Yes.
18        Q.   And, did these negotiations that you were
19   having with Paul ever develop into any agreement?
20        A.   No.
21        Q.   So, is it your position that you never moved
22   from your original position, which is -- we don't care
23   if you stay or go, but if you stay, you are going to
24   be held to the company bonus plan?
```

1    A.    I told them I would consider some type of
2 agreement, if they would give up their two years.
3    Q.    And the two years you are referring to are
4 the two years that they were granted in the original
5 contract in exchange for a one-year covenant not to
6 compete?
7    A.    My understanding was those two years carried
8 forward after the contract was null and void.
9    Q.    So, your understanding was that if their
10 contract terminated in June of '01, that they would
11 immediately be entitled to a two-year payout?
12    A.    No.
13         MR. KLEIN:  Objection.
14 BY MS. STUDEN:
15    Q.    I am trying to understand what is in your
16 head.  I don't mean to put words in your mouth.
17    A.    My understanding was that they could
18 continue to work in our company as long as they
19 performed.  And if at any time they left, they would
20 get their two years.
21    Q.    And that was a provision of the contract
22 that bothered you?
23    A.    The contract, in general, bothered me.
24    Q.    But, specifically -- you heard yesterday

1    MR. KLEIN: I think he may have
2 misunderstood your question.
3    MS. STUDEN: Yeah, I think he did.
4 BY MS. STUDEN:
5    Q.  What I am asking you about is: I want to
6 make sure that I understand correctly that although
7 you recall exchanging documents back and forth with
8 Paul Croft during this time frame negotiating the
9 terms of continued employment, the only document, to
10 your knowledge, that exists reflecting that exchange
11 is what has been marked as Exhibit 17?
12    MR. KLEIN: Objection.
13    THE WITNESS: You know, to me part of
14 doing business with us is our salary letters and our
15 bonus criteria. So, to me, those are part of the
16 discussions about how we are going to do business.
17 BY MS. STUDEN:
18    Q.  Okay. But, aside from those --
19    A.  No.
20    Q.  And, you say you did not send Exhibit 17?
21    A.  I don't recall it. It is not my fax number.
22    Q.  Do you know whose fax number it is?
23    A.  Yes. It is the general.
24    Q.  And you have no idea who typed the document?

1  your counsel about.  But, I am trying to get your
2  understanding.  Your understanding is that when that
3  contract, which is marked Exhibit 3, came to an end
4  based on your understanding in June of 2001, the only
5  provision of that contract that continued to survive
6  was the provision relating to what happens if the
7  employee quit, or got terminated?
8              MR. KLEIN:  Objection.
9  BY MS. STUDEN:
10     Q.    Is that a fair statement?  Is that your
11 understanding?
12     A.    Not the quit part, but the termination, yes.
13 My understanding on the quit part was just the first
14 years of the contract -- the first couple years of it.
15             MR. KLEIN:  So the record is clear, if
16 you are going to ask which part of the contract he is
17 referring to, to actually use the contract because I
18 think there has been some confusion here.
19             MS. STUDEN:  I think that is an
20 excellent idea.
21 BY MS. STUDEN:
22     Q.    Tell me what part of Exhibit 3, which is the
23 contract, in your understanding survived -- that means
24 was still an obligation of the company after June 22nd

```
 1    of 2001?
 2        A.   I am going to have to read this.
 3        Q.   Go ahead.
 4        A.   No. 6.
 5        Q.   What about No. 6?
 6        A.   My understanding is upon termination that we
 7    are responsible to pay you equal to twice the amount
 8    of your annual salary in effect at the time.
 9        Q.   So, your understanding is that provision
10    survived the termination of the contract on June 21st,
11    2001?
12        A.   Yes.
13        Q.   Any other provisions that you understood the
14    company was still bound to in that contract after you
15    believe the contract was over?
16        A.   No.
17             MR. KLEIN:  Thank you.  Much clearer
18    now.
19             MS. STUDEN:  I agree.
20    BY MS. STUDEN:
21        Q.   Let me show you what was marked as Sherman
22    Exhibit 11.  It is a memo dated February 19th, '01.
23    It says "To file Paul Croft."  Are you familiar with
24    that document?
```

```
 1    in Jamestown?
 2        A.   Correct.
 3        Q.   Kevin Toman was not running the plant in
 4    Jamestown?
 5        A.   He was overseeing both of them.
 6        Q.   Okay.  Let me show you what we have marked
 7    Exhibit 16 memo dated January 5th of 2001.  It is re:
 8    2001 rate increases.  It is directed to Paul Croft.
 9    Do you recall the circumstances leading up to this
10    memo going out?
11        A.   Yes.
12        Q.   What were they?
13        A.   We had received the letter terminating the
14    contract.  We didn't see any reason to give them a
15    salary increase for six months that would, in effect,
16    be paid over the next two-and-a-half years.
17        Q.   You didn't want to raise his salary because
18    that would affect the pay out on the two-year salary
19    for the one-year covenant?
20             MR. KLEIN:  Objection.
21             THE WITNESS:  Correct.  And the next
22    six months.
23    BY MS. STUDEN:
24        Q.   Would you agree with me that that decision
```

```
1    really is unrelated to performance?
2         A.   Correct.
3         Q.   Let me show you Exhibit 18.  Sherman Exhibit
4    18 is a memo dated January 5th, 2001, re:  2001 rate
5    increases.  And it says over here "revised."  Do you
6    recall when this memo was revised?
7         A.   Specific day, no.
8         Q.   Do you recall what the time lapse was
9    between the issuance of the memo dated January 5th,
10   2001, which is Exhibit 16, between the time that was
11   sent out, and the time the second one, Exhibit 18 was
12   sent out?
13        A.   I believe within a couple of weeks.
14        Q.   And in Exhibit 18, dealing with the 2001
15   rate increase -- this is directed to Paul Croft --
16   there is, in fact, an increase in his salary, correct?
17        A.   Correct.
18        Q.   What gave rise to that decision?
19        A.   He informed me that he would like to
20   continue to work after the contract had expired, and I
21   gave him a raise based on a formula that we use for
22   our other Sales Managers.
23        Q.   And what was the formula?
24        A.   Based on sales increase the previous year.
```