# EXHIBIT F

```
 1              UNITED STATES DISTRICT COURT
 2                 DISTRICT OF MASSACHUSETTS
 3
 4    PAUL R. CROFT,                    )
 5            Plaintiff,                ) Case No.
 6         -vs-                         ) 04CV-11487-RWZ
 7    NATIONAL BEDDING COMPANY          )
 8    d/b/a SERTA MATTRESS COMPANY,     )
 9            Defendant.                )
10
11         The deposition of JULIA GUINEY called for
12    examination pursuant to Notice and the Rules of
13    Civil Procedure for the United States District
14    Courts pertaining to the taking of depositions,
15    taken before CHRISTINE M. PINA, a notary public
16    within and for the County of Will and State of
17    Illinois, at 55 East Monroe Street, Chicago,
18    Illinois, on the 25th day of March, 2005, at the
19    hour of 1:30 p.m.
20
21
22
23    Reported By:  Christine M. Pina, CSR, RPR
24    License No.: 084-003785
```

COPY

Seyfarth Shaw LLP
APR 1 8 2005

1

```
1    APPEARANCES:

2          (VIA TELEPHONE)

3        BURNS AND LEVINSON, by

4        MS. LAURA STUDEN

5              and

6        MS. LINDSEY BRADY

7        125 Summer Street

8        Boston, Massachusetts 02110

9        (617) 345-3219

10             Representing the Plaintiff,

11         (VIA TELEPHONE)

12       SEYFARTH SHAW, by

13       MR. DANIEL B. KLEIN

14       Two Seaport Lane, Suite 300

15       Boston, Massachusetts 02210

16             Representing the Defendant,

17       (LOCAL COUNSEL)

18       SEYFARTH SHAW, by

19       MS. BETH GOLUB

20       55 East Monroe Street, Suite 4200

21       Chicago, Illinois 60603

22       (312) 346-3000

23             Representing the Defendant.

24   ALSO PRESENT:  Paul Croft - via telephone
```

2

1    Q.    Were you aware at that point in time as to
2    whether Paul Croft had a written contract?
3    A.    I was aware that the three had an
4    employment contract when we had the ASA
5    acquisition.  It was a two-year contract that began
6    in '99.
7    Q.    Prior to this litigation, did you ever
8    have an opportunity to actually look at that
9    contract?
10   A.    Prior to this litigation?
11   Q.    Yes.
12   A.    Yes.
13   Q.    Do you recall for what reason you looked
14   at the contract prior to this litigation?
15   A.    Yes.
16   Q.    What reason?
17   A.    The reason was to check with our attorney
18   to see if the Evergreen agreement was valid and
19   truly an Evergreen agreement, and that was the
20   portion for the one year non-compete for two-year
21   pay that would survive even if the employment --
22   rest of the employment contract was terminated.
23   Q.    And the notion that that would survive
24   even if the employment agreement was terminated

27

1  originated from where, I mean who told you that the
2  Evergreen portion of that contract would survive
3  the termination of the contract?
4       MS. GOLUB:  I'm going to object to the extent
5  it calls for her to reveal attorney
6  communications.
7       MS. STUDEN:  Okay.  That's fine.  I just want
8  to know who; that's not privileged.  I'm asking
9  whether or not this was -- let me phrase it in a
10 way that may not give you a problem.
11 BY MS. STUDEN:
12      Q.   Your understanding that the Evergreen
13 clause of Paul Croft's employment agreement
14 survived a termination of the contract was not
15 something that you concluded on your own, is that
16 true?
17      A.   True.
18      Q.   Can you tell me why you were investigating
19 that question at that time?
20      A.   I was asked to do so.
21      Q.   By whom?
22      A.   I believe it was Bob Sherman.
23      Q.   Can you tell me, as best as you recall,
24 what Bob Sherman asked you to do?

28

1    A.   Correct.

2    Q.   If he had any questions about the memo or
3  about his compensation, he would direct those to
4  Bob Sherman, not to you, correct?

5    A.   Correct.

6    MS. STUDEN:  Would you mark as Exhibit 4
7  B & L No. 239?

8                (Whereupon Guiney Deposition
9                Exhibit No. 4 was marked
10               for identification.)

11  BY MS. STUDEN:

12    Q.   That's a memo that's dated January 5,
13  2001, and it also says revised; do you see where
14  I'm reading?

15    A.   Yes.

16    Q.   Why was this memo revised?

17    A.   I would assume it's because Bob Sherman
18  told me that -- to revise it because we changed the
19  salary.

20    Q.   So, you changed the salary from 200,000 to
21  212,000, correct?

22    A.   Yes.

23    Q.   Do you know why that change was made?

24    A.   No.

36

```
 1        Q.    You were not involved in any of the
 2   discussions that led up to that decision?
 3        A.    Correct.
 4        Q.    Although this memo is dated the same date
 5   as Exhibit 3, is it fair to say that the change
 6   that took place must have taken place some time
 7   after January 5, 2001?
 8        A.    Yes.
 9        Q.    Do you recall when the change actually did
10   occur?
11        A.    Well, I do know from looking at my e-mails
12   that it would have occurred around -- I would have
13   revised it around January 30 of that same month of
14   2001.
15        Q.    When you say looking at your e-mails, do
16   you have an e-mail trail -- strike that.
17              Which e-mail are you referring to?
18        A.    I do recall in the discovery process going
19   through my e-mails and finding some e-mails that I
20   had sent to the comptroller indicating that there
21   were some revisions.
22        MS. STUDEN:  Would you look at Serta Document
23   No. 028?
24        MS. GOLUB:  Mark this as 5?
```

37

```
1       MS. STUDEN:  It's actually Serta 028, 029, and
2   030.  It's all stapled together.
3       MS. GOLUB:  So, those are all Exhibit 5?
4       MS. STUDEN:  Yes.
5                   (Whereupon Guiney Deposition
6                    Group Exhibit No. 5 was marked
7                    for identification.)
8   BY MS. STUDEN:
9       Q.   Is Exhibit 5 the e-mail that you were
10  referring to earlier?
11      A.   Yes.
12      Q.   And so you know from this e-mail that
13  actually the change in salary, that is the revision
14  to Exhibit 4, actually occurred January 30 of 2001?
15      A.   Yes.
16      MS. STUDEN:  Would you mark Serta 031 as
17  Exhibit 6?
18                  (Whereupon Guiney Deposition
19                   Exhibit No. 6 was marked
20                   for identification.)
21  BY MS. STUDEN:
22      Q.   This is an e-mail sent from you on
23  February 2, 2001, is that correct?
24      A.   Yes.
```

38

```
 1   top contract length through December 31, 2004,
 2   correct?
 3       A.   Yes.
 4       Q.   At the bottom of the page is what appears
 5   to be fax data with a date and an ID number?
 6       A.   Okay.
 7       Q.   Can you read the date?
 8       A.   It looks like February 5, '01.
 9       Q.   Can you read the ID number?
10       A.   ID is 147 it looks like 6450205.
11       Q.   Is that a fax number?
12       A.   That's the fax number of the general fax
13   in our office.
14       Q.   Where is that general fax located?
15       A.   In the mailroom.
16       Q.   Who typically uses that general fax?
17       A.   Anybody that works for Serta could use
18   it.  I guess anybody who walked in our mailroom
19   could use it for that matter.
20       Q.   Now, before this litigation began, had you
21   ever seen this document before?
22       A.   I don't recall -- I do not believe so.  I
23   don't recall when I first saw it.
24       Q.   I was going to ask you do you remember
```

40